# EXHIBIT A

# *NATIONAL REGISTERED AGENTS, INC.*

## *SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM*

To:  STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

SOP Transmittal #   **537142254**

213-337-4615 - Telephone

Entity Served:  GreenSky, LLC  (Domestic State: GEORGIA)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of CALIFORNIA on this 06 day of February, 2020. The following is a summary of the document(s) received:

1.  **Title of Action:**  ELIZABETH BELYEA, ETC., PLTF. vs. GREENSKY, INC, ETC., ET AL., DFTS. // TO: GREENSKY, INC

2.  **Document(s) Served:**  Other: SUMMONS, COMPLAINT, ATTACHMENT

3.  **Court of Jurisdiction/Case Number:** San Francisco County - Superior Court - San Francisco, CA
Case # CGC20582136

4.  **Amount Claimed, if any:**  N/A

5.  **Method of Service:**

_X_ Personally served by:      _X_ Process Server      ___ Law Enforcement      ___ Deputy Sheriff      ___ U. S Marshall

___ Delivered Via:      ___ Certified Mail      ___ Regular Mail      ___ Facsimile

___ Other (Explain):

6.  **Date and Time of Receipt:**  02/06/2020 12:50:00 PM CST

7.  **Appearance/Answer Date:**  WITHIN 30 CALENDAR DAYS AFTER THIS SUMMONS AND LEGAL PAPERS

8.  **Received From:**  Daniel T. Lebel        9.  **Carrier Airbill #** 1ZY041160194913360
Consumer Law Practice Of Daniel T. Lebel
2600 Grand Blvd., Suite 580
San Francisco, CA 94111        **10.  Call Made to:** Not required
816-886-8206

11.    **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  STEVEN E. FOX  steve.fox@greensky.com

Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com

Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com

REMARKS : According to the California Secretary of State, the only entity registered beginning with the name GREENSKY, INC is GREENSKY, LLC

**NATIONAL REGISTERED AGENTS, INC.**                    **CopiesTo:**

Transmitted by   Amanda Garcia
The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

02-06-2020

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GREENSKY INC., a corporation, GREENSKY OF GEORGIA, LLC,
GREENSKY, LLC, limited liability companies, and DOES 1-20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ELIZABETH BELYEA, individually and on behalf of all others
similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* San Francisco Superior Court<br>400 McAllister St.<br>San Francisco, CA 94102 | CASE NUMBER: *(Número del Caso):* C G C - 2 0 - 5 8 2 1 3 6 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel T. LeBel, PO Box 720286, San Francisco, CA 94172; (415) 513-1414

| DATE: *(Fecha)* JAN 0 9 2020 | CLERK OF THE COURT Clerk, by *(Secretario)* | DE LA VEGA-NAVARRO, Rossel | Deputy *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant
2. ☐ as the person sued under the fictitious name of *(specify):*

**BY FAX**

3. ☒ on behalf of *(specify):* Green Sky Inc

under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

ENDORSED
**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Daniel T. LeBel, SBN 246169
Consumer Law Practice of Daniel T. LeBel
PO Box 720286
San Francisco, CA 94172
TELEPHONE NO.: (415) 513-1414    FAX NO.: (877) 563-7848
ATTORNEY FOR (Name): Elizabeth Belyea

For Court Use Only
FILED
San Francisco County Superior Court
JAN 09 2020
CLERK OF THE COURT
BY: ROSSALY DE LA VEGA
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Unlimited Jurisdiction

CASE NAME:
Belyea v. Greensky, Inc. et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: | CGC-20-582136 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☑ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint (not specified above) (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition (not specified above) (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☐ is  ☑ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties     d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve     e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence     f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action (specify): Cal Fin 22000; Decl. Rel.; Civ Code 1750/1789.10; Cal B&P17200/17500
5. This case ☑ is  ☐ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 1/7/2020
Daniel T. LeBel
(TYPE OR PRINT NAME)     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

1  DANIEL T. LEBEL, SBN 246169
   CONSUMER LAW PRACTICE
2  OF DANIEL T. LEBEL
3  PO Box 720286
   San Francisco, CA 94111
4  T: (415) 513-1414
   F: (877) 563-7848
5  danlebel@consumerlawpractice.com
6
   BRYCE BELL (motion for *pro hac vice* forthcoming)
7  MARK W. SCHMITZ (motion for *pro hac vice* forthcoming)
   ANDREW R. TAYLOR (motion for *pro hac vice* forthcoming)
8  BELL LAW, LLC
   2600 Grand Blvd., Suite 580
9  Kansas City, MO 64108
10 T: 816-886-8206
   F: 816-817-8500
11 Bryce@BellLawKC.com
   MS@BellLawKC.com
12 AT@BellLawKC.com
13
   *Attorneys for Plaintiff and all others similarly situated,*
14
15         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
16                    IN THE COUNTY OF SAN FRANCISCO

17 ELIZABETH BELYEA,                         )  Case No - 20 - 582136
   individually and on behalf of all others  )
18 similarly situated,                        )
                                              )  CLASS ACTION COMPLAINT
19                                            )
                        Plaintiffs,           )  1. California Financing Law
20 v.                                         )  (Cal. Fin. Code §22000)
                                              )  2. Credit Services Act of 1984
21                                            )  (Cal. Civ. Code § 1789.10)
   GREENSKY, INC.,                            )  3. Declaratory Judgment
22 a corporation,                             )  4. California Unfair Competition Law
                                              )  (Cal. Bus. & Prof. Code §17200)
23 and                                        )  5. California False Advertising Law
                                              )  (Cal. Bus & Prof. Code §17500)
24 GREENSKY OF GEORGIA, LLC, and              )  6. Consumer Legal Remedies Act
25 GREENSKY, LLC,                             )  (Cal. Civ. Code § 1750)
   limited liability companies, and DOES 1-20 )
26                                            )
                                              )
27                      Defendants.           )  DEMAND FOR JURY TRIAL
28

CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

1.      Plaintiff brings this class action complaint against Defendants to recover damages for herself and others similarly situated caused by Defendants' failure to comply with state lending and/or credit services law, as well as multiple consumer protection laws. On information and belief, Plaintiff alleges as follows:

## PARTIES

2.      Plaintiff Elizabeth Belyea ("Plaintiff") is and, at all relevant times, has been a resident of California and a consumer.

3.      Defendants GreenSky of Georgia, LLC and GreenSky, LLC are, on information and belief, related entities that are ostensibly controlled by GreenSky, Inc., a publicly traded corporation (collectively, "GREENSKY" or "Defendants").

4.      GreenSky of Georgia, LLC is registered in California as a foreign limited liability company.

5.      GREENSKY has consistently provided California consumers (and merchants) with materials attributed to GreenSky, LLC such that that entity is properly included in this complaint.

6.      GREENSKY may be served by serving National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

7.      At all times relevant to this complaint, Defendants were engaged in the business of marketing, servicing, managing, controlling, establishing the terms of credit, originating, distributing, transmitting funds for, and/or collecting on consumer installment loan and/or credit products.

8.      The true names and capacities of Defendants sued as Does 1 through 20 are unknown to Plaintiffs at this time. Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of Does 1 through 20 when ascertained. Plaintiffs are informed and believe, and based thereon alleges, that

each Defendant is jointly and severally responsible in some manner for the damages alleged herein.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over the Defendants in that they each solicit business and sales of their consumer loan services and products throughout California.

10.    This Court has jurisdiction over this action pursuant to § 410.10 of the California Code of Civil Procedure. Jurisdiction is also proper under California Civil Code § 17200 *et seq.*

11.    Venue is appropriate in the County of San Francisco pursuant to California Code of Civil Procedure § 395, because Defendants conduct business within this county.

12.    This is a class action for violations of California Financing Law ("CFL") or, in the alternative, California's Credit Services Act of 1984 ("CSA"), as well as the Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA").

## GREENSKY'S BUSINESS MODEL
### GREENSKY Is Not a Properly Licensed Lender, Broker, or Credit Services Organization but Takes Fees from Loans or Other Extensions of Credit Provided by Legitimate Lenders.

13.    GREENSKY, presumably for the sake of greater profit, adopted a path that was plainly illegal in California (and many other, if not every other, state(s)): it made its money by taking undisclosed finance charges on consumer loans, in clear violation of the CFL.

14.    GREENSKY, put simply, is a contemporary iteration of what has been called a "rent-a-bank" scheme;[1] its business model on an unlicensed basis is illegal as a matter of California law.  Despite the array of obfuscation and buzzwords it has offered with regard to its business, **the important question is: How does GreenSky make money? The answer is fairly simple: GREENSKY puts lending in the hands of contractors—plumbers, roofers, HVAC**

---

[1] *See, e.g.,* ATTORNEYS GENERAL FOR THE DISTRICT OF COLUMBIA, MASSACHUSETTS, CALIFORNIA, COLORADO, ILLINOIS, IOWA, MARYLAND, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, VIRGINIA, AND CONNECTICUT, *Request for Information on Small-Dollar Lending* (Jan. 22, 2019), at pp. 2-4, available at https://www.fdic.gov/regulations/laws/federal/2018/2018-small-dollar-lending-3064-za04-c-038.pdf (last visited Oct. 11, 2019) (describing traditional rent-a-bank schemes).

installers, window installers, etc.— and takes fees for itself as a percentage of consumer loans.  These fees are *de facto* finance charges, part of the cost of borrowing money or receiving an extension of credit, but GREENSKY calls them "merchant fees."

15.    GREENSKY has attempted to evade state laws and regulatory regimes by declaring itself to be just a consumer loan "servicer," "program administrator," or "platform" when, in fact, it is far more. According to GREENSKY's own Initial Public Offering ("IPO") pitchbook, it is described as a "platform" that supports "the full transaction lifecycle, including credit application, underwriting, real-time allocation to bank partners, funding, settlement, and servicing."[2]

16.    That same pitchbook also assured potential investors that GREENSKY maintained a "robust [and] integrated regulatory compliance framework."[3]

17.    GREENSKY partners with, generally, larger regional banks that fund its "program," or "programs." Examples include (and/or included) Fifth Third Bank, Regions Bank, Sun Trust Bank, and Midland States Bancorp, Inc. These banks broadly have little or no knowledge whatsoever of the merchants that exist in GREENSKY's program or the many individual consumers that receive GREENSKY-branded loans.

18.    Upon information and belief, these partner banks supply general criteria—e.g., broad funding and interest rate parameters—relative to the GREENSKY program while remaining thoroughly removed from the ultimate allocation of funds to consumers and merchants.

19.    For example, Regions Bank (of Alabama), which had been one of GREENSKY's largest bank partners yet recently declined to renew its funding contract with GREENSKY, "[didn't] break out GreenSky loans in its financial statements."[4]

20.    On the April 27, 2018, Statement of Information GREENSKY filed with the California Secretary of State, it misleadingly classified itself as a mere "payment platform."

[2] EVOLVE CAPITAL PARTNERS, GreenSky, Inc. Summary of Initial Public Offering (May 2018), available at https://www.evolve-capital.com/wp-content/uploads/2018/06/Greensky-IPO-Profile.pdf (last visited October 11, 2019).
[3] *Id.*
[4] Alan Kline, *How Buy Now is Evolving into Borrow Now*, 128 AMERICAN BANKER 15, 18 (Mar. 2018).

21.     Indeed, in the aforementioned IPO pitchbook, GREENSKY was more accurately described as a "lending platform":

# GreenSky, Inc. IPO – Executive Su

**Initial Public Offering Overview**

**GreenSky™**                    **NASDAQ:GSKY**

📄 **Description**

GreenSky, Inc. is a financing and payments technology company that operates a platform that provides credit solutions. The company's lending platform enables retailers, healthcare providers, and home contractors to offer Point of Sale (PoS) credit to their customers.

22.     GREENSKY has overwhelmingly derived its revenues from charging the "merchant fees,"[5]  which are finance charges, as well as receiving interest rate spread-driven "incentive payments" from partner banks.

23.     Importantly, GREENSKY does not disclose the amount of these finance charges to consumers.

24.     Rather, buried in the fine print of the installment loan agreement provided to Plaintiff was the following statement:

Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.

25.     GREENSKY simply possesses no reliable enforcement mechanism to ensure that contractors do not charge customers for some or all of these fees.

---

[5] GREENSKY, INC., Form 10-K (for the fiscal year ended Dec. 31, 2018, filed with the SEC; "2018 10-K"), at 79.

26.     Further, rather than burying such an innocuous statement deep within the fine print, an effort at genuine disclosure would dictate that GREENSKY reveal that it had taken on, average, 10% of the principal amount as part of the transaction.

27.     The reason for such concealment is simple: most of GREENSKY's business is taking finance charges on consumer transactions; however, by simply calling these "merchant fees," GREENSKY maintains that it need not be licensed under the wide variety of laws that would restrict and/or curtail and/or require disclosure of the taking of such. On the other hand, the bank partners, as chartered institutions, must reveal their relatively minor administrative fees under the Truth in Lending Act.

28.     Likewise, GREENSKY does not train the merchants in its program to disclose the amount of the merchant fees to consumers, making it that much easier to dissemble the actual nature of its business.

29.     In GREENSKY's own words: "The merchant fee is calculated by multiplying a set fee percentage (as outlined in a schedule provided to the merchants) by the dollar amount of a loan *at the point of origination*."[6]   (emphasis added). The Merchant Program Agreement GREENSKY would enter with the Merchants provided that the "Merchant will pay GreenSky a contractor or transaction fee ("Transaction Fee").  … The Transaction Fee is due and payable to GreenSky upon the funding of a Loan." In this way, GREENSKY's primary source of revenue is derived directly from the extension (not servicing) of credit.

### GREENSKY's Competitors Follow the Law

30.     GREENSKY's illegal scheme puts legitimate businesses in the same market as GREENSKY at a relative disadvantage.

31.     In GREENSKY's own words: "*We face competition from a diverse landscape of consumer lenders, including traditional banks, credit unions and credit card issuers, as well as alternative technology-enabled lenders*."[7] Indeed, it is telling that GREENSKY proclaims its primary competitors to exclusively be different forms of lenders.

---

[6] *Id.* at 78 (emphasis added).
[7] *Id.* at 8 (emphasis added).

32.     For example, San Francisco-based Affirm—which, like GREENSKY, is a point-of-sale fintech firm—reported itself to the Secretary of State as a "financial services" firm and is licensed (as Affirm Identity, #6054768), as a finance lender and broker, with the Department of Business Oversight.

33.     For example, Oakland-based Solar Mosaic, Inc., which, like GREENSKY, offers point-of-sale financing (for solar systems), also became a licensed lender (#6054631) by at least 2012.

<u>**GREENSKY Originates Consumer Loans**</u>

34.     In GREENSKY's own words: "While many of our Bank Partners may traditionally focus on lending opportunities within their geographic footprints, *__our platform enables them to__* *__originate loans in all 50 states__* . . ."[8] Thus, GREENSKY expressly originates loans; again, the partner banks are removed from this process and in this way GREENSKY explicitly acts as a broker and originator for the partner banks.

35.     In GREENSKY's own words: "*__Our platform delivers significant loan volume__*, while requiring minimal upfront investment by our Bank Partners. Furthermore, our program is designed to adhere to the regulatory and compliance standards of our Bank Partners, which has helped us to gain their confidence, *__allowing them to outsource both loan facilitation and__* *__servicing functions to us__*."[9]

36.     In GREENSKY's own words: "Our platform is powered by a *__proprietary__* technology infrastructure that delivers stability, speed, scalability and security. *__It supports the full__* *__transaction lifecycle, including credit application, underwriting, real-time loan allocation to__* *__our Bank Partners, document distribution, funding, settlement and servicing__*, and it can be expanded to additional industry verticals as we scale our business."[10]

37.     Indeed, close examination of GREENSKY reveals that it has downplayed the nature of its business to consumers and regulators, while offering a truer picture to investors.

---

[8] *Id.* at 6 (emphasis added).
[9] *Id.* at 4 (emphasis added).
[10] *Id.* (emphasis added).

38.     In GREENSKY's own words: "***We derive most of our revenue and profitability from upfront transaction fees that merchants pay us every time they facilitate a transaction using our platform. Thus, our profitability is strongly correlated with merchant transaction volume. The transaction fee rate depends on the terms of financing selected by a consumer. In addition, we collect servicing fees*** on the loan portfolios we service for our Bank Partners."[11]

39.     The penultimate sentence underlined above alludes to yet another deception that is largely inherent in GREENSKY's business model: Consumers generally do not themselves select the terms of financing. The thousands of merchant-contractors—plumbers, roofers, HVAC installers, window installers, etc.—often do not, and are indeed not equipped to, fully and adequately explain a range of financing plans to consumers; in many cases, that notion is actually absurd. Instead, these merchants are empowered to push through loan applications with ease on tablets utilizing the GreenSky platform.

40.     In GREENSKY's own words: "Our Bank Partners offer certain loan products that have a feature whereby the account holder is provided a promotional period to repay the loan principal balance in full without incurring a finance charge. For these loan products, we bill interest each month throughout the promotional period and, under the terms of the contracts with our Bank Partners, we are obligated to pay this billed interest to the Bank Partners if an account holder pays off the loan balance in full within the promotional period."[12] Thus, GREENSKY contracts to assume a particular type of credit risk before any loan is even made.

### GREENSKY Offers Loan Terms That the Bank Partners Do Not

41.     Further, this incentive structure reveals (at least) three important aspects of GREENSKY's business model: 1) **It contracts with consumers for loan terms that are fundamentally different from those offered by the bank partners** (because the banks harvest a particular rate of interest regardless of whether the consumer pays off the loan within the promotional period), 2) **GREENSKY, not the partner banks, offers a deferred interest loan product** (i.e., GREENSKY is the true lender for at least a portion of the loan), and 3) **it behooves**

---

[11] *Id.* at 5 (emphasis added).
[12] *Id.* at 84.

**GREENSKY to have customers that are not able to pay off loans within the promotional period but do not ultimately default**.

42.     Indeed, just this single statement reveals how fundamentally deluded GREENSKY is with regard to its own business: **if the bank partners themselves did indeed "offer certain loan products that have a feature whereby the account holder is provided a promotional period to repay the loan principal balance in full without incurring a finance charge," then there would be no need for GREENSKY to cover such prepayment risk**.[13]

43.     GREENSKY commonly refers to the amounts it must pay the banks when prepayments occur as *finance charge reversals* ("FCRs").[14]

44.     GREENSKY's business model, very much unlike that of a mere loan servicer or program administrator, is predicated on the bet that it can originate enough consumer loans to harvest robust "merchant fees" while also mitigating prepayment risk and collecting volume and/or spread "incentive payments" from the banks (and while also evading state regulatory agencies).

45.     For example, in GREENSKY's own words: ". . . the expected increase in the fair value change in the FCR liability that we expect to dissipate in the following quarters, which is resulting from spread compression and margin contraction as an increase in contracted Bank Partner yields . . ."[15]

---

[13] Prepayment risk generally refers to the potential cost to a lender of having a given borrower repay a loan before the contractual termination date such that the lender does not harvest the full amount of interest potentially generated by the debt. This complaint uses "prepayment risk," as applied to GREENSKY, to mean the period of deferred interest, or "waived" interest, during which a consumer, should they pay off the loan during such time, would realize no interest costs; this period is usually 12 to 18 months. Obviously, lending money at 0% interest would generally not be profitable and, as stated, GREENSKY's partner banks do not actually offer such loans to consumers. Rather, GREENSKY offers deferred interest on its own program loans as an enticement and performs its own risk/reward calculations with regard to this particular form of prepayment risk. This also highlights the fact that GREENSKY's "merchant fees" are actually a de facto finance charge.

[14] *See, e.g.,* GREENSKY, INC., Q2 2019 Earnings Call, Corrected Transcript (Aug. 6, 2019), at 5 (emphasis added).

[15] GREENSKY, INC., Q1 2019 Earnings Call, Corrected Transcript (May 7, 2019), at 6.

46.     Put in plainer English, this means that a key part of GREENSKY's business comes from "playing the yield curve"—i.e., realizing profits or losses based upon how much more interest (spread) it can charge relative to its fixed bank contracts as interest rates shift over varying periods of time.

47.     Hence, "The increases in [FCR] expense is due to both to the growth of the deferred interest loans in the portfolio, as well as the higher APR on deferred interest loans originated since mid-2018."[16]

48.     Even further, GREENSKY has explored "forward flow" arrangements with other cash-rich entities, such as pension funds and insurance companies. Such arrangements would likely, amongst other aspects, lower its cost of borrowing (because GREENSKY, as described, is foremost a re-lender and a broker of consumer loans, such arrangements could be profitable) while also diversifying and muting various sources of risk to its business.[17]

49.     For example, in GREENSKY's own words: "In terms of structure, what we do expect is a counterparty would write a multi-year arrangement whereby we would agree on a forward flow, we would fund up to an annual dollar amount and those commitments would be sort of billions of magnitudes. And this would sit side by side with our existing bank partners. So just think of it as another peg in our round-robin. But there appears to be quite a bit of appetite and liquidity in the market that would embrace this quality of consumer loan."[18]

50.     Regardless of whether GREENSKY ultimately utilizes such funding sources, this is but another aspect through which its rent-a-bank nature can be viewed. **GREENSKY does not simply service or administrate consumer loans that have already been made: rather, it secures funding sources for itself, originates loans, and collects finance charges thereon. This arrangement on an unlicensed basis is plainly illegal in California.**

51.     The high level of average merchant fees (~10% of principal traditionally) mentioned throughout this complaint are partially a reflection of GREENSKY covering the prepayment risk just discussed. Indeed, as the interest-waiver period increases, GREENSKY's

---

[16] GREENSKY, INC., Q2 2019 Earnings Call, Corrected Transcript (Aug. 6, 2019), at 5.
[17] *See, e.g., id.* at 4.
[18] *Id.* at 12.

merchant-fee percentage increases—that is why GREENSKY is "agnostic" as to finance plan selection.[19]

52.     In fact, this is another essential part of GREENSKY's deception: **The consumers who, according to GREENSKY, benefit from interest-waiver periods are charged _more_ up front because the merchants themselves are charged more to cover the aforementioned prepayment risk and they pass this on to to consumers**.

53.     This point is further elucidated by GREENSKY's own description of its loan plan for "less creditworthy" borrowers; as seen below, GREENSKY set a flat fee of 3.25% for such products, **which do not offer deferred interest**—hence, there is no prepayment risk for GREENSKY relative to the underlying interest payments. Thus, GREENSKY simply takes an unlawful finance charge of 3.25%, in addition to possible interest rate spreads and/or "incentive payments" from the banks, of principal on loans made to low-prime and/or subprime borrowers. GREENSKY' 2017 merchant training materials explain this as follows:



GreenSky

## Seamless Counteroffer

- Automatically considers less creditworthy customers for our counteroffer plan
- Quick, seamless process
- No additional phone call or follow up

| Plan 7096[1] | |
|---|---|
| Terms | 96 months |
| APR Range | 19.99% - 26.99% |
| Credit Limit | Up to $8,500 |
| Contractor Fee | 3.25% |

54.     In GREENSKY's own words: "_**We have developed an algorithm that underwrites potential loans against the specified credit criteria of each of our Bank Partners.**_"[20]  Again, the

---

[19] _See, e.g.,_ GREENSKY, INC., Q4 2018 Earnings Call, Corrected Transcript (Mar. 5, 2019), at 5.

bank partners provide only broad parameters, while GREENSKY controls the credit application process and provides a **proprietary credit-risk overlay** that determines **whether GREENSKY is willing to extend a loan**; the banks are not involved in the actual credit application approval/denial process.

55.     **Indeed, it makes no sense for a loan servicer or program administrator to "underwrite" (i.e., insure or guarantee) potential loans**; rather, GREENSKY accepts basic loan parameters from the partner banks as gateway criteria and then assesses its own willingness to adopt risks, necessarily including prepayment risk, before pushing a loan through.

56.     Further, **if the bank partners were not lending to GREENSKY as a separate entity, then they should be in competition for any given consumer loan amongst themselves; instead, it is GREENSKY that distributes loans *to* the banks on a "round-robin" basis**.

57.     Even if GREENSKY were offering consumers the exact same terms offered by the bank partners, it would still be acting as an unlicensed consumer loan broker and thereby harvesting unlawful fees.

58.     GREENSKY admittedly "auto-populates"[21] consumer credit applications, provides consumers with GREENSKY-branded loan agreements, receives payments from consumers directly, purports to take a purchase money security interest in (at least) some goods purchased with funds loaned by GREENSKY, and reports to consumer reporting agencies while the partner banks show up as little more than fine print on the GREENSKY-branded loan



---

[20] *Id.* at 7 (emphasis added).
[21] *Id.* at 6.

agreements:

# GreenSky® Installment Loan Agreement
## RETAIL INSTALMENT CREDIT AGREEMENT

59.     Where banks have traditionally maintained a protocol[22]  for the purposes of identity verification so as to, for example, help curb unauthorized transactions and money laundering, GREENSKY and/or the merchants in its program purport to fulfill this function—the partner banks are uninvolved.

### GREENSKY Defines Consumer Loan Terms and Owns Credit Risk

60.     Further, GREENSKY contracts with the merchants, via merchant program agreements ("MPAs"), in its program so as to expressly own the "credit risk" and act as the "sole authority to prescribe the terms and conditions" of credit applications and consumer loans.

61.     Specifically, as stated in an MPA: "GreenSky may offer Loan(s) to Merchant's qualified customers as contemplated by this Agreement. As between the parties, *GreenSky has sole authority to prescribe the terms and conditions of the credit application, the Loan Agreement, and each Loan (including, without limitations, interest rate maximum  amount and term).* GreenSky may at any time, *in its sole discretion (including at the direction of a Funding Bank*), *prospectively modify such terms and conditions with respect to Loans* for which approval is granted subsequent to the time of the modification. GreenSky may *in its sole discretion (including at the direction of a Funding Bank*) *change the credit standards at any time* without notice to Merchant and may reject and accept credit applications in its sole discretion . . ." (emphasis added).

62.     Beneath this provision, the MPA also stated that "*GreenSky shall own the Loans*, including the Borrower names and other Borrower Information, and, *shall bear the credit risk for*

---

[22] For example, the Patriot Act authorized the Secretary of the Treasury to promulgate regulations pertaining to banks and reasonable due diligence in verifying customers' identities, especially when opening an account. *See* 31 U.S.C. § 5318(l). Here, though GreenSky claims that the partner banks are the actual lenders, they are two degrees (with GreenSky and the merchants in between) removed from the ultimate beneficiary of a given account.

***the Loans.*** Merchant acknowledges and agrees that it shall have no ownership interest in the Loans" (emphasis added).

63.     Significantly, GREENSKY stated that this authority to establish terms of credit was **in addition to** those that may be given at the direction of its bank partners.

64.     Merchants and/or consumers do not apply for loans with the bank partners, as would typically be the case with "indirect lending."[23] Rather, **the entire process is managed by GREENSKY and done in the GREENSKY name**.

65.     Thus, GREENSKY has filled nearly every function traditionally managed by lenders despite continually claiming to not be a lender:



Is GreenSky a lender? Who is my loan with?

GreenSky is not a lender. We are a service provider and program administrator for federally insured, federal and state chartered banks that provide consumer loans under the GreenSky® Programs.

As a borrower, you received a loan agreement that identifies the bank that is offering and funding your loan. This loan agreement is between you and the funding bank directly. However, GreenSky services your loan at the direction and control of your lender, so any questions you have should be directed to us.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

/ / /

/ / /

/ / /

[23] For example, credit unions sometimes enter indirect lending arrangements with car dealers. This means that the dealer may direct the borrower to the credit union at the dealership but the loan application will still be submitted to the credit union with the consumer apprised of such. In this analogy, GreenSky is the credit union but, contrary to the credit union's legitimate model, points to the bank partners when issues of "lending" arise.

Borrower: _____ Date: _____
Electronic record constitutes acceptance of this Agreement (see above)
LENDER: b/ SunTrust Bank, a Georgia banking corporation

Co-Borrower: _____ Date: _____
Electronic record constitutes acceptance of this Agreement (see above)
Date: 07/01/2019

(This is a disclosure of the lender behind the consumer loan made to Plaintiff—
it was made at the bottom of a page; in the manner common to rent-a-bank schemes,
this would have been the extent of SunTrust's involvement with the actual consumer)

66.     While GREENSKY has seemingly not charged overtly usurious interest rates in the manner that has captured the attention of, for example, California legislators,[24] it has commonly charged aggressive interest rates to consumers on behalf of its bank partners. Specifically, GREENSKY has charged an APR of up to, approximately, 27.99% on its deferred consumer installment loan products; the upper bound on its non-deferred products has been more in the range of 13.99%. These charges, again, do not include GREENSKY's "merchant fees."

67.     In the specific case of Plaintiff, to be discussed in detail below, this resulted in a loan award of up to $35,000 with an APR of 25% despite her 835 Experian credit score; if she had taken the entire seven-year period to pay off the full amount, she would have made a total of nearly $78,000 in payments, while GREENSKY would have taken (and indeed took) approximately $2,000 off the top of the loan.

### GREENSKY Has Flouted California Law

68.     GREENSKY's violations of California law have been harmful and willful.

69.     GREENSKY has long been on notice that it is required to be registered/licensed by state agencies. For example, on or about February 25, 2015 (more than three years before it IPO'd), an investigator with the New Jersey Department of Banking and Insurance sent GREENSKY a letter regarding its "possible unlicensed New Jersey consumer loan activity." GREENSKY eventually settled that claim for $160,000 and later registered as a "money transmitter" in New Jersey.

---

[24] *See* Assembly Bill 539 (capping interest rates on loans up to $10,000 at 36%).

70.     In 2017, GREENSKY was sued in Florida for operating as an unlicensed credit services organization ("CSO").[25]

71.     Further, as a publicly traded company with substantial revenues and a supposedly "robust [and] integrated regulatory compliance framework," GREENSKY knew, or should have known, of California lending laws. But GREENSKY"s very business model seemingly depends upon it dissembling to consumers and regulatory bodies and flouting the dictates of these laws.

### GREENSKY Consumer Loans Lack Accountability

72.     GREENSKY has essentially given merchants carte blanche to push through loans using its platform, normally using tablets and electronic signatures, with minimal due diligence. Indeed, GREENSKY even stated on its website: **"There is no need to physically sign and/or return your Loan Agreement. You** accept the terms of and electronically sign the Loan Agreement when you authorize the contractor/merchant to process a transaction on your account." (emphasis in original):

What does my Loan Agreement mean?

Note: There is no need to physically sign and/or return your Loan Agreement. You accept the terms of and electronically sign the Loan Agreement when you authorize the contractor/merchant to process a transaction on your account. Until (and unless) you authorize a transaction, you have no obligation on your GreenSky® Program loan.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

73.     Likewise, GREENSKY touted: "*No sales contracts or completion certificates required for funding*."[26]:

///

///

---

[25] *See Locicero v. Intrust Bank, N.A.*, Case No. 17-61484-CIV-DPG, 2018 WL 4374908, at *6-7 (S.D. Fla. Sept. 13, 2018) (denying GreenSky's motion to dismiss in part because GreenSky was plausibly a credit services organization).

[26] Taken from GreenSky Trade Credit, LLC's own 2015 marketing materials (emphasis added).

## No sales contracts or completion certificates required for funding*

74.     While GREENSKY may classify loan-type selection as a matter of consumer choice, the reality is that merchants are able, and incentivized, to make this choice for consumers and/or to misleadingly inform them in this regard. Again, the merchants, typically using tablets (with screens that may be hard for many to properly see) and electronic signatures, purport to bind consumers to loans before the terms have been disclosed. Many consumers have no idea who GREENSKY is until they start receiving bills from it and justifiably think that GREENSKY is a bank or credit card company. After all, those bills ask for payment to be sent directly to GREENSKY.

75.     With regard to upselling, GREENSKY offered merchants "Sample Plans to Close More Deals at a Higher Ticket," including how to "Turn an $8,000 job to a $10,000 dream project":[27]

/ / /

/ / /

/ / /

---

[27] Taken from GreenSky, LLC's own 2017 merchant training materials.

**GreenSky**

## Sample Plans to Close More Deals at a Higher Ticket

*Turn an $8,000 job to a $10,000 dream project.*

76.     It is not evident how an additional $2,000 would turn a mere "job" into a "dream project" and, based on GREENSKY's business model, as described throughout, a significant portion of that increase would simply be GREENSKY taking its cut of principal with the consumer absorbing a deceptive markup.

77.     This particular practice—training and encouraging merchants on its platform to upsell and/or build GREENSKY's finance charge into the cost of a project—is an important part of GREENSKY's deception. At no point does, for example, a given consumer see that a given merchant might otherwise charge $20,000 for a project but charges the consumer $22,000, knowing that GREENSKY will charge (on average) that merchant 10% to access credit; the consumer will not see that, say, Fifth Third Bank wired $22,000 to the "GREENSKY program" and that GREENSKY would eventually keep $2,000 of those funds while the merchant would retain its standard $20,000.

78.     **This lack of disclosure is deceptive and harms consumers, who wind up paying most of GREENSKY's revenues** (the "merchant fees") while still paying standard to high interest rates.

79.     Given, as described throughout, the nature of GREENSKY's business model, it seems likely that it would only have the potential for viability, when combined with general evasion of state laws, in industries—e.g., home improvement contracting, elective healthcare,

auto mechanics—where the given merchant generally has a high level of specialization and autonomy relative to the consumer and can more easily deceive them.

80.    In building such a business model, GREENSKY has also outsourced critical lending functions—e.g., general transparency, identity verification, filling out of application forms, explanation of terms and conditions, disclosure of fees—to thousands of random contractors.

**GREENSKY Is Clearly More than Just a Servicer or Program Administrator**

81.    Because GREENSKY claims to just be a sort of middle-man—a neutral program administrator or servicer—it is able to play parties off one another when there is a dispute, even though GREENSKY is the essential "link" that "bring[s] everyone together." Indeed, GREENSKY does not just service credit—it actively facilitates its extension, with minimal due diligence.

## General Information

Who is GreenSky and what does it do?

The GreenSky® Programs make it easy for contractors to offer affordable financing to customers like you. GreenSky is the servicer for one of the nation's largest bank lending programs. Banks in the GreenSky® Programs have financed more than one million home improvement projects. We service loans on behalf of more than a dozen leading banks across the nation.

You can think of GreenSky as a link between contractors, their customers and banks. We bring everyone together and simplify the loan process, from application, to decision/approval, to payments.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

82.    Even that bit of "general information" is further deceptive in that it claims "GreenSky" is the "servicer" of the GREENSKY programs. In fact, per the GREENSKY installment loan agreement sent to Plaintiff, **a totally different GREENSKY entity—GreenSky**

**Servicing, LLC—has been created for the purpose of *servicing* loans.** This again highlights the fact that GREENSKY is much more than a mere servicer:

of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

83.    GREENSKY can transmit funds *before* the consumer has even seen an installment loan agreement. Its business model enables merchants to "[*a]ccept downpayment the same day the customer is approved*" regardless of whether a given consumer has actually authorized a loan or seen its terms (emphasis added):



# Why Use the GreenSky® Program

## Simple & quick process
- Paperless application and approvals
- Easily accept customer payments
- Providing copies of Sales contracts and Certificates of Completion are not required for every transaction[1]
- Accept downpayment the same day customer is approved[2]
- No pre-payment penalties

(taken from GreenSky, LLC's own 2017 merchant training materials)

84.    On information and belief, most, if not all, states have lending laws and credit services laws that place a cap on certain fees/charges and/or prescribe "cooling off" periods, not to mention cost money and time to comply with. If GREENSKY were to properly comply with such laws, it is doubtful that much would be left of its business model.

85.    GREENSKY's motivations in this regard are clear: it is easier and cheaper to evade compliance with state regulations; it is easier for merchants to push "hard-sell" or fraudulent transactions through when there is no mandated "cooling off" period or cancellation form; and it is

vastly more profitable to charge fees of, say, 10% of principal when you are unregulated in a state with a cap on such charges.

86.     Further, on information and belief, GREENSKY suffers from poor internal controls and high employee turnover. This has, in part, led to spotty compliance, inconsistent growth, and insufficient due diligence of merchants on its platform, including investigation of consumer complaints. While it is hardly dispositive of the issue, it is telling that GREENSKY ranked dead last in a ranking of best "notable" fintech companies to work for (based on Glassdoor reviews):[28]

///

///

///

---

[28] EFINANCIALCAREERS.COM, *available at* https://news.efinancialcareers.com/uk-en/329766/best-worst-fintech-companies-work (last visited Oct. 22, 2019).

| Rank | Company | Avg. Employee Review |
|------|---------|---------------------:|
| 1 | Robinhood | 4.9 |
| 2 | Kabbage | 4.7 |
| 2 | TransferWise | 4.7 |
| 4 | Coinbase | 4.6 |
| 5 | Stripe | 4.5 |
| 6 | Betterment | 4.3 |
| 7 | Affirm | 4.1 |
| 7 | Square | 4.1 |
| 9 | Ayden | 3.9 |
| 10 | Credit Karma | 3.8 |
| 11 | PayPal | 3.7 |
| 12 | Avant | 3.6 |
| 12 | Prosper | 3.6 |
| 12 | SoFi | 3.6 |
| 15 | Markit | 3.3 |
| 16 | Lending Club | 3.1 |
| 17 | GreenSky | 2.9 |

87.     __Another way to conceptualize GREENSKY as a business is to think of it as a technology platform that acts as a broker of bank loans__. In essence, GREENSKY developed an application and supporting infrastructure, based primarily on enabling merchants to use tablets to generate loans, in a manner that was useful to some banks and/or in a manner that the banks could not, or were not willing to, do.

88.     In essence, **GREENSKY contracts to borrow excess reserves** from partner banks and then lends them to consumers.

89.     In GREENSKY's own words: "We believe our Bank Partners would require significant time and investment to build such a technology solution and merchants network themselves."; "*Our platform alleviates the need for our Bank Partners to bear any marketing, software development or technology infrastructure costs to originate loans.*"[29]

90.     It is not difficult to imagine a lawful version of GREENSKY—for example, one in which it derived revenues from licensing its software to chartered banks or one in which it was properly licensed as a lender/broker (or credit services organization) and derived its revenue from taking lawful and transparent fees on loans and/or other extensions of credit.

91.     For the sake of comparison, the aforementioned point-of-sale fintech firm Affirm, which is licensed as a lender and broker in California (#6054768), generally makes its money by lending at APRs up to 30% or so (lawful in California) while taking very small, *disclosed* fees on transactions (lawful in California).

92.     GREENSKY, on the other hand, effectively brokers loans on an unlicensed basis (unlawful) while taking substantial, undisclosed fees on consumer loans (unlawful). Its primary strategy in its defense seems to simply be proclaiming that it is "not a lender" and taking a calculated risk, or simply hoping, that no one figures out that its business model is plainly illegal in California.

93.     **In aggregate, then, GREENSKY can be viewed as a non-depository finance lender and/or broker whose loans are underwritten by the partner banks.** Thus, GREENSKY should be licensed under the CFL. GREENSKY therefore takes fees on consumer transactions that

---

[29] 2018 10-K, at 6 (emphasis added).

1   are illegal as a matter of California law.

2   94.     As such, pursuant to Cal. Fin. Code § 22750, because GREENSKY has quite

3   clearly and willfully taken fees that are "other than" and "in excess of" those permitted by the

4   CFL, GREENSKY-branded loans issued to California consumers during the proposed class period

5   must be declared void and amounts paid to the GREENSKY program, including the "merchant

6   fees," must be disgorged.

7   95.     In the alternative, should GREENSKY be found to be an (unlicensed) "credit

8   services organization," then the remedy, pursuant to Cal. Civ. Code § 1789.21(a), is essentially the

9   same: it must disgorge all fees and other charges paid to it by California consumers as a result of

10  aiding in unlicensed extensions of credit.

13  **GREENSKY CEO AND BOARD CHAIRMAN DAVID ZALIK**

14  96.     GREENSKY was co-founded in 2006 by David Zalik ("Zalik"),[30] who currently

15  serves as CEO and Chairman of the Board.

16  97.     Zalik also co-founded RockBridge Commercial Bank ("RockBridge") as a Georgia-

17  chartered bank in 2007.

18  98.     RockBridge was funded with a then-state-record $37 million in equity.

19  99.     Zalik was also an officer and/or director of RockBridge.

20  100.    In late 2009, RockBridge was shuttered by the Georgia Department of Banking and

21  Finance, with the FDIC named receiver of RockBridge's balance sheet.

22  101.    The FDIC reported that, as of June 2010, RockBridge's estimated loss to its

23  Deposit Insurance Fund would be approximately $100 million.

24  102.    In assessing RockBridge's swift demise, the FDIC's 2010 Material Loss Review

25  found: "RockBridge's failure [could] be attributed to (1) *__inadequate management and Board of__*

26  *__Directors (Board) oversight__*; (2) a high concentration in Commercial Real Estate lending; and

27  ---
[30] *See, e.g.,* https://www.forbes.com/profile/david-zalik/#36544a812d23 (last visited January 3,
28  2020).

(3) *poor credit underwriting and credit administration. Management and the Board pursued a business strategy that deviated from its original business plan without having the appropriate management expertise and internal controls in place to adequately mitigate the corresponding risks*." (emphasis added).

103.    Accordingly, GREENSKY is following a pattern Zalik has developed: trading compliance for profits.

## GREENSKY AND THE SOLAR SECTOR

104.    GREENSKY, Inc. IPO'd in 2018 at a price of $23/share. As of January 3, 2020, it was trading at approximately $8.56/share.

105.    Given, primarily, GREENSKY's precipitous collapse during an otherwise up-market and, per Zalik, that decline owing almost exclusively to the company's allegedly unanticipated and undisclosed shift away from lending for solar energy systems, the company was hit with multiple shareholder suits.[31]

106.    The gravamen of these shareholder suits was that GREENSKY, Inc. had abandoned its most lucrative line of business—lending for solar systems—and had not properly informed the shareholders of this strategic plan.[32]  This, of course, begged the question of *why* a for-profit company would abandon its most lucrative line of business.

107.    In this vein, GREENSKY made the unusual assertion, back in 2015, in its "Sponsor/Merchant Compliance Guidelines for GreenSky Loan Programs" that: "*Although all merchants may be subject to claims of unfair, deceptive or abusive acts or practices, merchants who specialize in energy efficiency and alternative energy face additional risk from customers claiming deception during the sales process if they are not satisfied with the projects*." (emphasis added). The guidelines did not say *why* this entirely non-intuitive assertion would be true.

---

[31] *See, e.g., Mustafin v. GreenSky, Inc.*, Case No. 1:18-cv-11071-PAE (filed Nov. 27, 2018, S.D.N.Y).

[32] *See, e.g., id.* at 6 ("The Offering Documents failed to disclose the substantial change in the composition of GreenSky's merchant business mix and the resulting diminution in transaction-fee revenue.")

108.    Indeed, on information and belief, GREENSKY long turned a blind eye to the predatory, and sometimes outright fraudulent, practices that were especially rampant among various solar merchants on its platform. To the contrary, as outlined above, GREENSKY is itself predatory and implicitly endorses this kind of conduct by merchants. This bad behavior involved, among other aspects, aggressive and deceptive sales practices aimed especially at vulnerable populations, such as lower-income racial minorities and the elderly,[33] as well as unsubstantiated promises of government subsidies that would eventually arrive to substantially cover the cost of such solar systems.

109.    This assertion is in keeping with GREENSKY's aforementioned odd statement about alternative-energy merchants facing undue claims of deception from customers.

110.    It is also in keeping with, per the *Mustafin* shareholder suit, the claim that GREENSKY generally charged its solar merchants *twice* the level of fees—14% versus 7%—when compared to other merchants on its platform.[34] With GREENSKY taking 14% of *principal* on solar transactions, the only likely way that solar merchants accessing GREENSKY's credit would be competitive would be through undue predatory, misleading, and/or subprime (or low-prime) lending.

111.    Even though GREENSKY derived approximately 20% of its revenues—and, per the numbers above, a substantially larger percentage of its profits—from the solar sector in the years before 2018, GREENSKY derived just 4% of its merchant-fee revenue from solar in 2018.[35] This move away from solar was, on information and belief, a deliberate decision by GREENSKY because, at least in part, it had determined that the consumer complaints and accordant risk of litigation stemming from unscrupulous solar merchants on its platform had grown too great[36]

---

[33] *See, e.g.,* Katherine Proctor, *Solar Power Firm Called Elder Abuser*, COURTHOUSE NEWS SERVICE (July 13, 2015), https://www.courthousenews.com/solar-power-firm-called-elder-abuser/.

[34] *Mustafin* at 5.

[35] *Id.*

[36] When looking at consumer litigation against GreenSky, one is struck by the disproportionate number of complaints, given their relatively modest share of the home improvement market nationally, involving solar merchants. *See, e.g., Farris v. Energy One Solar*, No. 4:19-cv-02361-JCH (E.D. Mo. Aug. 16, 2019); *Terlizzi v. Altitude Marketing, Inc.*, No. 16-cv-1712-WJM-STV, 2018 WL 2196090 (D. Colo. May 14, 2018); *Wilkinson v. SunTrust Bank*, No. 2:18-cv-00256-TS

and/or the recent decline in green-energy subsides had substantially pared away the most predatory, uncompetitive alternative energy firms, which had dominated the GREENSKY platform.

112. GREENSKY harvested windfall profits for years by failing to reasonably monitor various merchants—particularly solar merchants—in its program while also evading state lending and/or credit services laws. Given the numbers above, it is entirely possible that GREENSKY would not have been able to IPO without embracing such unlawful conduct in its business model.

113. Likewise, the merchant-fee numbers given above broadly accord with those given in the 2018 10-K: GREENSKY reported total revenue of approximately $415 million on transaction volume (loans made via its platform) of approximately $3.8 billion, which amounts to a volume-to-revenue margin of about 10.9%. This amount, again, is nearly the same as its "merchant fees," which are taken upon loan origination and on principal.

114. For the sake of comparison, actual loan servicing fees are typically quite small—for example, a normal loan servicing fee (a "strip") may be set at an APR of 0.25% (.0025) of principal, taken monthly.[37] On a solar system loan of $25,000, this would enable GREENSKY to collect about $5.20 per month.  Using Plaintiff's loan as an example, this would amount to approximately $612.50 *over the life of the loan with no reduction in principal*—i.e., even that figure substantially overstates typical loan servicing fees over the longer term. But by using the masked "merchant fee" method, GREENSKY could take approximately $1,600-2,000 **upon origination**.

115. Further, GREENSKY *also* charges the bank partners a (high) loan servicing fee of approximately 1.00% APR.

116. As these numbers reveal, GREENSKY's entire business model largely depends on how it has classified itself and it has done so deceptively, at the expense of individual consumers and state agencies.

(D. Utah Mar. 23, 2018); *Alfortish v. GreenSky, LLC*, No. 16-15084, 2017 WL 699830, at *1 (E.D. La. Feb. 22, 2017); *Davy v. Duke Energy Carolinas, LLC*, No. 7:15-cv-4927-MGL, 2016 WL 852696, at *3 (D. S.C. Mar. 4, 2016).

[37]*See,     e.g.,     INVESTOPEDIA,   Loan     Servicing     Definition,* https://www.investopedia.com/terms/l/loan_servicing.asp (last visited Oct. 18, 2019).

117.   In a *Forbes* article about Zalik and GREENSKY, that magazine noted that the company's "financial technology model is robust because it transfers a lot of the risk and work to banks and contractors."[38] Indeed, as described throughout this complaint, **this model has largely relied on violating state laws, whether they be lending laws or credit services laws—this is what has allowed GREENSKY to "transfer risk." Further, much of this risk is actually transferred *to consumers*—**indeed, the banks essentially do nothing in this regard other than transmit money to the GREENSKY "program" with GREENSKY, in effect, brokering the loans while also being contractually obligated to assume prepayment risk.

118.   GREENSKY's failure to properly register as a lender and/or broker under the CFL or, alternatively, as a credit services organization under the CSA deprives consumers of the protections of such licensure, including but not limited to fee-limitation, disclosure, and monitoring requirements.

119.   GREENSKY's failure to properly register as a lender and/or broker under the CFL or, alternatively, as a credit services organization under the CSA has enabled it to unlawfully and unfairly hide the nature of its business from consumers.

120.   GREENSKY's business model and trajectory thus bear uncanny resemblances to those of RockBridge, whose mismanagement and resultant swift demise ultimately cost the FDIC approximately $100 million. For example, within just, approximately, a year-and-a-half of its IPO, GREENSKY was trading at less than one-third of its offering price, being sued by shareholders for undisclosed changes to its core business strategy, while evincing poor management expertise, internal controls, credit administration, and portfolio concentration. Further, a substantial portion of whatever earnings GREENSKY has generated have been *directly* derived from willful evasion of state lending and/or credit servicing laws.

---

[38] Nathan Vardi, *A Fintech Billionaire's Consumer Loans Come Under Fire in Alabama*, FORBES (July 25, 2019), https://www.forbes.com/sites/nathanvardi/2019/07/25/a-billionaires-consumer-loans-come-under-fire-in-alabama/#44dc9a1f25d7.

**PLAINTIFF'S EXPERIENCE WITH GREENSKY**

121.    Plaintiff Elizabeth "Liz" Belyea is a resident of California; she retired in 2016 after a career in education, as both a teacher and an administrator.

122.    Plaintiff supplements her retirement income by renting a house that she owns. The location of that house is 2609 Castro Way, Sacramento, California 95818.

123.    Tenants who were renting that home, which was built in 1925, began experiencing drainage problems sometime during June 2019.

124.    Soon thereafter, following an inspection by a plumbing company, it became apparent that the old pipes in the rental house were failing.

125.    As the plumbing company uncovered further issues, three different estimates for the necessary underlying work were generated: the first was for $5,750.00; the second was for $4,800; and the third was for $23,600.00, not including the eventual $571.50 in floor repair costs.

126.    Plaintiff was able to cover the first two bills, totaling $10,550.00, out-of-pocket.

127.    However, the third bill, for $23,600, was too much for her to cover out-of-pocket; an agent of the plumbing company (the "plumber") told Plaintiff that she could finance through an affiliate of the company.

128.    The plumber told her that she could obtain that financing under the condition that, if she were able to pay the loan back within eighteen months, interest would be waived.

129.    The plumber selected a financing plan for Plaintiff.

130.    Her Experian credit score at that time was 835.

131.    Despite this nearly perfect credit score, she eventually discovered that the GREENSKY-branded loan came with an APR of 25.03%, subject to eighteen months of interest-waiver. Plaintiff was shocked when she saw that APR. Over the life of the loan—seven years—she would have had to pay a total of $77,867.22 (over half of which would be interest).

132.    Alarmed by the possibility of ever paying such an interest rate, Plaintiff withdrew retirement funds in November 2019 so that she could pay off the loan.

133.    GREENSKY collected an unlawful financing charge—the "merchant fee"—on the consumer loan made to Plaintiff.

## CALIFORNIA FINANCING LAW ("CFL"),
### Cal. Fin. Code § 22000 et seq.

134.    Pursuant to Cal. Fin. Code § 22001, the CFL is to be "liberally construed" to "promote its underlying purposes and policies," which include "foster[ing] competition among finance lenders, "*protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders,*" "encourag[ing] the development of fair and economically sound lending practices," and "*protect[ing] property owners from deceptive and misleading practices that threaten the efficacy and viability of property-assessed clean energy financing programs.*" (emphasis added).

135.    Pursuant to Cal. Fin. Code § 22009, a "finance lender" means "any person who is engaged in the business of making consumer loans or making commercial loans."

136.    Pursuant to Cal. Fin. Code § 22004, a "'broker' includes any person who is engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender."

137.    Pursuant to Cal. Fin. Code § 22100(a), "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner [of Business Oversight]."

138.    Pursuant to Cal. Fin. Code § 22101 et seq., the CFL requires finance lenders and brokers to follow a number of particular steps and abide by specified rules and procedures with regard to becoming, and existing as, a licensed entity.

139.    Pursuant to Cal. Fin. Code § 22200, "'Charges' include the aggregate interest, fees, bonuses, commissions, brokerage, discounts, expenses, and other forms of costs charged, contracted for, or received by a licensee or any other person in connection with the investigating, arranging, negotiating, procuring, guaranteeing, making, servicing, collecting, and enforcing of a loan or forbearance of money, credit, goods, or things in action, or any other service rendered."

140.    Pursuant to Cal. Fin. Code § 22203, a "'consumer loan' means a loan, whether secured by either real or personal property, or both, or unsecured, the proceeds of which are intended by the borrower for use primarily for personal, family, or household purposes."

141.    Pursuant to Cal. Fin. Code § 22305, "a licensee may contract for and receive an administrative fee, which shall be fully earned immediately upon making the loan, with respect to a loan of a bona fide principal amount of *not more than two thousand five hundred dollars ($2,500) at a rate not in excess of 5 percent of the principal amount (exclusive of the administrative fee) or fifty dollars ($50), whichever is less, and with respect to a loan of a bona fide principal amount in excess of two thousand five hundred dollars ($2,500), at an amount not to exceed seventy-five dollars ($75).*" (emphasis added).

142.    Pursuant to Cal. Fin. Code § 22306, "*No amount in excess of that allowed by this article shall be <u>directly or indirectly charged</u>, contracted for, or received by any person, and the total charges of the finance lender and broker and any other person in the aggregate shall not exceed the maximum rate provided for in this article.*" (emphasis added).

143.    Pursuant to Cal. Fin. Code § 22309, "Except as provided in Section 22305 and Article 4 (commencing with Section 22400), *no charges on loans made pursuant to this division shall be paid, deducted, or received in advance, or compounded . . .*" (emphasis added).

144.    Pursuant to Cal. Fin. Code § 22327, "No licensee shall induce or permit any borrower to be or to become obligated directly or indirectly, or both, under more than one contract of loan at the same time with the same licensee for the purpose or with the result of obtaining a higher rate of charge than would otherwise be permitted by this article . . .".

145.    Pursuant to Cal. Fin. Code § 22333, "*No licensee shall take any instrument in which blanks are left to be filled in after execution.*" (emphasis added).

146.    Pursuant to Cal. Fin. Code § 22112(a), "A licensee shall maintain a surety bond in accordance with this subdivision in a minimum amount of twenty-five thousand dollars ($25,000)."

147.    Pursuant to Cal. Fin. Code § 22337(a), each licensed financed lender shall "Deliver or cause to be delivered to the borrower, or any one thereof, *at the time the loan is made*, a statement showing in clear and distinct terms the name, address, and license number of the *finance lender and the broker, if any*." (emphasis added). Per the CFL, GreenSky's "merchant fee" should have been disclosed on a form such as this one:

**CALIFORNIA FINANCE LENDERS LAW STATEMENT OF LOAN**

Date:

Lender Name:

Lender Address:

Lender's License Number:

Borrower Name(s):

Borrower Address:

1. This loan is made pursuant to the California Finance Lenders Law, Division 9 (commencing with Section 22000) of the Finance Code. The above-named lender is a licensed finance lender, Department of Corporations California Finance Lenders License No.

FOR INFORMATION CONTACT THE DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA.

2. The California Finance Lenders Law requires that a licensed finance lender obtain a signed statement from a borrower as to whether any person has performed any act as a broker in connection with the making of a loan.

Has any person performed any act as a broker in connection with the making of your loan ☐ Yes ☐ No

If your answer is yes, please indicate below the name of the person who will receive payment for broker service services and a statement of all sums paid or payable to such person:

148.    Pursuant to Cal. Fin. Code § 22750, "*If any amount other than, or in excess of, the charges permitted by this division is willfully charged, contracted for, or received, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction.*" (emphasis added).

## CALIFORNIA'S CREDIT SERVICES ACT OF 1984 ("CSA"), ## Cal. Civ. Code § 1789.10 et seq.

149.    Recognizing the importance of consumer credit and that "[c]ertain advertising and business practices of some credit service organizations have worked a financial hardship upon the people in this state, often those who are of limited economic means and inexperienced in credit matters," California legislators enacted the CSA to "protect the public from unfair or deceptive advertising and business practices."[39]

150.    The CSA is to be "construed liberally" in order to achieve these purposes.[40]

151.    The CSA was enacted in order to capture, for the purposes of regulation, new types of credit-related businesses that were not already subject to regulation by the state.[41]

---

[39] Cal. Civ. Code § 1789.11(a)-(c).

[40] *Id.* at § 1789.11(c).

152.    The CSA defines a "credit services organization" is "a person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration:

(1) Improving a buyer's credit record, history, or rating.

(2) *Obtaining a loan or other extension of credit for a buyer*.

(3) *Providing advice or assistance to a buyer with regard to either paragraph (1) or (2)*."[42] (emphasis added).

153.    A CSO shall not do any of the following in California:[43]

"(a) *Charge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer.*

(b) Fail to perform the agreed services within six months following the date the    buyer signs the contract for those services.

(c) *Charge or receive any money or other valuable consideration for referral of the buyer to a retail seller or other credit grantor who will or may extend credit to the buyer, if either of the following apply*:

(1) *The credit that is or will be extended to the buyer (A) is upon substantially the same terms as those available to the general public or (B) is upon substantially the same terms that would have been extended to the buyer without the assistance of the credit services organization.*

(2) *The money or consideration is paid by the credit grantor or is derived from the buyer's payments to the credit grantor for costs, fees, finance charges, or*

---

[41] *See id.* at § 1789.12(b)(1)-(7).

[42] *Id.* at § 1789.12.

[43] *Id.* at § 1789.13(a)-(r).

*principal*.

(d) Make, or counsel or advise a buyer to make, a statement that is untrue or misleading and that is known, or that by the exercise of reasonable care should be known, to be untrue or misleading, to a consumer credit reporting agency or to a person who has extended credit to a buyer or to whom a buyer is applying for an extension of credit, such as statements concerning a buyer's identification, home address, creditworthiness, credit standing, or credit capacity.

(e) Remove, or assist or advise the buyer to remove, adverse information from the buyer's credit record which is accurate and not obsolete.

(f)·Create, or assist or advise the buyer to create, a new credit record by using a different name, address, social security number, or employee identification number.

(g) Make or use untrue or misleading representations in the offer or sale of the services of a credit services organization, including either of the following:

(1) Guaranteeing or otherwise stating that the organization is able to delete an adverse credit history, unless the representation clearly discloses, in a manner equally as conspicuous as the guarantee, that this can be done only if the credit history is inaccurate or obsolete and is not claimed to be accurate by the creditor who submitted the information.

(2) Guaranteeing or otherwise stating that the organization is able to obtain an extension of credit, regardless of the buyer's previous credit problems or credit history, unless the representation clearly discloses, in a manner equally as conspicuous as the guarantee, the eligibility requirements for obtaining an extension of credit.

(h) *Engage, directly or indirectly, in an act, practice, or course of business that operates or would operate as a fraud or deception upon a person in connection with the offer or sale of the services of a credit services organization.*

(i) *Advertise or cause to be advertised, in any manner, the services of the credit services organization, without being registered with the Department of Justice.*

(j) Fail to maintain an agent for service of process in this state.

(k) Transfer or assign its certificate of registration.

(l) Submit a buyer's dispute to a consumer credit reporting agency without the    buyer's

knowledge.

(m) Use a consumer credit reporting agency's telephone system or toll-free telephone number to represent the caller as the buyer in submitting a dispute of a buyer or requesting disclosure without prior authorization of the buyer.

(n) *Directly or indirectly extend credit to a buyer*.

(o) Refer a buyer to a credit grantor that is related to the credit services organization by a common ownership, management, or control, including a common owner, director, or officer.

(p) *Refer a buyer to a credit grantor for which the credit services organization provides, or arranges for a third party to provide, services related to the extension of credit such as underwriting, billing, payment processing, or debt collection*.

(q) *Provide a credit grantor with an assurance that a portion of an extension of credit to a buyer referred by the credit services organization will be repaid, including providing a guaranty, letter of credit, or agreement to acquire a part of the credit grantor's financial interest in the extension of credit*.

(r) *Use a scheme, device, or contrivance to evade the prohibitions contained in this section*."

(emphasis added).

154. Further, the CSA provides for affirmative duties on the part of CSOs. Per Cal. Civ. Code §§ 1789.14 and 1789.15, a CSO—"prior to the execution of a contract or agreement between the buyer and a credit services organization"—"shall provide the buyer a statement in writing, containing . . .

> (a) A complete and detailed description of the services to be performed by the credit services organization for or on behalf of the buyer and the total amount the buyer will have to pay, or become obligated to pay, for the services.
> (b) The buyer's right to proceed against the bond under the circumstances and in the manner set forth in Section 1789.18.

(c) The name and address of the surety company which issued the bond.
(d) A complete and accurate statement of the availability of nonprofit credit counseling services.

The information statement shall be printed in at least 10-point boldface type and shall include the following statement or any substantially equivalent alternative that is approved by the Department of Justice:

'CONSUMER CREDIT FILE RIGHTS UNDER STATE AND FEDERAL LAW
You have a right to obtain a copy of your credit file from a consumer credit reporting agency. You may be charged a reasonable fee not exceeding eight dollars   ($8). There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The consumer credit reporting agency must provide someone to help you interpret the information in your credit file. You have a right to dispute inaccurate information by contacting the consumer credit reporting agency directly. However, neither you nor any credit repair company or credit services organization has the right to have accurate, current, and verifiable information removed from your credit report. Under the Federal Fair Credit Reporting Act, the consumer credit reporting agency must remove accurate, negative information from your report only if it is over seven years old. Bankruptcy information can be reported for 10 years. If you have notified a credit reporting agency in writing that you dispute the accuracy of information in your credit file, the consumer credit reporting agency must then reinvestigate and modify or remove inaccurate information. The consumer credit reporting agency may not charge a fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the consumer credit reporting agency. If reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the consumer credit reporting agency to keep in your file, explaining why you think the record is inaccurate. The consumer credit reporting agency must include your statement about disputed information in any report it issues about you. *You have a right to cancel the contract for any reason within five working days from the date you signed it. If for any reason you do cancel the contract during this time, you do not owe any money. You have a right to sue a credit services organization if it misleads you.'"*

(emphasis added).

155.    Further, Cal. Civ. Code § 1789.16 provides that a CSO "shall not provide any service to a buyer except pursuant to a written contract that complies with this section," which section includes, among other provisions, the requirements of a five-day "cooling-off period" and preprinted notice of cancellation.

156.    Cal. Civ. Code § 1789.18 mandates that *"[n]o credit services organization shall conduct business in this state unless the credit services organization has first obtained a surety bond in the principal amount of one-hundred thousand dollars ($100,000)* issued by an admitted

1  surety and the bond complies with the following . . .". (emphasis added). On information and
2  belief, GREENSKY has not obtained such a bond.

3      157.    Cal. Civ. Code § 1789.20 provides that any person who violates the CSA shall be
4  guilty of a misdemeanor.

5      158.    Importantly, the CSA also provides for a private cause of action: "*Any buyer*
6  *injured by a violation of this title or by the credit services organization's breach of a contract*
7  *subject to this title may bring any action for recovery of damages, or for injunctive relief, or*
8  *both. Judgment shall be entered for actual damages, <u>but in no case less than the amount paid</u>*
9  *<u>by the buyer to the credit services organization, plus reasonable attorney's fees and costs</u>. An*
10 *award, if the trial court deems it proper, may be entered for punitive damages.*"[44] (emphasis
11 added).

12                          **CLASS ACTION ALLEGATIONS**

13     159.    Plaintiff seeks to certify a statewide class comprising: **California consumers who**
14 **transacted business with and/or received funds from or through GREENSKY ("Class") for a**
15 **period beginning four years prior to the date this complaint is filed until the date of class**
16 **certification ("Class Period").**
17

18     160.    This action has been brought and may properly be maintained as a class action,
19 pursuant to the provisions of California Code of Civil Procedure section 382, because there is a
20 well-defined community of interest in the litigation and the proposed class is easily ascertainable.

21     161.    Numerosity. Upon information and belief, there are hundreds, if not thousands, of
22 members of the proposed Class. Joinder of all members is therefore impracticable.
23

24     162.    Commonality and Predominance. Common questions of fact and law exist as to all
25 Class members such that those questions predominate over questions affecting Plaintiff or
26 individual Class members. These common questions include, but are not limited to, the following:
27

---
28 [44] Cal. Civ. Code § 1789.21(a).

a. Does GREENSKY's conduct and failure to obtain licensure in California illegal?

b. Is GREENSKY's conduct and failure to obtain licensure violate the CFL and/or CSA?

c. Did GREENSKY fail to inform consumers as to the "merchant fees" it was charging?

d. Was GREENSKY's charging of fees beyond the CFL's cap unconscionable or, alternatively, Did GREENSKY "directly or indirectly" extend credit to buyers on an unlicensed basis?

e. Did GREENSKY violate the CFL and/or CSA?

f. Did GREENSKY also violate other laws, as described herein?

g. Did GREENSKY harvest windfall profits at the expense of consumers as a result of its violations of California laws?

h. Should GREENSKY be compelled to disgorge funds, including principal, interest, and/or other charges as a result of its violations of California law?

i. Are Plaintiff and Class members entitled to damages or any other monetary relief and, if so, in what amount?

j. Should GREENSKY be enjoined from continuing to operate on an unlicensed basis in California?

163.    Typicality. Plaintiff is informed and believes and thereon alleges that each member of the Class herein was subjected to the same general forms of misrepresentation outlined above. More specifically, these forms include but are not limited to: that GREENSKY lent (as a lender/broker) or directly or indirectly extended credit (as a CSO) to Plaintiff and every Class member on an unlicensed basis; in so doing, misrepresented that it could lawfully do so under California law, failed to disclose the nature and amount of its "merchant fees"; misrepresented that it could lawfully collect these under California law; and generally misrepresented the nature of its enterprise to the detriment of consumers. The factual and legal bases of GREENSKY's liability to Plaintiff and each Class member are the same, resulting in injury to Plaintiff and each Class

1    member as a result of GREENSKY's conduct described herein. GREENSKY has acted or failed to

2    act on grounds generally applicable to Plaintiff and members of the proposed Class, thereby

3    making final declaratory relief and injunctive relief, as described below, appropriate.

4           164.    Adequacy. Plaintiff will fairly and adequately represent and protect the interests of

5    other Class members. Plaintiff has retained counsel with substantial experience in litigating

6    complex cases, including class actions. Both Plaintiff and her counsel will vigorously prosecute

7    this action on behalf of the Class and have the financial ability to do so. Neither Plaintiff nor

8    counsel has any interest adverse to the other Class members.

9           165.    Superiority. A class action is superior to all other available methods for the fair and

10   efficient adjudication of this matter. As alleged herein, GREENSKY acted and failed to act on

11   grounds generally applicable to Plaintiff and other Class members. Such conduct requires the

12   Court's imposition of uniform relief to ensure compatible standards of conduct towards Class

13   members and to make corresponding declaratory relief and injunctive relief appropriate for all

14   Class members. Upon information and belief, no overlapping class actions have been filed against

15   GREENSKY in California. Management of this case will not be difficult given the nature and

16   significance of the common questions.

17          166.    Individual Control. The interests of individual Class members are best served by

18   certifying this case as a class action. Class members' individual damages may only measure

19   thousands or tens of thousands of dollars. By contrast, the undersigned counsel believe they will

20   likely be compelled to invest tens, or hundreds, of thousands of dollars in time, costs, and

21   expenses in prosecution of this controversy so as to best prosecute and win these Class claims. If

22   counsel represented only Plaintiff, they would likely be compelled to expend substantially all of

23   the same time, costs, and expenses in the prosecution of this action. Further, as described

24   throughout, the fundamental nature of GREENSKY's business model is deceptive and difficult to

25   detect by any given consumer. In the absence of a class action, individual Class members would be

26   unlikely to effectively prosecute their claims.

27

28   ///

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA FINANCING LAW ("CFL"),
### Cal. Fin. Code § 22000 *et seq.*
### (Against All Defendants)

167.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

168.   Plaintiff brings this count on behalf of the Class.

169.   Per Cal. Fin. Code § 22009, a "finance lender" means "any person who is engaged in the business of making consumer loans or making commercial loans." The CFL defines the "business of making consumer loans or commercial loans" as "including lending money and taking, in the name of the lender, or in any other name, in whole or in part, as security for a loan, any contract or obligation involving the forfeiture of rights in or to personal property, the use and possession of which property is retained by other than the mortgagee or lender, or any lien on, assignment of, or power of attorney relative to wages, salary, earnings, income, or commission."

170.   As described above, GREENSKY is a "finance lender" because it is engaged in the business of making consumer loans. Additionally, with respect to at least loans extended for solar products, GREENSKY took a security interest for its own benefit in the products as a loan condition.

171.   Pursuant to Cal. Fin. Code § 22004, a "'broker' includes any person who is engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender."

172.   As described above, GREENSKY is a broker because it is engaged in the business of negotiating, selling, marketing, and/or distributing loans made by a finance lender (the partner banks).

173.   More specifically, GREENSKY's engagement in the business of making and/or brokering consumer loans includes, but is not limited to, the following: obtaining funds from partner banks; setting interest rate and other loan-term parameters; auto-populating credit applications; processing credit applications; retaining the right to accept/reject credit applications;

verifying consumer identities and credit scores via its proprietary software; "allocating" funds to its bank partners using its own proprietary system; (re)lending funds borrowed from its partner banks; transmitting/disbursing funds; providing merchants and/or consumers with GREENSKY-branded "shopping passes"; providing consumers with GREENSKY-branded installment loan agreements; directing consumers to make loan payments directly to GREENSKY; reporting such loans to consumer reporting agencies; (at least sometimes) attempting to take a purchase money security interest in the goods purchased with such loans; controlling which merchants are in its program; purporting to train these merchants to use its platform; purporting to perform due diligence on these merchants that use its platform; and deriving revenues that are a function of loan volume, loan origination, interest rates, and/or interest rate spreads on unsecured and/or secured loans that are primarily for family/household purposes.

174.    Indeed, as stated above, the partner banks really have little or nothing at all to do with this process: GREENSKY has built a business on de facto (re)lending/brokering, using the bank partners' state or federal charters as a shield, and disguising this fact with nothing more than semantics.

175.    On information and belief, GREENSKY is not licensed with the Commissioner of the Department of Business Oversight.

176.    GREENSKY's evasion of the CFL has been willful. More specifically, as described above, GREENSKY has long been on notice that it should be registered with state agencies as a consumer lender and/or broker (or CSO).

177.    GREENSKY does not qualify for any of the germane exemptions and the burden of proof would lie with Defendant should it claim such an exemption. *See* Cal. Fin. Code § 22053.

178.    GREENSKY's loans were "consumer loans" for the purposes of the CFL.

179.    GREENSKY harvested windfall profits as a direct result of evading the CFL.

180.    GREENSKY's charging of fees well in excess of the CFL's cap on such fees was unconscionable.

181.    GREENSKY's evasion of the CFL caused ascertainable injury to California consumers.

182.   GREENSKY's multiple misrepresentations to consumers and, particularly, its failure to properly disclose the "merchant fees" it received, were misleading and unconscionable.

183.   GREENSKY's unconscionable actions in this regard also give rise to a private cause of action under the Unfair Competition Law ("UCL").[45]

184.   GREENSKY's violations of the CFL have been systematic and multitudinous. Defendant's very business model, including, but not limited to, how it represents itself to consumers and state agencies, the consecution by which it obtains and disburses consumer loans, the fees it charges on such loans, and its reporting and/or collecting on these loans, entails numerous violations of the CFL spread over many individual California consumers.

185.   More specifically, GREENSKY's violations of the CFL include, but are not limited to: § 22100(a) (because Defendants have engaged in the business of a finance lender without a license from the commissioner); § 22101 (because Defendants have, on information and belief, not applied for such a license); § 22102 (because Defendants have operated throughout California without submitting applications for branch licenses); § 22103 (because, on information and belief, Defendants have not paid any application or related fees); § 22104 (because Defendants have not filed financial documents with the commissioner); § 22106 (because Defendants have not applied for a license for a location either inside or outside of California); § 22107 (because Defendants have not paid the commissioner its pro rata share of administrative costs/expenses); § 22151 (because Defendants have not obtained a license that may be "conspicuously posted"); § 22159 (because Defendants have not filed annual reports with the commissioner); § 22161 (multiple provisions) (because Defendants have, broadly, made, directly and indirectly, numerous materially false and/or misleading statements to consumers in California and violated § 17200 of the Business and Professions Code); § 22305 (because Defendants have charged administrative fees much greater than, respectively, $50 or $75); § 22309 (because Defendants have charged fees on loans not provided for, as stated); § 22320.5 (because Defendants have collected delinquency fees greater than, respectively, the stated amounts); § 22325 (because Defendants have not displayed such a schedule in licensed place(s) of business); § 22327 (because, in some cases, Defendants

---

[45] *See De La Torre v. Cashcall, Inc.*, 422 P.3d 1004, 1019-20 (Cal. 2018).

1   have induced borrowers into "split plan" loans, the terms of which may not comport with the

2   charges allowed by this article; that is, for split loans of $2,500 or less, the charges may exceed

3   those allowed for in § 22303); and § 22112(a) (because Defendants have not obtained such a

4   surety bond).

5       186.   As described above, GREENSKY has acted as an unlicensed finance lender and/or

6   broker in California and has violated the CFL in numerous ways.

7       187.   As described above, GREENSKY has charged fees on principal—it does not really

8   matter whether one terms them "loan origination," "financing," "administrative," or "merchant"

9   fees, as they are taken *immediately upon principal* and according to *a schedule set by GREENSKY*;

10  these fees, which have averaged around 10% of principal (including on loans of $25,000+), are

11  proscribed by Cal. Fin. Code §§ 22305-06.

12      188.   Pursuant to Cal. Fin. Code § 22750, the consumer installment loans made and/or

13  brokered by GREENSKY during the Class Period must be declared void and GREENSKY has no

14  right to collect the interest, principal, or other charges there upon.

15

16  *Plaintiff, as made clear in this complaint, asserts that GREENSKY should have long ago been
    licensed by a California agency and has been violating numerous California laws for years. As
    just stated, Plaintiff maintains that GREENSKY is a finance lender and/or broker for the
    purposes of the CFL. In the alternative, Plaintiff asserts that GREENSKY should be licensed as a
    CSO, as described below:*

17

18

19                        **SECOND CAUSE OF ACTION**
20      **VIOLATIONS OF THE CREDIT SERVICES ACT OF 1984 ("CSA"),**
                  **Cal. Civ. Code § 1789.10 *et seq.***
21                        **(Against All Defendants)**

22      189.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully

23  set forth herein.

24      190.   Plaintiff brings this count on behalf of the Class.

25      191.   Pursuant to Cal. Civ. Code § 1789.12, a "credit services organization" is "a person

26  who, with respect to the extension of credit by others, sells, provides, or performs, or represents

27  that he or she can or will sell, provide or perform, any of the following services, in return for the

28  payment of money or other valuable consideration:

(1) Improving a buyer's credit record, history, or rating.
(2) *Obtaining a loan or other extension of credit for a buyer*.
(3) *Providing advice or assistance to a buyer with regard to either paragraph (1) or (2)*."[46]
(emphasis added).

192.   As described throughout this Complaint, GREENSKY's entire business is built around *obtaining* loans on behalf of others. The vast bulk of its revenues have been derived directly from taking a cut of consumer loans and calling them "merchant fees." If it is somehow not a lender and/or broker for the purposes of the CFL, then GREENSKY **_must_** be a CSO for the purposes of the CSA.

193.   More specifically, GREENSKY sells, provides, performs, and/or represents that it can (and actually *does*) obtain credit for buyers in return for the payment of money—the "merchant fees." GREENSKY does this in ways that include, but are not limited to, the following: accepting consumer credit applications via its platform; auto-populating these applications; partnering with banks to obtain funds for consumer loans; organizing these banks into a "program" for the purposes of extending consumer credit; advertising to merchants (and, ultimately, buyers) that it can obtain credit for home improvement or elective healthcare projects; accepting and rejecting credit applications; providing consumers with GREENSKY-branded installment loan agreements; determining loan terms and conditions; (re)lending money held on bank balance sheets as GREENSKY program assets/liabilities; transmitting loan funds to merchants via the shopping passes; accepting loan payments directly from consumers; and reporting trade lines to consumer reporting agencies.

194.   A CSO is required to be licensed with the California Department of Justice; GREENSKY is not.

195.   Pursuant to Cal. Civ. Code § 1789.13(n), GREENSKY shall not "*[d]irectly or indirectly* extend credit to a buyer." (emphasis added). As stated throughout, GREENSKY has actively extended credit to buyers and is thus in violation of this provision. For at least the "promotional period" of the loans, GREENSKY is at least the de facto lender, for it is the entity

with the contractual repayment obligation if the consumer pays off the loan in full before that promotional period ends.

196.    GREENSKY has further violated the CSA in ways that include, but are not limited to, the following: § 1789.13(a) (because Defendants received money or other valuable consideration before distributing money to merchants and/or buyers); § 1789.13(c) (because Defendants received money or other valuable consideration for simply referring buyers to the banks in their program for non-competitive loans and interest rates); § 1789.13(h) (because, as described throughout, GREENSKY's business model is fundamentally fraudulent in that it has relied on representing the company as something other than what it actually is); § 1789.13(i) (because Defendants have not registered with the Department of Justice); § 1789.13(p) (because, if GREENSKY were to continue to maintain that is not a lender, then it would be referring consumers to credit grantors (the partner banks) with which it maintained agreements related to lending, underwriting, servicing, payment processing, and/or debt collection); and § 1789.13(r) (because, as stated, Defendants have relied on misrepresentations to disguise the nature of GREENSKY's business so as to evade state licensing).

197.    GREENSKY's violations of § 1789.13(c) require further explication because they are particularly important to its business model. GREENSKY, as described throughout, has harvested the bulk of its revenues from "merchant fees"; the remainder consists of "incentive payments" from the partner banks. GREENSKY thus clearly receives valuable consideration for referring buyers to credit grantors; for the purposes of this provision, the credit granted to consumer is "substantially" the same as that offered without the assistance of GREENSKY and/or to the general public.

198.    Indeed, if the terms of credit were not "substantially" the same in this regard, then GREENSKY would effectively be admitting to its role as a (re)lender (i.e., as one taking spreads on money lent to its program) for, given its merchant fees plus interest rates that climb well above 20% (after the promotional period) for borrowers still within the "prime" credit score range, it is evident that GREENSKY is not obtaining competitive rates for consumers.

199.   Likewise, by receiving "incentive payments" from credit grantors (the partner banks) for its extension of credit, GREENSKY is also in violation of the second prong of § 1789.13(c).

200.   Further, GREENSKY has not complied with the affirmative duties required by the CSA in ways that include but are not limited to: failure to provide a prescribed information statement, *including the right to sue the CSO and cancel the agreement within five days* (in violation of § 1789.15); failure to provide buyers with a prescribed contract, including a detachable notice of cancellation (in violation of § 1789.16); and failure to maintain a surety bond of $100,000 in California (in violation of § 1789.18).

201.   Pursuant to § 1789.21(a), "*Any buyer injured by a violation of this title or by the credit services organization's breach of a contract subject to this title may bring any action for recovery of damages, or for injunctive relief, or both. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages.*" (emphasis added).

### THIRD CAUSE OF ACTION
### DECLARATORY RELIEF
### (Against All Defendants)

202.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

203.   Plaintiff brings this count on behalf of the Class.

204.   As outlined above, GREENSKY is either a finance lender and/or broker, pursuant to Cal. Civ. Code § 22000 et seq., or a credit services organization, pursuant to Cal. Civ. Code § 1789.10 *et seq.*

205.   Plaintiff asks this Court to declare that GREENSKY operates as an unlicensed lender and/or broker in California.

/ / /

/ / /

## FOURTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),
### Bus. & Prof. § 17200
### (Against All Defendants)

206.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

207.   Plaintiff brings this count on behalf of the Class.

208.   The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ." as well as any acts prohibited by Chapter 1 of the False Advertising Law (Bus. & Prof. § 17500 *et seq.*; "FAL").[47]

209.   GREENSKY's acts, as described throughout, are business practices.

210.   As stated, GREENSKY's business and advertising acts and practices have systematically violated the UCL, as well as the FAL, which constitutes a violation of the UCL.

211.   Defendants' conduct has which is "Unlawful," "Unfair," or "Deceptive" includes, but is not limited to, the following:

   a.   By violating California laws (whether as a lender, broker, and/or CSO)— particularly those designed to protect consumers, as described herein;

   b.   By unfairly and unconscionably profiting, at the expense of consumers, from these violations of California law;

   c.   By fraudulently failing to disclose its (material) fees to consumers;

   d.   By unfairly and unlawfully purporting to bind consumers to "split plan" loans before disclosing the terms of those loans;

   e.   By unfairly and unlawfully purporting to bind consumers to GREENSKY-branded installment loan agreements before disclosing the terms and conditions of those loans;

/ / /

---

[47] Cal. Civ. Code § 17200.

f.  By unfairly training merchants on its platform to upsell by charging consumers more for a given product while concealing the fees being paid to GREENSKY; and

g.  By violating the FAL, as will be described below.

212.   Defendants' misrepresentations and omissions caused Plaintiff and Class members to purchase goods or services from the merchants on GREENSKY's platform. Absent those misrepresentations and omissions, Plaintiff and Class members would not have purchased the germane goods or services or would not have purchased them at the prices they paid.

213.   Accordingly, Plaintiff and Class members suffered injury in fact, including lost money or property, as a result of GREENSKY's misrepresentations and omissions.

## FIFTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"),
### Bus. & Prof. § 17500
### (Against All Defendants)

214.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

215.   Plaintiff brings this count on behalf of the Class.

216.   The FAL prohibits advertising products using untrue or misleading statements that the speaker knows or should know are untrue or misleading.

217.   GREENSKY's platform enabled billions of dollars of consumer loans to be made throughout the United States, including California. Meanwhile, GREENSKY advertised to consumers and state agencies that it was nothing more than a "program administrator," "service provider," and/or "payment platform"; these terms all have meaning and were misleading as applied to GREENSKY.

218.   More specifically, a "program administrator," in general, administers some program that *is already in existence and was established by some other authority* (e.g., a PACE program); a "service provider"—a *loan* service provider—typically collects a very small amount of outstanding principal in exchange for collecting on loans *that were already in existence when it began to service them*; and a "payment platform," such as PayPal, is, generally, an interface/network

1   whereby one can transfer funds in exchange for, usually, the platform collecting a relatively small
2   fee (or, for consumers, the transfer may be free) for transmitting those funds.

3       219.    As described throughout this complaint, GREENSKY's platform *originates* loans;
4   it is a "program administrator" only to the extent it administers its *own* "program." As described
5   above, GREENSKY has harvested the vast bulk of its revenues from charging substantial fees
6   upon principal at "*the point of origination*" (emphasis added)—it is not a mere loan servicer. And,
7   while it may be a payment platform, it is doing so to collect payments on the GREENSKY-
8   branded loans that were originated on its own platform.

9       220.    GREENSKY knew or should have known that these representations were untrue
10  and/or misleading.

11      221.    Further, as described throughout, GREENSKY has built its business model upon,
12  and profited directly from, this semantic sleight of hand. GREENSKY, in essence, was able to get
13  some number of bank partners to agree to lend *it* (GREENSKY) money for its platform on a
14  revolving basis with whatever terms and conditions and hide the nature of its business from
15  consumers and state agencies.

16      222.    As stated above, GREENSKY itself admitted that it offered loan products—at least
17  its deferred interest products—with terms *different from those offered by the partner banks*
18  (because GREENSKY contracted to cover the first year of interest regardless of whether the
19  consumer was able to pay before the end of the deferment period). *Thus, GREENSKY—not the*
20  *partner banks—offered deferred interest loan products*.

21      223.    Consumers, thinking that they were doing business strictly with a given merchant,
22  would often be surprised to see GREENSKY-branded installment loan agreements arrive. These
23  loan agreements would arrive with TILA disclosures but *without disclosure of the approximately,*
24  *on average, 10% of principal that GREENSKY would ultimately deduct.*

25      224.    GREENSKY has also failed to represent the true nature of its business to state
26  regulatory agencies.

27      225.    These misrepresentations and omissions resulted in an incentive structure in which
28  merchants were expressly encouraged to upsell, often using unscrupulous methods, their products

using GREENSKY financing. GREENSKY likewise gave merchants the ability to access GREENSKY funds with minimal due diligence, which was to GREENSKY's advantage.

226. These misrepresentations and omissions resulted in a business model that relied upon evading state laws.

227. GREENSKY's misleading and/or untrue statements in this regard were material and likely to deceive a reasonable consumer.

228. Plaintiff and Class members suffered injury in fact, including the loss of money or property, as a result of GREENSKY's unlawful, unfair, or deceptive practices. Absent GREENSKY's misrepresentations and omissions, Plaintiff and Class members would not have purchased the relevant goods or services or would not have purchased them at the prices they paid.

229. GREENSKY has evinced a pattern and practice of such wrongful conduct in California and across the country.

## SIXTH CAUSE OF ACTION
## VIOLATION OF CONSUMER LEGAL REMEDIES ACT ("CLRA"),
### Cal. Civ. Code § 1750
### (Against All Defendants)

230. Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

231. Plaintiff brings this count on behalf of the Class.

232. The CLRA prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.

233. The lending services provided by GREENSKY are "services" within the meaning of Cal. Civ. Code § 1761(b).

234. Plaintiff and Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

235. Plaintiff, Class members, and Defendants are each "persons" within the meaning of Cal. Civ. Code § 1761(c).

236.   As alleged herein, GREENSKY made misrepresentations and omissions regarding its role in making, brokering, and/or extending consumer loans.

237.   These misrepresentations and omissions were undertaken in transactions that were intended to, or did, result in the sale of GREENSKY's services to California consumers, so as to satisfy § 1770(a).

238.   GREENSKY's conduct, as described herein, was and is in violation of at least the following enumerated prohibitions in Cal. Civ. Code § 1770(a):

      a.   § 1770(1): Passing off goods or services as those of another.

      b.   § 1770(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.

      c.   § 1770(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.

      d.   § 1770(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

      e.   § 1770(9): Advertising goods or services with intent not to sell them as advertised.

239.   Plaintiff and Class members suffered injury in fact and actual damages resulting from GREENSKY's material misrepresentations and omissions because they paid an inflated purchase price for the relevant goods or services and/or would not have purchased the goods or services if they had known of GREENSKY's misrepresentations and omissions. At this time, however, Plaintiff does not seek those damages.

240.   Plaintiff, individually and on behalf of the class, has provided notice to GREENSKY of its violations of the CLRA concurrent with the filing of this Complaint. Should GREENSKY fail to remedy its conduct pursuant to the notice, Plaintiff shall amend this Complaint to seek monetary damages pursuant to Cal. Civ. Code § 1780(a)(1).

241.   Pursuant to Cal. Civ. Code § 1780, Plaintiff and those similarly situated are entitled to restitution of all payments made on the GREENSKY loans, are entitled to obtain an order requiring GREENSKY to correct the misrepresentations it made to the Class, and to recover reasonable attorneys' fees and costs.

242.   Plaintiff, individually and on behalf of the Class, seeks restitution and injunctive relief pursuant to Cal. Civ. Code. § 1780.  The CLRA, Cal. Civ. Code § 1750 *et seq.*, is designed to protect consumers against unfair and deceptive business practices.  It applies to GREENSKY's conduct because it covers transactions that are intended to result, or that do in fact result, in the sale or lease of goods and services to consumers.

243.   GREENSKY knew, or should have known, that it was misrepresenting its business to consumers and state agencies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

1.   Approving of the proposed Class, certifying Plaintiff as representative of the Class and designating her counsel as counsel for the Class;

2.   Enjoining Defendants from the business practices described herein;

3.   Granting the requested declaratory judgment;

4.   Declaring that Defendants committed the violations alleged herein;

5.   Granting damages, except as limited in by the Consumer Legal Remedies Act, restitution, and/or disgorgement to Plaintiff and the Class;

6.   Granting compensatory damages, the amount of which is to be determined by jury at trial, except as limited in by the Consumer Legal Remedies Act;

7.   Granting punitive damages;

8.   Granting pre- and post-judgment interest;

9.   Granting attorneys' fees and costs; and

10.   Granting further relief as this Court may deem proper.

///

1

2

## DEMAND FOR JURY TRIAL

3
Plaintiff, individually and on behalf of the proposed Class, hereby demands a trial by jury

4
on all issues so triable.

5
///

6
///

7
///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: January 7, 2019

Respectfully submitted,

DANIEL T. LeBEL, SBN 246169
**CONSUMER LAW PRACTICE**
**OF DANIEL T. LeBEL**
PO Box 720286
San Francisco, CA 94111
T: (415) 513-1414
F: (877) 563-7848
danlebel@consumerlawpractice.com

BRYCE BELL (motion for *pro hac vice* forthcoming)
MARK W. SCHMITZ (motion for *pro hac vice* forthcoming)
ANDREW R. TAYLOR (motion for *pro hac vice* forthcoming)
**BELL LAW, LLC**
2600 Grand Blvd., Suite 580
Kansas City, MO 64108
T: 816-886-8206
F: 816-817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT

CASE NUMBER: CGC-20-582136 ELIZABETH BELYEA VS. GREENSKY, INC. A CORPORATIC

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

DATE: **JUN-10-2020**

TIME: **10:30AM**

PLACE: **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



# Superior Court of California, County of San Francisco
# Alternative Dispute Resolution
# Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

## WHY CHOOSE ADR?

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

> **\*\*<u>Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint</u>\*\***

## WHAT ARE THE ADR OPTIONS?

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

## 1) MANDATORY SETTLEMENT CONFERENCES

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

(A) **MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF)**, in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

(B) **JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco Superior Court Judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

(C) **PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

(D) **COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

### 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

#### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

#### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS.   THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*)

FOR COURT USE ONLY

TELEPHONE NO.:

ATTORNEY FOR *(Name)*:

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____ |
| | **DEPARTMENT 610** |

**1)   The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐   **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐   **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session.   Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available  to those who qualify. communityboards.org

☐   **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the internet.

☐   **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no  equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this  program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐   **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days  ☐ 90-120 days  ☐ Other (please specify) _____

☐   **Other ADR process (describe)**_____

**2)   The parties agree that the ADR Process shall be completed by (date):** _____
**3)   Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____


_____              _____
Name of Party Stipulating                                    Name of Party Stipulating

_____              _____
Name of Party or Attorney Executing Stipulation        Name of Party or Attorney Executing Stipulation

_____              _____
Signature of Party or Attorney                              Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant        ☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____              Dated: _____

☐  *Additional signature(s) attached*

ADR-2  10/18              **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

## CONSUMER LAW PRACTICE
### DANIEL T. LeBEL, ATTORNEY

## DEMAND AND NOTICE OF VIOLATION
## OF CONSUMERS LEGAL REMEDIES ACT

TO:   GREENSKY OF GEORGIA, LLC, GREENSKY, INC., AND GREENSKY, LLC

PLEASE TAKE NOTICE that you are in violation of the Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*), for the reasons stated in the Complaint ("Complaint"), filed in the Superior Court of the State of California, in and for San Francisco County, on or about January 9, 2020, entitled: **Elizabeth Belyea v. Greensky, Inc. et al.**, and attached hereto as Exhibit A.

This notice is served upon you on behalf of Elizabeth Belyea ("Plaintiff"). All communications or responses regarding this Notice shall be directed to Plaintiff's counsel as follows:

Daniel T. LeBel
**CONSUMER LAW PRACTICE**
PO Box 720286
San Francisco, CA 94172
(415) 513-1414

## STATEMENT OF VIOLATIONS

The Complaint alleges that Greensky, Inc., Greensky of Georgia, LLC, and Greensky, LLC ("Defendants"), violated the Consumers Legal Remedies Act by, among other things, through misrepresentations and omissions about the nature of it's service. These acts violated and continue to violate the Consumers Legal Remedies Act because Defendant:

    i.    § 1770(a)(1): Passing off goods or services as those of another.
    ii.    § 1770(a)(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.
    iii.    § 1770(a)(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.
    iv.    § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.
    v.    § 1770(9): Advertising goods or services with intent not to sell them as advertised.

## CONSUMER LAW PRACTICE
### DANIEL T. LeBEL, ATTORNEY

## STATEMENT OF REMEDIES

IT IS HEREBY DEMANDED THAT WITHIN THIRTY (30) DAYS from the date on which this Notice is served upon you that you remedy your violations as follows:

Restore all payments made on the GREENSKY loans to Plaintiff and the proposed class; correct the omissions and misrepresentations made to Plaintiff and the Class; adopt best practices to ensure the omissions and misrepresentations are not continued; and pay Plaintiff's reasonable attorneys' fees and costs.

# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  STEVEN E. FOX
    GreenSky, LLC
    5565 GLENRIDGE CONNECTOR, SUITE 700
    ATLANTA, GA 30342

SOP Transmittal #  **537142635**

213-337-4615 - Telephone

Entity Served:  GreenSky, LLC  (Domestic State: GEORGIA) (Served as GREENSKY, INC., ET AL., DFTS. // TO: GREENSKY, LLC Name discrepancy noted.)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of CALIFORNIA on this 06 day of February, 2020. The following is a summary of the document(s) received:

1. **Title of Action:**  ELIZABETH BELYEA, ETC., PLTF. vs. GREENSKY, INC., ET AL., DFTS. // TO: GREENSKY, LLC

2. **Document(s) Served:**  Other: Summons, Complaint, Attachment

3. **Court of Jurisdiction/Case Number:** San Francisco County - Superior Court - San Francisco, CA
    Case # CGC20582136

4. **Amount Claimed, if any:**  N/A

5. **Method of Service:**

  _X_ Personally served by:    _X_ Process Server    ___ Law Enforcement    ___ Deputy Sheriff    ___ U. S Marshall

  ___ Delivered Via:    ___ Certified Mail    ___ Regular Mail    ___ Facsimile

  ___ Other (Explain):

6. **Date and Time of Receipt:**  02/06/2020 12:50:00 PM CST

7. **Appearance/Answer Date:** Within 30 Calendar Days After This Summons And Legal Papers

8. **Received From:**  Daniel T. Lebel        **9.** **Carrier Airbill #** 1ZY041160194913360
    Consumer Law Practice Of Daniel T. Lebel
    PO BOX 720286
    San Francisco, CA 94111      **10.** **Call Made to:** Not required
    415-513-1414

11. **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  STEVEN E. FOX  steve.fox@greensky.com

Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com

Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com

REMARKS : According to the California Secretary of State, the only entity registered beginning with the name (ABC Company) is (ABC Company, Inc.).

**NATIONAL REGISTERED AGENTS, INC.**        **CopiesTo:**

Transmitted by   Amanda Garcia

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

82-06-2020

**SUM-100**

# SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GREENSKY INC., a corporation, GREENSKY OF GEORGIA, LLC,
GREENSKY, LLC, limited liability companies, and DOES 1-20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ELIZABETH BELYEA, individually and on behalf of all others
similarly situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Francisco Superior Court<br>400 McAllister St.<br>San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):* CGC-20-582136 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel T. LeBel, PO Box 720286, San Francisco, CA 94172; (415) 513-1414

DATE: JAN 09 2020       Clerk, by DE LA VEGA-NAVARRO, Rossi       Deputy
*(Fecha)*       CLERK OF THE COURT       *(Secretario)*       *(Adjunto)*

*(For proof of service of this summons use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

BY FAX

1. ☐ as an individual defendant
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Greensky LLC
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* LLC
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Daniel T. LeBel, SBN 246169
Consumer Law Practice of Daniel T. LeBel
PO Box 720286
San Francisco, CA 94172
TELEPHONE NO.: (415) 513-1414     FAX NO.: (877) 563-7848
ATTORNEY FOR (Name): Elizabeth Belyea

ENDORSED
FILED
San Francisco County Superior Court

JAN 09 2020

CLERK OF THE COURT
BY: ROSSALY DE LA VEGA
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister St
MAILING ADDRESS: 400 McAllister St
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Unlimited Jurisdiction

CASE NAME:
Belyea v. Greensky, Inc. et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER |
|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | CGC-20-582136 |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [✓] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [ ] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action (specify): Cal Fin 22000; Decl Rel.; Civ Code 1750/1789.10; Cal B&P 17200/17500
5. This case [✓] is [ ] is not a class action suit
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 1/7/2020
Daniel T. LeBel
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

1   DANIEL T. LEBEL, SBN 246169
    CONSUMER LAW PRACTICE
2   OF DANIEL T. LEBEL
    PO Box 720286
3   San Francisco, CA 94111
4   T: (415) 513-1414
    F: (877) 563-7848
5   danlebel@consumerlawpractice.com

6   BRYCE BELL (motion for *pro hac vice* forthcoming)
7   MARK W. SCHMITZ (motion for *pro hac vice* forthcoming)
    ANDREW R. TAYLOR (motion for *pro hac vice* forthcoming)
8   BELL LAW, LLC
    2600 Grand Blvd., Suite 580
9   Kansas City, MO 64108
10  T: 816-886-8206
    F: 816-817-8500
11  Bryce@BellLawKC.com
    MS@BellLawKC.com
12  AT@BellLawKC.com

13
    *Attorneys for Plaintiff and all others similarly situated,*
14

15          **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
16              **IN THE COUNTY OF SAN FRANCISCO**

17  ELIZABETH BELYEA,                          )   Case No. CGC - 20 - 582136
    individually and on behalf of all others   )
18  similarly situated,                        )   CLASS ACTION COMPLAINT
                                               )
19                         Plaintiffs,         )   1. California Financing Law
                                               )   (Cal. Fin. Code §22000)
20  v.                                         )   2. Credit Services Act of 1984
                                               )   (Cal. Civ. Code § 1789.10)
21                                             )   3. Declaratory Judgment
    GREENSKY, INC.,                            )   4. California Unfair Competition Law
22  a corporation,                             )   (Cal. Bus. & Prof. Code §17200)
                                               )   5. California False Advertising Law
23  and                                        )   (Cal. Bus & Prof. Code §17500)
                                               )   6. Consumer Legal Remedies Act
24  GREENSKY OF GEORGIA, LLC, and              )   (Cal. Civ. Code § 1750)
25  GREENSKY, LLC,                             )
    limited liability companies, and DOES 1-20 )
26                                             )
27                         Defendants.         )   **DEMAND FOR JURY TRIAL**
28

                                               1

## CLASS ACTION COMPLAINT

1.     Plaintiff brings this class action complaint against Defendants to recover damages for herself and others similarly situated caused by Defendants' failure to comply with state lending and/or credit services law, as well as multiple consumer protection laws. On information and belief, Plaintiff alleges as follows:

## PARTIES

2.     Plaintiff Elizabeth Belyea ("Plaintiff") is and, at all relevant times, has been a resident of California and a consumer.

3.     Defendants GreenSky of Georgia, LLC and GreenSky, LLC are, on information and belief, related entities that are ostensibly controlled by GreenSky, Inc., a publicly traded corporation (collectively, "GREENSKY" or "Defendants").

4.     GreenSky of Georgia, LLC is registered in California as a foreign limited liability company.

5.     GREENSKY has consistently provided California consumers (and merchants) with materials attributed to GreenSky, LLC such that that entity is properly included in this complaint.

6.     GREENSKY may be served by serving National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

7.     At all times relevant to this complaint, Defendants were engaged in the business of marketing, servicing, managing, controlling, establishing the terms of credit, originating, distributing, transmitting funds for, and/or collecting on consumer installment loan and/or credit products.

8.     The true names and capacities of Defendants sued as Does 1 through 20 are unknown to Plaintiffs at this time. Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of Does 1 through 20 when ascertained. Plaintiffs are informed and believe, and based thereon alleges, that

1    each Defendant is jointly and severally responsible in some manner for the damages alleged

2    herein.

3

## JURISDICTION AND VENUE

4    9.     This Court has personal jurisdiction over the Defendants in that they each solicit

5    business and sales of their consumer loan services and products throughout California.

6    10.     This Court has jurisdiction over this action pursuant to § 410.10 of the California

7    Code of Civil Procedure. Jurisdiction is also proper under California Civil Code § 17200 *et seq.*

8    11.     Venue is appropriate in the County of San Francisco pursuant to California Code

9    of Civil Procedure § 395, because Defendants conduct business within this county.

10    12.     This is a class action for violations of California Financing Law ("CFL") or, in the

11    alternative, California's Credit Services Act of 1984 ("CSA"), as well as the Unfair Competition

12    Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA").

13

## GREENSKY'S BUSINESS MODEL
14
**GREENSKY Is Not a Properly Licensed Lender, Broker, or Credit Services Organization but Takes Fees from Loans or Other Extensions of Credit Provided by Legitimate Lenders.**
15

16    13.     GREENSKY, presumably for the sake of greater profit, adopted a path that was

17    plainly illegal in California (and many other, if not every other, state(s)): it made its money by

18    taking undisclosed finance charges on consumer loans, in clear violation of the CFL.

19    14.     GREENSKY, put simply, is a contemporary iteration of what has been called a

20    "rent-a-bank" scheme;[1] its business model on an unlicensed basis is illegal as a matter of

21    California law. Despite the array of obfuscation and buzzwords it has offered with regard to its

22    business, **the important question is: How does GreenSky make money? The answer is fairly**

23    **simple: GREENSKY puts lending in the hands of contractors—plumbers, roofers, HVAC**

24

---

25    [1] *See, e.g.,* ATTORNEYS GENERAL FOR THE DISTRICT OF COLUMBIA, MASSACHUSETTS, CALIFORNIA,
     COLORADO, ILLINOIS, IOWA, MARYLAND, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON,
26    PENNSYLVANIA, VIRGINIA, AND CONNECTICUT, *Request for Information on Small-Dollar Lending*
     (Jan. 22, 2019), at pp. 2-4, available at https://www.fdic.gov/regulations/laws/federal/2018/2018-
27    small-dollar-lending-3064-za04-c-038.pdf (last visited Oct. 11, 2019) (describing traditional rent-
28    a-bank schemes).

installers, window installers, etc.— and takes fees for itself as a percentage of consumer loans.  These fees are *de facto* finance charges, part of the cost of borrowing money or receiving an extension of credit, but GREENSKY calls them "merchant fees."

15.    GREENSKY has attempted to evade state laws and regulatory regimes by declaring itself to be just a consumer loan "servicer," "program administrator," or "platform" when, in fact, it is far more. According to GREENSKY's own Initial Public Offering ("IPO") pitchbook, it is described as a "platform" that supports "the full transaction lifecycle, including credit application, underwriting, real-time allocation to bank partners, funding, settlement, and servicing."[2]

16.    That same pitchbook also assured potential investors that GREENSKY maintained a "robust [and] integrated regulatory compliance framework."[3]

17.    GREENSKY partners with, generally, larger regional banks that fund its "program," or "programs." Examples include (and/or included) Fifth Third Bank, Regions Bank, Sun Trust Bank, and Midland States Bancorp, Inc. These banks broadly have little or no knowledge whatsoever of the merchants that exist in GREENSKY's program or the many individual consumers that receive GREENSKY-branded loans.

18.    Upon information and belief, these partner banks supply general criteria—e.g., broad funding and interest rate parameters—relative to the GREENSKY program while remaining thoroughly removed from the ultimate allocation of funds to consumers and merchants.

19.    For example, Regions Bank (of Alabama), which had been one of GREENSKY's largest bank partners yet recently declined to renew its funding contract with GREENSKY, "[didn't] break out GreenSky loans in its financial statements."[4]

20.    On the April 27, 2018, Statement of Information GREENSKY filed with the California Secretary of State, it misleadingly classified itself as a mere "payment platform."

---

[2] EVOLVE CAPITAL PARTNERS, GreenSky, Inc. Summary of Initial Public Offering (May 2018), available at https://www.evolve-capital.com/wp-content/uploads/2018/06/Greensky-IPO-Profile.pdf (last visited October 11, 2019).
[3] *Id.*
[4] Alan Kline, *How Buy Now is Evolving into Borrow Now*, 128 AMERICAN BANKER 15, 18 (Mar. 2018).

21.     Indeed, in the aforementioned IPO pitchbook, GREENSKY was more accurately described as a "lending platform":

# GreenSky, Inc. IPO – Executive Su

**Initial Public Offering Overview**

**GreenSky™**                          **NASDAQ:GSKY**

📄 **Description**

GreenSky, Inc. is a financing and payments technology company that
operates a platform that provides credit solutions. The company's lending
platform enables retailers, healthcare providers, and home contractors to
offer Point of Sale (PoS) credit to their customers.

22.     GREENSKY has overwhelmingly derived its revenues from charging the "merchant fees,"[5]  which are finance charges, as well as receiving interest rate spread-driven "incentive payments" from partner banks.

23.     Importantly, GREENSKY does not disclose the amount of these finance charges to consumers.

24.     Rather, buried in the fine print of the installment loan agreement provided to Plaintiff was the following statement:

**Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.**

25.     GREENSKY simply possesses no reliable enforcement mechanism to ensure that contractors do not charge customers for some or all of these fees.

---

[5] GREENSKY, INC., Form 10-K (for the fiscal year ended Dec. 31, 2018, filed with the SEC; "2018 10-K"), at 79.

26.     Further, rather than burying such an innocuous statement deep within the fine print, an effort at genuine disclosure would dictate that GREENSKY reveal that it had taken on, average, 10% of the principal amount as part of the transaction.

27.     The reason for such concealment is simple: most of GREENSKY's business is taking finance charges on consumer transactions; however, by simply calling these "merchant fees," GREENSKY maintains that it need not be licensed under the wide variety of laws that would restrict and/or curtail and/or require disclosure of the taking of such. On the other hand, the bank partners, as chartered institutions, must reveal their relatively minor administrative fees under the Truth in Lending Act.

28.     Likewise, GREENSKY does not train the merchants in its program to disclose the amount of the merchant fees to consumers, making it that much easier to dissemble the actual nature of its business.

29.     In GREENSKY's own words: "The merchant fee is calculated by multiplying a set fee percentage (as outlined in a schedule provided to the merchants) by the dollar amount of a loan ***at the point of origination***."[6]   (emphasis added). The Merchant Program Agreement GREENSKY would enter with the Merchants provided that the "Merchant will pay GreenSky a contractor or transaction fee ("Transaction Fee").  … The Transaction Fee is due and payable to GreenSky upon the funding of a Loan." In this way, GREENSKY's primary source of revenue is derived directly from the extension (not servicing) of credit.

## GREENSKY's Competitors Follow the Law

30.     GREENSKY's illegal scheme puts legitimate businesses in the same market as GREENSKY at a relative disadvantage.

31.     In GREENSKY's own words: "***We face competition from a diverse landscape of consumer lenders, including traditional banks, credit unions and credit card issuers, as well as alternative technology-enabled lenders***."[7]  Indeed, it is telling that GREENSKY proclaims its primary competitors to exclusively be different forms of lenders.

---

[6] *Id.* at 78 (emphasis added).
[7] *Id.* at 8 (emphasis added).

32.     For example, San Francisco-based Affirm—which, like GREENSKY, is a point-of-sale fintech firm—reported itself to the Secretary of State as a "financial services" firm and is licensed (as Affirm Identity, #6054768), as a finance lender and broker, with the Department of Business Oversight.

33.     For example, Oakland-based Solar Mosaic, Inc., which, like GREENSKY, offers point-of-sale financing (for solar systems), also became a licensed lender (#6054631) by at least 2012.

### GREENSKY Originates Consumer Loans

34.     In GREENSKY's own words: "While many of our Bank Partners may traditionally focus on lending opportunities within their geographic footprints, ***our platform enables them to originate loans in all 50 states*** . . ."[8] Thus, GREENSKY expressly originates loans; again, the partner banks are removed from this process and in this way GREENSKY explicitly acts as a broker and originator for the partner banks.

35.     In GREENSKY's own words: "***Our platform delivers significant loan volume***, while requiring minimal upfront investment by our Bank Partners. Furthermore, our program is designed to adhere to the regulatory and compliance standards of our Bank Partners, which has helped us to gain their confidence, ***allowing them to outsource both loan facilitation and servicing functions to us***."[9]

36.     In GREENSKY's own words: "Our platform is powered by a ***proprietary*** technology infrastructure that delivers stability, speed, scalability and security. ***It supports the full transaction lifecycle, including credit application, underwriting, real-time loan allocation to our Bank Partners, document distribution, funding, settlement and servicing***, and it can be expanded to additional industry verticals as we scale our business."[10]

37.     Indeed, close examination of GREENSKY reveals that it has downplayed the nature of its business to consumers and regulators, while offering a truer picture to investors.

---

[8] *Id.* at 6 (emphasis added).
[9] *Id.* at 4 (emphasis added).
[10] *Id.* (emphasis added).

38.     In GREENSKY's own words: "*We derive most of our revenue and profitability from upfront transaction fees that merchants pay us every time they facilitate a transaction using our platform. Thus, our profitability is strongly correlated with merchant transaction volume. The transaction fee rate depends on the terms of financing selected by a consumer. In addition, we collect servicing fees* on the loan portfolios we service for our Bank Partners."[11]

39.     The penultimate sentence underlined above alludes to yet another deception that is largely inherent in GREENSKY's business model: Consumers generally do not themselves select the terms of financing. The thousands of merchant-contractors—plumbers, roofers, HVAC installers, window installers, etc.—often do not, and are indeed not equipped to, fully and adequately explain a range of financing plans to consumers; in many cases, that notion is actually absurd. Instead, these merchants are empowered to push through loan applications with ease on tablets utilizing the GreenSky platform.

40.     In GREENSKY's own words: "Our Bank Partners offer certain loan products that have a feature whereby the account holder is provided a promotional period to repay the loan principal balance in full without incurring a finance charge. For these loan products, we bill interest each month throughout the promotional period and, under the terms of the contracts with our Bank Partners, we are obligated to pay this billed interest to the Bank Partners if an account holder pays off the loan balance in full within the promotional period."[12] Thus, GREENSKY contracts to assume a particular type of credit risk before any loan is even made.

### GREENSKY Offers Loan Terms That the Bank Partners Do Not

41.     Further, this incentive structure reveals (at least) three important aspects of GREENSKY's business model: 1) **It contracts with consumers for loan terms that are fundamentally different from those offered by the bank partners** (because the banks harvest a particular rate of interest regardless of whether the consumer pays off the loan within the promotional period), 2) **GREENSKY, not the partner banks, offers a deferred interest loan product** (i.e., GREENSKY is the true lender for at least a portion of the loan), and 3) **it behooves**

---

[11] *Id.* at 5 (emphasis added).
[12] *Id.* at 84.

**GREENSKY to have customers that are not able to pay off loans within the promotional period but do not ultimately default**.

42.     Indeed, just this single statement reveals how fundamentally deluded GREENSKY is with regard to its own business: **if the bank partners themselves did indeed "offer certain loan products that have a feature whereby the account holder is provided a promotional period to repay the loan principal balance in full without incurring a finance charge," then there would be no need for GREENSKY to cover such prepayment risk**.[13]

43.     GREENSKY commonly refers to the amounts it must pay the banks when prepayments occur as *__finance charge reversals__* ("FCRs").[14]

44.     GREENSKY's business model, very much unlike that of a mere loan servicer or program administrator, is predicated on the bet that it can originate enough consumer loans to harvest robust "merchant fees" while also mitigating prepayment risk and collecting volume and/or spread "incentive payments" from the banks (and while also evading state regulatory agencies).

45.     For example, in GREENSKY's own words: ". . . the expected increase in the fair value change in the FCR liability that we expect to dissipate in the following quarters, which is resulting from spread compression and margin contraction as an increase in contracted Bank Partner yields . . ."[15]

---

[13] Prepayment risk generally refers to the potential cost to a lender of having a given borrower repay a loan before the contractual termination date such that the lender does not harvest the full amount of interest potentially generated by the debt. This complaint uses "prepayment risk," as applied to GREENSKY, to mean the period of deferred interest, or "waived" interest, during which a consumer, should they pay off the loan during such time, would realize no interest costs; this period is usually 12 to 18 months. Obviously, lending money at 0% interest would generally not be profitable and, as stated, GREENSKY's partner banks do not actually offer such loans to consumers. Rather, GREENSKY offers deferred interest on its own program loans as an enticement and performs its own risk/reward calculations with regard to this particular form of prepayment risk. This also highlights the fact that GREENSKY's "merchant fees" are actually a de facto finance charge.

[14] *See, e.g.,* GREENSKY, INC., Q2 2019 Earnings Call, Corrected Transcript (Aug. 6, 2019), at 5 (emphasis added).

[15] GREENSKY, INC., Q1 2019 Earnings Call, Corrected Transcript (May 7, 2019), at 6.

46.     Put in plainer English, this means that a key part of GREENSKY's business comes from "playing the yield curve"—i.e., realizing profits or losses based upon how much more interest (spread) it can charge relative to its fixed bank contracts as interest rates shift over varying periods of time.

47.     Hence, "The increases in [FCR] expense is due to both to the growth of the deferred interest loans in the portfolio, as well as the higher APR on deferred interest loans originated since mid-2018."[16]

48.     Even further, GREENSKY has explored "forward flow" arrangements with other cash-rich entities, such as pension funds and insurance companies. Such arrangements would likely, amongst other aspects, lower its cost of borrowing (because GREENSKY, as described, is foremost a re-lender and a broker of consumer loans, such arrangements could be profitable) while also diversifying and muting various sources of risk to its business.[17]

49.     For example, in GREENSKY's own words: "In terms of structure, what we do expect is a counterparty would write a multi-year arrangement whereby we would agree on a forward flow, we would fund up to an annual dollar amount and those commitments would be sort of billions of magnitudes. And this would sit side by side with our existing bank partners. So just think of it as another peg in our round-robin. But there appears to be quite a bit of appetite and liquidity in the market that would embrace this quality of consumer loan."[18]

50.     Regardless of whether GREENSKY ultimately utilizes such funding sources, this is but another aspect through which its rent-a-bank nature can be viewed. **GREENSKY does not simply service or administrate consumer loans that have already been made: rather, it secures funding sources for itself, originates loans, and collects finance charges thereon. This arrangement on an unlicensed basis is plainly illegal in California**.

51.     The high level of average merchant fees (~10% of principal traditionally) mentioned throughout this complaint are partially a reflection of GREENSKY covering the prepayment risk just discussed. Indeed, as the interest-waiver period increases, GREENSKY's

---

[16] GREENSKY, INC., Q2 2019 Earnings Call, Corrected Transcript (Aug. 6, 2019), at 5.
[17] *See, e.g., id.* at 4.
[18] *Id.* at 12.

merchant-fee percentage increases—that is why GREENSKY is "agnostic" as to finance plan selection.[19]

52.     In fact, this is another essential part of GREENSKY's deception: **The consumers who, according to GREENSKY, benefit from interest-waiver periods are charged _more_ up front because the merchants themselves are charged more to cover the aforementioned prepayment risk and they pass this on to to consumers**.

53.     This point is further elucidated by GREENSKY's own description of its loan plan for "less creditworthy" borrowers; as seen below, GREENSKY set a flat fee of 3.25% for such products, **which do not offer deferred interest**—hence, there is no prepayment risk for GREENSKY relative to the underlying interest payments. Thus, GREENSKY simply takes an unlawful finance charge of 3.25%, in addition to possible interest rate spreads and/or "incentive payments" from the banks, of principal on loans made to low-prime and/or subprime borrowers. GREENSKY' 2017 merchant training materials explain this as follows:



**GreenSky**

## Seamless Counteroffer

- Automatically considers less creditworthy customers for our counteroffer plan
- Quick, seamless process
- No additional phone call or follow up

| Plan 7096¹ | |
|---|---|
| Terms | 96 months |
| APR Range | 19.99% - 26.99% |
| Credit Limit | Up to $8,500 |
| Contractor Fee | 3.25% |

54.     In GREENSKY's own words: "_We have developed an algorithm that underwrites potential loans against the specified credit criteria of each of our Bank Partners._"[20]  Again, the

---

[19] _See, e.g.,_ GREENSKY, INC., Q4 2018 Earnings Call, Corrected Transcript (Mar. 5, 2019), at 5.

bank partners provide only broad parameters, while GREENSKY controls the credit application process and provides a **proprietary credit-risk overlay** that determines **whether GREENSKY is willing to extend a loan**; the banks are not involved in the actual credit application approval/denial process.

55.     **Indeed, it makes no sense for a loan servicer or program administrator to "underwrite" (i.e., insure or guarantee) potential loans**; rather, GREENSKY accepts basic loan parameters from the partner banks as gateway criteria and then assesses its own willingness to adopt risks, necessarily including prepayment risk, before pushing a loan through.

56.     Further, **if the bank partners were not lending to GREENSKY as a separate entity, then they should be in competition for any given consumer loan amongst themselves; instead, it is GREENSKY that distributes loans *to* the banks on a "round-robin" basis**.

57.     Even if GREENSKY were offering consumers the exact same terms offered by the bank partners, it would still be acting as an unlicensed consumer loan broker and thereby harvesting unlawful fees.

58.     GREENSKY admittedly "auto-populates"[21] consumer credit applications, provides consumers with GREENSKY-branded loan agreements, receives payments from consumers directly, purports to take a purchase money security interest in (at least) some goods purchased with funds loaned by GREENSKY, and reports to consumer reporting agencies while the partner banks show up as little more than fine print on the GREENSKY-branded loan



---

[20] *Id.* at 7 (emphasis added).
[21] *Id.* at 6.

agreements:

# GreenSky® Installment Loan Agreement
## RETAIL INSTALMENT CREDIT AGREEMENT

59.     Where banks have traditionally maintained a protocol[22] for the purposes of identity verification so as to, for example, help curb unauthorized transactions and money laundering, GREENSKY and/or the merchants in its program purport to fulfill this function—the partner banks are uninvolved.

### GREENSKY Defines Consumer Loan Terms and Owns Credit Risk

60.     Further, GREENSKY contracts with the merchants, via merchant program agreements ("MPAs"), in its program so as to expressly own the "credit risk" and act as the "sole authority to prescribe the terms and conditions" of credit applications and consumer loans.

61.     Specifically, as stated in an MPA: "GreenSky may offer Loan(s) to Merchant's qualified customers as contemplated by this Agreement. As between the parties, *GreenSky has sole authority to prescribe the terms and conditions of the credit application, the Loan Agreement, and each Loan (including, without limitations, interest rate maximum amount and term).* GreenSky may at any time, *in its sole discretion (including at the direction of a Funding Bank), prospectively modify such terms and conditions with respect to Loans* for which approval is granted subsequent to the time of the modification. GreenSky may *in its sole discretion (including at the direction of a Funding Bank) change the credit standards at any time* without notice to Merchant and may reject and accept credit applications in its sole discretion . . ." (emphasis added).

62.     Beneath this provision, the MPA also stated that "*GreenSky shall own the Loans*, including the Borrower names and other Borrower Information, and, *shall bear the credit risk for*

---

[22] For example, the Patriot Act authorized the Secretary of the Treasury to promulgate regulations pertaining to banks and reasonable due diligence in verifying customers' identities, especially when opening an account. *See* 31 U.S.C. § 5318(l). Here, though GreenSky claims that the partner banks are the actual lenders, they are two degrees (with GreenSky and the merchants in between) removed from the ultimate beneficiary of a given account.

1    *the Loans.* Merchant acknowledges and agrees that it shall have no ownership interest in the
2    Loans" (emphasis added).

3        63.    Significantly, GREENSKY stated that this authority to establish terms of credit
4    was **in addition to** those that may be given at the direction of its bank partners.

5        64.    Merchants and/or consumers do not apply for loans with the bank partners, as
6    would typically be the case with "indirect lending."[23] Rather, **the entire process is managed by**
7    **GREENSKY and done in the GREENSKY name**.

8        65.    Thus, GREENSKY has filled nearly every function traditionally managed by
9    lenders despite continually claiming to not be a lender:

Is GreenSky a lender? Who is my loan with?

GreenSky is not a lender. We are a service provider and program administrator for federally insured, federal and state chartered banks that provide consumer loans under the GreenSky® Programs.

As a borrower, you received a loan agreement that identifies the bank that is offering and funding your loan. This loan agreement is between you and the funding bank directly. However, GreenSky services your loan at the direction and control of your lender, so any questions you have should be directed to us.

            (taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

22   ///

23   ///

24   ///

25   _____
26   [23] For example, credit unions sometimes enter indirect lending arrangements with car dealers. This
     means that the dealer may direct the borrower to the credit union at the dealership but the loan
27   application will still be submitted to the credit union with the consumer apprised of such. In this
     analogy, GreenSky is the credit union but, contrary to the credit union's legitimate model, points to
28   the bank partners when issues of "lending" arise.

Bottower: _____ Date: _____    Co- Borrower: _____ Date: _____
Electronic record constitutes acceptance of this Agreement (see above)    Electronic record constitutes acceptance of this Agreement (see above)
LENDER: A/ SunTrust Bank, a Georgia banking corporation    Date: 07/01/2019

(This is a disclosure of the lender behind the consumer loan made to Plaintiff—
it was made at the bottom of a page; in the manner common to rent-a-bank schemes,
this would have been the extent of SunTrust's involvement with the actual consumer)

66.     While GREENSKY has seemingly not charged overtly usurious interest rates in the manner that has captured the attention of, for example, California legislators,[24] it has commonly charged aggressive interest rates to consumers on behalf of its bank partners. Specifically, GREENSKY has charged an APR of up to, approximately, 27.99% on its deferred consumer installment loan products; the upper bound on its non-deferred products has been more in the range of 13.99%. These charges, again, do not include GREENSKY's "merchant fees."

67.     In the specific case of Plaintiff, to be discussed in detail below, this resulted in a loan award of up to $35,000 with an APR of 25% despite her 835 Experian credit score; if she had taken the entire seven-year period to pay off the full amount, she would have made a total of nearly $78,000 in payments, while GREENSKY would have taken (and indeed took) approximately $2,000 off the top of the loan.

## GREENSKY Has Flouted California Law

68.     GREENSKY's violations of California law have been harmful and willful.

69.     GREENSKY has long been on notice that it is required to be registered/licensed by state agencies. For example, on or about February 25, 2015 (more than three years before it IPO'd), an investigator with the New Jersey Department of Banking and Insurance sent GREENSKY a letter regarding its "possible unlicensed New Jersey consumer loan activity." GREENSKY eventually settled that claim for $160,000 and later registered as a "money transmitter" in New Jersey.

[24] *See* Assembly Bill 539 (capping interest rates on loans up to $10,000 at 36%).

70.    In 2017, GREENSKY was sued in Florida for operating as an unlicensed credit services organization ("CSO").[25]

71.    Further, as a publicly traded company with substantial revenues and a supposedly "robust [and] integrated regulatory compliance framework," GREENSKY knew, or should have known, of California lending laws. But GREENSKY"s very business model seemingly depends upon it dissembling to consumers and regulatory bodies and flouting the dictates of these laws.

### GREENSKY Consumer Loans Lack Accountability

72.    GREENSKY has essentially given merchants carte blanche to push through loans using its platform, normally using tablets and electronic signatures, with minimal due diligence. Indeed, GREENSKY even stated on its website: **"There is no need to physically sign and/or return your Loan Agreement**. You accept the terms of and electronically sign the Loan Agreement when you authorize the contractor/merchant to process a transaction on your account." (emphasis in original):

> ### What does my Loan Agreement mean?
>
> Note: There is no need to physically sign and/or return your Loan Agreement. You accept the terms of and electronically sign the Loan Agreement when you authorize the contractor/merchant to process a transaction on your account. Until (and unless) you authorize a transaction, you have no obligation on your GreenSky® Program loan.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

73.    Likewise, GREENSKY touted: *"No sales contracts or completion certificates required for funding*."[26]:

///

///

---

[25] *See Locicero v. Intrust Bank, N.A.*, Case No. 17-61484-CIV-DPG, 2018 WL 4374908, at *6-7 (S.D. Fla. Sept. 13, 2018) (denying GreenSky's motion to dismiss in part because GreenSky was plausibly a credit services organization).

[26] Taken from GreenSky Trade Credit, LLC's own 2015 marketing materials (emphasis added).

## No sales contracts or completion certificates required for funding*

74.     While GREENSKY may classify loan-type selection as a matter of consumer choice, the reality is that merchants are able, and incentivized, to make this choice for consumers and/or to misleadingly inform them in this regard. Again, the merchants, typically using tablets (with screens that may be hard for many to properly see) and electronic signatures, purport to bind consumers to loans before the terms have been disclosed. Many consumers have no idea who GREENSKY is until they start receiving bills from it and justifiably think that GREENSKY is a bank or credit card company. After all, those bills ask for payment to be sent directly to GREENSKY.

75.     With regard to upselling, GREENSKY offered merchants "Sample Plans to Close More Deals at a Higher Ticket," including how to "Turn an $8,000 job to a $10,000 dream project":[27]

///

///

///

_____

[27] Taken from GreenSky, LLC's own 2017 merchant training materials.

**GreenSky**

## Sample Plans to Close More Deals at a Higher Ticket

*Turn an $8,000 job to a $10,000 dream project.*

76.     It is not evident how an additional $2,000 would turn a mere "job" into a "dream project" and, based on GREENSKY's business model, as described throughout, a significant portion of that increase would simply be GREENSKY taking its cut of principal with the consumer absorbing a deceptive markup.

77.     This particular practice—training and encouraging merchants on its platform to upsell and/or build GREENSKY's finance charge into the cost of a project—is an important part of GREENSKY's deception. At no point does, for example, a given consumer see that a given merchant might otherwise charge $20,000 for a project but charges the consumer $22,000, knowing that GREENSKY will charge (on average) that merchant 10% to access credit; the consumer will not see that, say, Fifth Third Bank wired $22,000 to the "GREENSKY program" and that GREENSKY would eventually keep $2,000 of those funds while the merchant would retain its standard $20,000.

78.     <u>**This lack of disclosure is deceptive and harms consumers, who wind up paying most of GREENSKY's revenues**</u> (the "merchant fees") while still paying standard to high interest rates.

79.     Given, as described throughout, the nature of GREENSKY's business model, it seems likely that it would only have the potential for viability, when combined with general evasion of state laws, in industries—e.g., home improvement contracting, elective healthcare,

auto mechanics—where the given merchant generally has a high level of specialization and autonomy relative to the consumer and can more easily deceive them.

80.     In building such a business model, GREENSKY has also outsourced critical lending functions—e.g., general transparency, identity verification, filling out of application forms, explanation of terms and conditions, disclosure of fees—to thousands of random contractors.

**GREENSKY Is Clearly More than Just a Servicer or Program Administrator**

81.     Because GREENSKY claims to just be a sort of middle-man—a neutral program administrator or servicer—it is able to play parties off one another when there is a dispute, even though GREENSKY is the essential "link" that "bring[s] everyone together." Indeed, GREENSKY does not just service credit—it actively facilitates its extension, with minimal due diligence.

# General Information

Who is GreenSky and what does it do?

The GreenSky® Programs make it easy for contractors to offer affordable financing to customers like you. GreenSky is the servicer for one of the nation's largest bank lending programs. Banks in the GreenSky® Programs have financed more than one million home improvement projects. We service loans on behalf of more than a dozen leading banks across the nation.

You can think of GreenSky as a link between contractors, their customers and banks. We bring everyone together and simplify the loan process, from application, to decision/approval, to payments.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

82.     Even that bit of "general information" is further deceptive in that it claims "GreenSky" is the "servicer" of the GREENSKY programs. In fact, per the GREENSKY installment loan agreement sent to Plaintiff, **a totally different GREENSKY entity—GreenSky**

**Servicing, LLC—has been created for the purpose of *servicing* loans**. This again highlights the fact that GREENSKY is much more than a mere servicer:

of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

83.      GREENSKY can transmit funds *before* the consumer has even seen an installment loan agreement. Its business model enables merchants to "[*a]ccept downpayment the same day the customer is approved*" regardless of whether a given consumer has actually authorized a loan or seen its terms (emphasis added):



Why Use the GreenSky® Program

**Simple & quick process**
- Paperless application and approvals
- Easily accept customer payments
- Providing copies of Sales contracts and Certificates of Completion are not required for every transaction[1]
- Accept downpayment the same day customer is approved[2]
- No pre-payment penalties

(taken from GreenSky, LLC's own 2017 merchant training materials)

84.      On information and belief, most, if not all, states have lending laws and credit services laws that place a cap on certain fees/charges and/or prescribe "cooling off" periods, not to mention cost money and time to comply with. If GREENSKY were to properly comply with such laws, it is doubtful that much would be left of its business model.

85.      GREENSKY's motivations in this regard are clear: it is easier and cheaper to evade compliance with state regulations; it is easier for merchants to push "hard-sell" or fraudulent transactions through when there is no mandated "cooling off" period or cancellation form; and it is

vastly more profitable to charge fees of, say, 10% of principal when you are unregulated in a state with a cap on such charges.

86.    Further, on information and belief, GREENSKY suffers from poor internal controls and high employee turnover. This has, in part, led to spotty compliance, inconsistent growth, and insufficient due diligence of merchants on its platform, including investigation of consumer complaints. While it is hardly dispositive of the issue, it is telling that GREENSKY ranked dead last in a ranking of best "notable" fintech companies to work for (based on Glassdoor reviews):[28]

///

///

///

---

[28] EFINANCIALCAREERS.COM, *available at* https://news.efinancialcareers.com/uk-en/329766/best-worst-fintech-companies-work (last visited Oct. 22, 2019).

| Rank | Company | Avg. Employee Review |
|---|---|---|
| 1 | Robinhood | 4.9 |
| 2 | Kabbage | 4.7 |
| 2 | TransferWise | 4.7 |
| 4 | Coinbase | 4.6 |
| 5 | Stripe | 4.5 |
| 6 | Betterment | 4.3 |
| 7 | Affirm | 4.1 |
| 7 | Square | 4.1 |
| 9 | Ayden | 3.9 |
| 10 | Credit Karma | 3.8 |
| 11 | PayPal | 3.7 |
| 12 | Avant | 3.6 |
| 12 | Prosper | 3.6 |
| 12 | SoFi | 3.6 |
| 15 | Markit | 3.3 |
| 16 | Lending Club | 3.1 |
| 17 | GreenSky | 2.9 |

87.    __Another way to conceptualize GREENSKY as a business is to think of it as a technology platform that acts as a broker of bank loans__. In essence, GREENSKY developed an application and supporting infrastructure, based primarily on enabling merchants to use tablets to generate loans, in a manner that was useful to some banks and/or in a manner that the banks could not, or were not willing to, do.

22

88.     In essence, **GREENSKY contracts to borrow excess reserves** from partner banks and then lends them to consumers.

89.     In GREENSKY's own words: "We believe our Bank Partners would require significant time and investment to build such a technology solution and merchants network themselves."; "*Our platform alleviates the need for our Bank Partners to bear any marketing, software development or technology infrastructure costs to originate loans*."[29]

90.     It is not difficult to imagine a lawful version of GREENSKY—for example, one in which it derived revenues from licensing its software to chartered banks or one in which it was properly licensed as a lender/broker (or credit services organization) and derived its revenue from taking lawful and transparent fees on loans and/or other extensions of credit.

91.     For the sake of comparison, the aforementioned point-of-sale fintech firm Affirm, which is licensed as a lender and broker in California (#6054768), generally makes its money by lending at APRs up to 30% or so (lawful in California) while taking very small, *disclosed* fees on transactions (lawful in California).

92.     GREENSKY, on the other hand, effectively brokers loans on an unlicensed basis (unlawful) while taking substantial, undisclosed fees on consumer loans (unlawful). Its primary strategy in its defense seems to simply be proclaiming that it is "not a lender" and taking a calculated risk, or simply hoping, that no one figures out that its business model is plainly illegal in California.

93.     **In aggregate, then, GREENSKY can be viewed as a non-depository finance lender and/or broker whose loans are underwritten by the partner banks**. Thus, GREENSKY should be licensed under the CFL. GREENSKY therefore takes fees on consumer transactions that

---

[29] 2018 10-K, at 6 (emphasis added).

are illegal as a matter of California law.

94.     As such, pursuant to Cal. Fin. Code § 22750, because GREENSKY has quite clearly and willfully taken fees that are "other than" and "in excess of" those permitted by the CFL, GREENSKY-branded loans issued to California consumers during the proposed class period must be declared void and amounts paid to the GREENSKY program, including the "merchant fees," must be disgorged.

95.     In the alternative, should GREENSKY be found to be an (unlicensed) "credit services organization," then the remedy, pursuant to Cal. Civ. Code § 1789.21(a), is essentially the same: it must disgorge all fees and other charges paid to it by California consumers as a result of aiding in unlicensed extensions of credit.

## GREENSKY CEO AND BOARD CHAIRMAN DAVID ZALIK

96.     GREENSKY was co-founded in 2006 by David Zalik ("Zalik"),[30] who currently serves as CEO and Chairman of the Board.

97.     Zalik also co-founded RockBridge Commercial Bank ("RockBridge") as a Georgia-chartered bank in 2007.

98.     RockBridge was funded with a then-state-record $37 million in equity.

99.     Zalik was also an officer and/or director of RockBridge.

100.    In late 2009, RockBridge was shuttered by the Georgia Department of Banking and Finance, with the FDIC named receiver of RockBridge's balance sheet.

101.    The FDIC reported that, as of June 2010, RockBridge's estimated loss to its Deposit Insurance Fund would be approximately $100 million.

102.    In assessing RockBridge's swift demise, the FDIC's 2010 Material Loss Review found: "RockBridge's failure [could] be attributed to (1) *inadequate management and Board of Directors (Board) oversight*; (2) a high concentration in Commercial Real Estate lending; and

---

[30] *See, e.g.,* https://www.forbes.com/profile/david-zalik/#36544a812d23 (last visited January 3, 2020).

(3) *poor credit underwriting and credit administration. Management and the Board pursued a business strategy that deviated from its original business plan without having the appropriate management expertise and internal controls in place to adequately mitigate the corresponding risks*." (emphasis added).

103.   Accordingly, GREENSKY is following a pattern Zalik has developed: trading compliance for profits.

## GREENSKY AND THE SOLAR SECTOR

104.   GREENSKY, Inc. IPO'd in 2018 at a price of $23/share. As of January 3, 2020, it was trading at approximately $8.56/share.

105.   Given, primarily, GREENSKY's precipitous collapse during an otherwise up-market and, per Zalik, that decline owing almost exclusively to the company's allegedly unanticipated and undisclosed shift away from lending for solar energy systems, the company was hit with multiple shareholder suits.[31]

106.   The gravamen of these shareholder suits was that GREENSKY, Inc. had abandoned its most lucrative line of business—lending for solar systems—and had not properly informed the shareholders of this strategic plan.[32]   This, of course, begged the question of *why* a for-profit company would abandon its most lucrative line of business.

107.   In this vein, GREENSKY made the unusual assertion, back in 2015, in its "Sponsor/Merchant Compliance Guidelines for GreenSky Loan Programs" that: "*Although all merchants may be subject to claims of unfair, deceptive or abusive acts or practices, merchants who specialize in energy efficiency and alternative energy face additional risk from customers claiming deception during the sales process if they are not satisfied with the projects*." (emphasis added). The guidelines did not say *why* this entirely non-intuitive assertion would be true.

---

[31] *See, e.g., Mustafin v. GreenSky, Inc.*, Case No. 1:18-cv-11071-PAE (filed Nov. 27, 2018, S.D.N.Y).

[32] *See, e.g., id.* at 6 ("The Offering Documents failed to disclose the substantial change in the composition of GreenSky's merchant business mix and the resulting diminution in transaction-fee revenue.")

108.   Indeed, on information and belief, GREENSKY long turned a blind eye to the predatory, and sometimes outright fraudulent, practices that were especially rampant among various solar merchants on its platform. To the contrary, as outlined above, GREENSKY is itself predatory and implicitly endorses this kind of conduct by merchants. This bad behavior involved, among other aspects, aggressive and deceptive sales practices aimed especially at vulnerable populations, such as lower-income racial minorities and the elderly,[33] as well as unsubstantiated promises of government subsidies that would eventually arrive to substantially cover the cost of such solar systems.

109.   This assertion is in keeping with GREENSKY's aforementioned odd statement about alternative-energy merchants facing undue claims of deception from customers.

110.   It is also in keeping with, per the *Mustafin* shareholder suit, the claim that GREENSKY generally charged its solar merchants *twice* the level of fees—14% versus 7%—when compared to other merchants on its platform.[34]  With GREENSKY taking 14% of *principal* on solar transactions, the only likely way that solar merchants accessing GREENSKY's credit would be competitive would be through undue predatory, misleading, and/or subprime (or low-prime) lending.

111.   Even though GREENSKY derived approximately 20% of its revenues—and, per the numbers above, a substantially larger percentage of its profits—from the solar sector in the years before 2018, GREENSKY derived just 4% of its merchant-fee revenue from solar in 2018.[35] This move away from solar was, on information and belief, a deliberate decision by GREENSKY because, at least in part, it had determined that the consumer complaints and accordant risk of litigation stemming from unscrupulous solar merchants on its platform had grown too great[36]

---

[33] *See, e.g.,* Katherine Proctor, *Solar Power Firm Called Elder Abuser*, COURTHOUSE NEWS SERVICE (July 13, 2015), https://www.courthousenews.com/solar-power-firm-called-elder-abuser/.

[34] *Mustafin* at 5.

[35] *Id.*

[36] When looking at consumer litigation against GreenSky, one is struck by the disproportionate number of complaints, given their relatively modest share of the home improvement market nationally, involving solar merchants. *See, e.g., Farris v. Energy One Solar*, No. 4:19-cv-02361-JCH (E.D. Mo. Aug. 16, 2019); *Terlizzi v. Altitude Marketing, Inc.*, No. 16-cv-1712-WJM-STV, 2018 WL 2196090 (D. Colo. May 14, 2018); *Wilkinson v. SunTrust Bank*, No. 2:18-cv-00256-TS

and/or the recent decline in green-energy subsidies had substantially pared away the most predatory, uncompetitive alternative energy firms, which had dominated the GREENSKY platform.

112.   GREENSKY harvested windfall profits for years by failing to reasonably monitor various merchants—particularly solar merchants—in its program while also evading state lending and/or credit services laws. Given the numbers above, it is entirely possible that GREENSKY would not have been able to IPO without embracing such unlawful conduct in its business model.

113.   Likewise, the merchant-fee numbers given above broadly accord with those given in the 2018 10-K: GREENSKY reported total revenue of approximately $415 million on transaction volume (loans made via its platform) of approximately $3.8 billion, which amounts to a volume-to-revenue margin of about 10.9%. This amount, again, is nearly the same as its "merchant fees," which are taken upon loan origination and on principal.

114.   For the sake of comparison, actual loan servicing fees are typically quite small—for example, a normal loan servicing fee (a "strip") may be set at an APR of 0.25% (.0025) of principal, taken monthly.[37] On a solar system loan of $25,000, this would enable GREENSKY to collect about $5.20 per month.   Using Plaintiff's loan as an example, this would amount to approximately $612.50 *over the life of the loan with no reduction in principal*—i.e., even that figure substantially overstates typical loan servicing fees over the longer term. But by using the masked "merchant fee" method, GREENSKY could take approximately $1,600-2,000 **upon origination**.

115.   Further, GREENSKY *also* charges the bank partners a (high) loan servicing fee of approximately 1.00% APR.

116.   As these numbers reveal, GREENSKY's entire business model largely depends on how it has classified itself and it has done so deceptively, at the expense of individual consumers and state agencies.

(D. Utah Mar. 23, 2018); *Alfortish v. GreenSky, LLC*, No. 16-15084, 2017 WL 699830, at *1 (E.D. La. Feb. 22, 2017); *Davy v. Duke Energy Carolinas, LLC*, No. 7:15-cv-4927-MGL, 2016 WL 852696, at *3 (D. S.C. Mar. 4, 2016).

[37]*See,   e.g.,   *INVESTOPEDIA,   Loan   Servicing   Definition, https://www.investopedia.com/terms/l/loan_servicing.asp (last visited Oct. 18, 2019).

117.    In a *Forbes* article about Zalik and GREENSKY, that magazine noted that the company's "financial technology model is robust because it transfers a lot of the risk and work to banks and contractors."[38] Indeed, as described throughout this complaint, **this model has largely relied on violating state laws, whether they be lending laws or credit services laws—this is what has allowed GREENSKY to "transfer risk." Further, much of this risk is actually transferred *to consumers*—**indeed, the banks essentially do nothing in this regard other than transmit money to the GREENSKY "program" with GREENSKY, in effect, brokering the loans while also being contractually obligated to assume prepayment risk.

118.    GREENSKY's failure to properly register as a lender and/or broker under the CFL or, alternatively, as a credit services organization under the CSA deprives consumers of the protections of such licensure, including but not limited to fee-limitation, disclosure, and monitoring requirements.

119.    GREENSKY's failure to properly register as a lender and/or broker under the CFL or, alternatively, as a credit services organization under the CSA has enabled it to unlawfully and unfairly hide the nature of its business from consumers.

120.    GREENSKY's business model and trajectory thus bear uncanny resemblances to those of RockBridge, whose mismanagement and resultant swift demise ultimately cost the FDIC approximately $100 million. For example, within just, approximately, a year-and-a-half of its IPO, GREENSKY was trading at less than one-third of its offering price, being sued by shareholders for undisclosed changes to its core business strategy, while evincing poor management expertise, internal controls, credit administration, and portfolio concentration. Further, a substantial portion of whatever earnings GREENSKY has generated have been *directly* derived from willful evasion of state lending and/or credit servicing laws.

---

[38] Nathan Vardi, *A Fintech Billionaire's Consumer Loans Come Under Fire in Alabama*, FORBES (July 25, 2019), https://www.forbes.com/sites/nathanvardi/2019/07/25/a-billionaires-consumer-loans-come-under-fire-in-alabama/#44dc9a1f25d7.

## PLAINTIFF'S EXPERIENCE WITH GREENSKY

121. Plaintiff Elizabeth "Liz" Belyea is a resident of California; she retired in 2016 after a career in education, as both a teacher and an administrator.

122. Plaintiff supplements her retirement income by renting a house that she owns. The location of that house is 2609 Castro Way, Sacramento, California 95818.

123. Tenants who were renting that home, which was built in 1925, began experiencing drainage problems sometime during June 2019.

124. Soon thereafter, following an inspection by a plumbing company, it became apparent that the old pipes in the rental house were failing.

125. As the plumbing company uncovered further issues, three different estimates for the necessary underlying work were generated: the first was for $5,750.00; the second was for $4,800; and the third was for $23,600.00, not including the eventual $571.50 in floor repair costs.

126. Plaintiff was able to cover the first two bills, totaling $10,550.00, out-of-pocket.

127. However, the third bill, for $23,600, was too much for her to cover out-of-pocket; an agent of the plumbing company (the "plumber") told Plaintiff that she could finance through an affiliate of the company.

128. The plumber told her that she could obtain that financing under the condition that, if she were able to pay the loan back within eighteen months, interest would be waived.

129. The plumber selected a financing plan for Plaintiff.

130. Her Experian credit score at that time was 835.

131. Despite this nearly perfect credit score, she eventually discovered that the GREENSKY-branded loan came with an APR of 25.03%, subject to eighteen months of interest-waiver. Plaintiff was shocked when she saw that APR. Over the life of the loan—seven years—she would have had to pay a total of $77,867.22 (over half of which would be interest).

132. Alarmed by the possibility of ever paying such an interest rate, Plaintiff withdrew retirement funds in November 2019 so that she could pay off the loan.

133. GREENSKY collected an unlawful financing charge—the "merchant fee"—on the consumer loan made to Plaintiff.

## CALIFORNIA FINANCING LAW ("CFL"),
### Cal. Fin. Code § 22000 et. seq.

134.     Pursuant to Cal. Fin. Code § 22001, the CFL is to be "liberally construed" to "promote its underlying purposes and policies," which include "foster[ing] competition among finance lenders, *protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders*," "encourag[ing] the development of fair and economically sound lending practices," and "*protect[ing] property owners from deceptive and misleading practices that threaten the efficacy and viability of property-assessed clean energy financing programs*." (emphasis added).

135.     Pursuant to Cal. Fin. Code § 22009, a "finance lender" means "any person who is engaged in the business of making consumer loans or making commercial loans."

136.     Pursuant to Cal. Fin. Code § 22004, a "'broker' includes any person who is engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender."

137.     Pursuant to Cal. Fin. Code § 22100(a), "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner [of Business Oversight]."

138.     Pursuant to Cal. Fin. Code § 22101 et seq., the CFL requires finance lenders and brokers to follow a number of particular steps and abide by specified rules and procedures with regard to becoming, and existing as, a licensed entity.

139.     Pursuant to Cal. Fin. Code § 22200, "'Charges' include the aggregate interest, fees, bonuses, commissions, brokerage, discounts, expenses, and other forms of costs charged, contracted for, or received by a licensee or any other person in connection with the investigating, arranging, negotiating, procuring, guaranteeing, making, servicing, collecting, and enforcing of a loan or forbearance of money, credit, goods, or things in action, or any other service rendered."

140.     Pursuant to Cal. Fin. Code § 22203, a "'consumer loan' means a loan, whether secured by either real or personal property, or both, or unsecured, the proceeds of which are intended by the borrower for use primarily for personal, family, or household purposes."

141.    Pursuant to Cal. Fin. Code § 22305, "a licensee may contract for and receive an administrative fee, which shall be fully earned immediately upon making the loan, with respect to a loan of a bona fide principal amount of *not more than two thousand five hundred dollars ($2,500) at a rate not in excess of 5 percent of the principal amount (exclusive of the administrative fee) or fifty dollars ($50), whichever is less, and with respect to a loan of a bona fide principal amount in excess of two thousand five hundred dollars ($2,500), at an amount not to exceed seventy-five dollars ($75).*" (emphasis added).

142.    Pursuant to Cal. Fin. Code § 22306, "*No amount in excess of that allowed by this article shall be <u>directly or indirectly charged</u>, contracted for, or received by any person, and the total charges of the finance lender and broker and any other person in the aggregate shall not exceed the maximum rate provided for in this article.*" (emphasis added).

143.    Pursuant to Cal. Fin. Code § 22309, "Except as provided in Section 22305 and Article 4 (commencing with Section 22400), *no charges on loans made pursuant to this division shall be paid, deducted, or received in advance, or compounded . . .*" (emphasis added).

144.    Pursuant to Cal. Fin. Code § 22327, "No licensee shall induce or permit any borrower to be or to become obligated directly or indirectly, or both, under more than one contract of loan at the same time with the same licensee for the purpose or with the result of obtaining a higher rate of charge than would otherwise be permitted by this article . . .".

145.    Pursuant to Cal. Fin. Code § 22333, "*No licensee shall take any instrument in which blanks are left to be filled in after execution.*" (emphasis added).

146.    Pursuant to Cal. Fin. Code § 22112(a), "A licensee shall maintain a surety bond in accordance with this subdivision in a minimum amount of twenty-five thousand dollars ($25,000)."

147.    Pursuant to Cal. Fin. Code § 22337(a), each licensed financed lender shall "Deliver or cause to be delivered to the borrower, or any one thereof, *at the time the loan is made*, a statement showing in clear and distinct terms the name, address, and license number of the *finance lender and the broker, if any.*" (emphasis added). Per the CFL, GreenSky's "merchant fee" should have been disclosed on a form such as this one:

```
┌──────────────────────────────────────────────────────────────────────────┐
│              CALIFORNIA FINANCE LENDERS LAW STATEMENT OF LOAN              │
│                                                                            │
│   Date:                                                                    │
│                                                                            │
│   Lender Name:                                                             │
│                                                                            │
│   Lender Address:                                                          │
│                                                                            │
│   Lender's License Number:                                                 │
│                                                                            │
│   Borrower Name(s):                                                        │
│                                                                            │
│   Borrower Address:                                                        │
│                                                                            │
│                                                                            │
│   1. This loan is made pursuant to the California Finance Lenders Law,     │
│      Division 9 (commencing with Section 22000) of the Finance Code. The   │
│      above-named lender is a licensed finance lender, Department of        │
│      Corporations California Finance Lenders License No.                   │
│                   FOR INFORMATION CONTACT THE DEPARTMENT OF                │
│                     CORPORATIONS, STATE OF CALIFORNIA.                     │
│   2. The California Finance Lenders Law requires that a licensed finance   │
│      lender obtain a signed statement from a borrower as to whether any    │
│      person has performed any act as a broker in connection with the       │
│      making of a loan.                                                     │
│                                                                            │
│      Has any person performed any act as a broker in connection with the  │
│      making of your loan  [ ] Yes  [ ] No                                  │
│                                                                            │
│      If your answer is yes, please indicate below the name of the person  │
│      who will receive payment for broker service services and a statement │
│      of all sums paid or payable to such person:                          │
│                                                                            │
└──────────────────────────────────────────────────────────────────────────┘
```

148.   Pursuant to Cal. Fin. Code § 22750, "***If any amount other than, or in excess of, the charges permitted by this division is willfully charged, contracted for, or received, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction***." (emphasis added).

## CALIFORNIA'S CREDIT SERVICES ACT OF 1984 ("CSA"),
### Cal. Civ. Code § 1789.10 et  seq.

149.   Recognizing the importance of consumer credit and that "[c]ertain advertising and business practices of some credit service organizations have worked a financial hardship upon the people in this state, often those who are of limited economic means and inexperienced in credit matters," California legislators enacted the CSA to "protect the public from unfair or deceptive advertising and business practices."[39]

150.   The CSA is to be "construed liberally" in order to achieve these purposes.[40]

151.   The CSA was enacted in order to capture, for the purposes of regulation, new types of credit-related businesses that were not already subject to regulation by the state.[41]

---

[39] Cal. Civ. Code § 1789.11(a)-(c).

[40] *Id.* at § 1789.11(c).

152.    The CSA defines a "credit services organization" is "a person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration:

(1) Improving a buyer's credit record, history, or rating.

(2) *Obtaining a loan or other extension of credit for a buyer*.

(3) *Providing advice or assistance to a buyer with regard to either paragraph (1) or (2)*."[42] (emphasis added).

153.    A CSO shall not do any of the following in California:[43]

"(a) *Charge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer.*

(b) Fail to perform the agreed services within six months following the date the      buyer signs the contract for those services.

(c) *Charge or receive any money or other valuable consideration for referral of the buyer to a retail seller or other credit grantor who will or may extend credit to the buyer, if either of the following apply*:

(1) *The credit that is or will be extended to the buyer (A) is upon substantially the same terms as those available to the general public or (B) is upon substantially the same terms that would have been extended to the buyer without the assistance of the credit services organization.*

(2) *The money or consideration is paid by the credit grantor or is derived from the buyer's payments to the credit grantor for costs, fees, finance charges, or*

---

[41] *See id.* at § 1789.12(b)(1)-(7).

[42] *Id.* at § 1789.12.

[43] *Id.* at § 1789.13(a)-(r).

*principal*.

(d) Make, or counsel or advise a buyer to make, a statement that is untrue or misleading and that is known, or that by the exercise of reasonable care should be known, to be untrue or misleading, to a consumer credit reporting agency or to a person who has extended credit to a buyer or to whom a buyer is applying for an extension of credit, such as statements concerning a buyer's identification, home address, creditworthiness, credit standing, or credit capacity.

(e) Remove, or assist or advise the buyer to remove, adverse information from the buyer's credit record which is accurate and not obsolete.

(f) Create, or assist or advise the buyer to create, a new credit record by using a different name, address, social security number, or employee identification number.

(g) Make or use untrue or misleading representations in the offer or sale of the services of a credit services organization, including either of the following:

(1) Guaranteeing or otherwise stating that the organization is able to delete an adverse credit history, unless the representation clearly discloses, in a manner equally as conspicuous as the guarantee, that this can be done only if the credit history is inaccurate or obsolete and is not claimed to be accurate by the creditor who submitted the information.

(2) Guaranteeing or otherwise stating that the organization is able to obtain an extension of credit, regardless of the buyer's previous credit problems or credit history, unless the representation clearly discloses, in a manner equally as conspicuous as the guarantee, the eligibility requirements for obtaining an extension of credit.

(h) *Engage, directly or indirectly, in an act, practice, or course of business that operates or would operate as a fraud or deception upon a person in connection with the offer or sale of the services of a credit services organization*.

(i) *Advertise or cause to be advertised, in any manner, the services of the credit services organization, without being registered with the Department of Justice*.

(j) Fail to maintain an agent for service of process in this state.

(k) Transfer or assign its certificate of registration.

(l) Submit a buyer's dispute to a consumer credit reporting agency without the      buyer's

knowledge.

(m) Use a consumer credit reporting agency's telephone system or toll-free

telephone number to represent the caller as the buyer in submitting a dispute of a buyer

or requesting disclosure without prior authorization of the buyer.

(n) *Directly or indirectly extend credit to a buyer*.

(o) Refer a buyer to a credit grantor that is related to the credit services organization

by a common ownership, management, or control, including a common owner,

director, or officer.

(p) *Refer a buyer to a credit grantor for which the credit services organization*

*provides, or arranges for a third party to provide, services related to the extension of*

*credit such as underwriting, billing, payment processing, or debt collection*.

(q) *Provide a credit grantor with an assurance that a portion of an extension of credit to*

*a buyer referred by the credit services organization will be repaid, including providing a*

*guaranty, letter of credit, or agreement to acquire a part of the credit grantor's*

*financial interest in the extension of credit*.

(r) *Use a scheme, device, or contrivance to evade the prohibitions contained in   this*

*section*."

(emphasis added).

154.    Further, the CSA provides for affirmative duties on the part of CSOs. Per Cal. Civ.

Code §§ 1789.14 and 1789.15, a CSO—"prior to the execution of a contract or agreement between

the buyer and a credit services organization"—"shall provide the buyer a statement in writing,

containing . . .

(a) A complete and detailed description of the services to be performed
by the credit services organization for or on behalf of the buyer and the total
amount the buyer will have to pay, or become obligated to pay, for the services.
(b) The buyer's right to proceed against the bond under the
circumstances and in the manner set forth in Section 1789.18.

(c) The name and address of the surety company which issued the bond.
(d) A complete and accurate statement of the availability of nonprofit
credit counseling services.

The information statement shall be printed in at least 10-point boldface
type and shall include the following statement or any substantially equivalent
alternative that is approved by the Department of Justice:

'CONSUMER CREDIT FILE RIGHTS UNDER STATE AND FEDERAL LAW
You have a right to obtain a copy of your credit file from a consumer credit reporting
agency. You may be charged a reasonable fee not exceeding eight dollars   ($8). There is
no fee, however, if you have been turned down for credit, employment, insurance, or a
rental dwelling because of information in your credit report within the preceding 60 days.
The consumer credit reporting agency must provide someone to help you interpret the
information in your credit file. You have a right to dispute inaccurate information by
contacting the consumer credit reporting agency directly. However, neither you nor any
credit repair company or credit services organization has the right to have accurate,
current, and verifiable information removed from your credit report. Under the Federal
Fair Credit Reporting Act, the consumer credit reporting agency must remove accurate,
negative information from your report only if it is over seven years old. Bankruptcy
information can be reported for 10 years. If you have notified a credit reporting agency in
writing that you dispute the accuracy of information in your credit file, the consumer
credit reporting agency must then reinvestigate and modify or remove inaccurate
information. The consumer credit reporting agency may not charge a fee for this service.
Any pertinent information and copies of all documents you have concerning an error
should be given to the consumer credit reporting agency. If reinvestigation does not
resolve the dispute to your satisfaction, you may send a brief statement to the consumer
credit reporting agency to keep in your file, explaining why you think the record is
inaccurate. The consumer credit reporting agency must include your statement about
disputed information in any report it issues about you. *You have a right to cancel the
contract for any reason within five working days from the date you signed it. If for any
reason you do cancel the contract during this time, you do not owe any money. You
have a right to sue a credit services organization if it misleads you.*'"

(emphasis added).

155.    Further, Cal. Civ. Code § 1789.16 provides that a CSO "shall not provide any

service to a buyer except pursuant to a written contract that complies with this section," which

section includes, among other provisions, the requirements of a five-day "cooling-off period" and

preprinted notice of cancellation.

156.    Cal. Civ. Code § 1789.18 mandates that *"[n]o credit services organization shall*

*conduct business in this state unless the credit services organization has first obtained a surety*

*bond in the principal amount of one-hundred thousand dollars ($100,000)* issued by an admitted

36

surety and the bond complies with the following . . .". (emphasis added). On information and belief, GREENSKY has not obtained such a bond.

157.    Cal. Civ. Code § 1789.20 provides that any person who violates the CSA shall be guilty of a misdemeanor.

158.    Importantly, the CSA also provides for a private cause of action: "*Any buyer injured by a violation of this title or by the credit services organization's breach of a contract subject to this title may bring any action for recovery of damages, or for injunctive relief, or both. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages.*"[44] (emphasis added).

## CLASS ACTION ALLEGATIONS

159.    Plaintiff seeks to certify a statewide class comprising: **California consumers who transacted business with and/or received funds from or through GREENSKY ("Class") for a period beginning four years prior to the date this complaint is filed until the date of class certification ("Class Period").**

160.    This action has been brought and may properly be maintained as a class action, pursuant to the provisions of California Code of Civil Procedure section 382, because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

161.    Numerosity. Upon information and belief, there are hundreds, if not thousands, of members of the proposed Class. Joinder of all members is therefore impracticable.

162.    Commonality and Predominance. Common questions of fact and law exist as to all Class members such that those questions predominate over questions affecting Plaintiff or individual Class members. These common questions include, but are not limited to, the following:

---

[44] Cal. Civ. Code § 1789.21(a).

a. Does GREENSKY's conduct and failure to obtain licensure in California illegal?

b. Is GREENSKY's conduct and failure to obtain licensure violate the CFL and/or CSA?

c. Did GREENSKY fail to inform consumers as to the "merchant fees" it was charging?

d. Was GREENSKY's charging of fees beyond the CFL's cap unconscionable or, alternatively, Did GREENSKY "directly or indirectly" extend credit to buyers on an unlicensed basis?

e. Did GREENSKY violate the CFL and/or CSA?

f. Did GREENSKY also violate other laws, as described herein?

g. Did GREENSKY harvest windfall profits at the expense of consumers as a result of its violations of California laws?

h. Should GREENSKY be compelled to disgorge funds, including principal, interest, and/or other charges as a result of its violations of California law?

i. Are Plaintiff and Class members entitled to damages or any other monetary relief and, if so, in what amount?

j. Should GREENSKY be enjoined from continuing to operate on an unlicensed basis in California?

163.   <u>Typicality</u>. Plaintiff is informed and believes and thereon alleges that each member of the Class herein was subjected to the same general forms of misrepresentation outlined above. More specifically, these forms include but are not limited to: that GREENSKY lent (as a lender/broker) or directly or indirectly extended credit (as a CSO) to Plaintiff and every Class member on an unlicensed basis; in so doing, misrepresented that it could lawfully do so under California law, failed to disclose the nature and amount of its "merchant fees"; misrepresented that it could lawfully collect these under California law; and generally misrepresented the nature of its enterprise to the detriment of consumers. The factual and legal bases of GREENSKY's liability to Plaintiff and each Class member are the same, resulting in injury to Plaintiff and each Class

member as a result of GREENSKY's conduct described herein. GREENSKY has acted or failed to act on grounds generally applicable to Plaintiff and members of the proposed Class, thereby making final declaratory relief and injunctive relief, as described below, appropriate.

164. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of other Class members. Plaintiff has retained counsel with substantial experience in litigating complex cases, including class actions. Both Plaintiff and her counsel will vigorously prosecute this action on behalf of the Class and have the financial ability to do so. Neither Plaintiff nor counsel has any interest adverse to the other Class members.

165. Superiority. A class action is superior to all other available methods for the fair and efficient adjudication of this matter. As alleged herein, GREENSKY acted and failed to act on grounds generally applicable to Plaintiff and other Class members. Such conduct requires the Court's imposition of uniform relief to ensure compatible standards of conduct towards Class members and to make corresponding declaratory relief and injunctive relief appropriate for all Class members. Upon information and belief, no overlapping class actions have been filed against GREENSKY in California. Management of this case will not be difficult given the nature and significance of the common questions.

166. Individual Control. The interests of individual Class members are best served by certifying this case as a class action. Class members' individual damages may only measure thousands or tens of thousands of dollars. By contrast, the undersigned counsel believe they will likely be compelled to invest tens, or hundreds, of thousands of dollars in time, costs, and expenses in prosecution of this controversy so as to best prosecute and win these Class claims. If counsel represented only Plaintiff, they would likely be compelled to expend substantially all of the same time, costs, and expenses in the prosecution of this action. Further, as described throughout, the fundamental nature of GREENSKY's business model is deceptive and difficult to detect by any given consumer. In the absence of a class action, individual Class members would be unlikely to effectively prosecute their claims.

///

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA FINANCING LAW ("CFL"),
### Cal. Fin. Code § 22000 *et seq.*
### (Against All Defendants)

167.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

168.    Plaintiff brings this count on behalf of the Class.

169.    Per Cal. Fin. Code § 22009, a "finance lender" means "any person who is engaged in the business of making consumer loans or making commercial loans." The CFL defines the "business of making consumer loans or commercial loans" as "including lending money and taking, in the name of the lender, or in any other name, in whole or in part, as security for a loan, any contract or obligation involving the forfeiture of rights in or to personal property, the use and possession of which property is retained by other than the mortgagee or lender, or any lien on, assignment of, or power of attorney relative to wages, salary, earnings, income, or commission."

170.    As described above, GREENSKY is a "finance lender" because it is engaged in the business of making consumer loans. Additionally, with respect to at least loans extended for solar products, GREENSKY took a security interest for its own benefit in the products as a loan condition.

171.    Pursuant to Cal. Fin. Code § 22004, a "'broker' includes any person who is engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender."

172.    As described above, GREENSKY is a broker because it is engaged in the business of negotiating, selling, marketing, and/or distributing loans made by a finance lender (the partner banks).

173.    More specifically, GREENSKY's engagement in the business of making and/or brokering consumer loans includes, but is not limited to, the following: obtaining funds from partner banks; setting interest rate and other loan-term parameters; auto-populating credit applications; processing credit applications; retaining the right to accept/reject credit applications;

verifying consumer identities and credit scores via its proprietary software; "allocating" funds to its bank partners using its own proprietary system; (re)lending funds borrowed from its partner banks; transmitting/disbursing funds; providing merchants and/or consumers with GREENSKY-branded "shopping passes"; providing consumers with GREENSKY-branded installment loan agreements; directing consumers to make loan payments directly to GREENSKY; reporting such loans to consumer reporting agencies; (at least sometimes) attempting to take a purchase money security interest in the goods purchased with such loans; controlling which merchants are in its program; purporting to train these merchants to use its platform; purporting to perform due diligence on these merchants that use its platform; and deriving revenues that are a function of loan volume, loan origination, interest rates, and/or interest rate spreads on unsecured and/or secured loans that are primarily for family/household purposes.

174.  Indeed, as stated above, the partner banks really have little or nothing at all to do with this process: GREENSKY has built a business on de facto (re)lending/brokering, using the bank partners' state or federal charters as a shield, and disguising this fact with nothing more than semantics.

175.  On information and belief, GREENSKY is not licensed with the Commissioner of the Department of Business Oversight.

176.  GREENSKY's evasion of the CFL has been willful. More specifically, as described above, GREENSKY has long been on notice that it should be registered with state agencies as a consumer lender and/or broker (or CSO).

177.  GREENSKY does not qualify for any of the germane exemptions and the burden of proof would lie with Defendant should it claim such an exemption. *See* Cal. Fin. Code § 22053.

178.  GREENSKY's loans were "consumer loans" for the purposes of the CFL.

179.  GREENSKY harvested windfall profits as a direct result of evading the CFL.

180.  GREENSKY's charging of fees well in excess of the CFL's cap on such fees was unconscionable.

181.  GREENSKY's evasion of the CFL caused ascertainable injury to California consumers.

182.   GREENSKY's multiple misrepresentations to consumers and, particularly, its failure to properly disclose the "merchant fees" it received, were misleading and unconscionable.

183.   GREENSKY's unconscionable actions in this regard also give rise to a private cause of action under the Unfair Competition Law ("UCL").[45]

184.   GREENSKY's violations of the CFL have been systematic and multitudinous. Defendant's very business model, including, but not limited to, how it represents itself to consumers and state agencies, the consecution by which it obtains and disburses consumer loans, the fees it charges on such loans, and its reporting and/or collecting on these loans, entails numerous violations of the CFL spread over many individual California consumers.

185.   More specifically, GREENSKY's violations of the CFL include, but are not limited to: § 22100(a) (because Defendants have engaged in the business of a finance lender without a license from the commissioner); § 22101 (because Defendants have, on information and belief, not applied for such a license); § 22102 (because Defendants have operated throughout California without submitting applications for branch licenses); § 22103 (because, on information and belief, Defendants have not paid any application or related fees); § 22104 (because Defendants have not filed financial documents with the commissioner); § 22106 (because Defendants have not applied for a license for a location either inside or outside of California); § 22107 (because Defendants have not paid the commissioner its pro rata share of administrative costs/expenses); § 22151 (because Defendants have not obtained a license that may be "conspicuously posted"); § 22159 (because Defendants have not filed annual reports with the commissioner); § 22161 (multiple provisions) (because Defendants have, broadly, made, directly and indirectly, numerous materially false and/or misleading statements to consumers in California and violated § 17200 of the Business and Professions Code); § 22305 (because Defendants have charged administrative fees much greater than, respectively, $50 or $75); § 22309 (because Defendants have charged fees on loans not provided for, as stated); § 22320.5 (because Defendants have collected delinquency fees greater than, respectively, the stated amounts); § 22325 (because Defendants have not displayed such a schedule in licensed place(s) of business); § 22327 (because, in some cases, Defendants

---

[45] *See De La Torre v. Cashcall, Inc.*, 422 P.3d 1004, 1019-20 (Cal. 2018).

have induced borrowers into "split plan" loans, the terms of which may not comport with the charges allowed by this article; that is, for split loans of $2,500 or less, the charges may exceed those allowed for in § 22303); and § 22112(a) (because Defendants have not obtained such a surety bond).

186.   As described above, GREENSKY has acted as an unlicensed finance lender and/or broker in California and has violated the CFL in numerous ways.

187.   As described above, GREENSKY has charged fees on principal—it does not really matter whether one terms them "loan origination," "financing," "administrative," or "merchant" fees, as they are taken *immediately upon principal* and according to *a schedule set by GREENSKY*; these fees, which have averaged around 10% of principal (including on loans of $25,000+), are proscribed by Cal. Fin. Code §§ 22305-06.

188.   Pursuant to Cal. Fin. Code § 22750, the consumer installment loans made and/or brokered by GREENSKY during the Class Period must be declared void and GREENSKY has no right to collect the interest, principal, or other charges there upon.

*Plaintiff, as made clear in this complaint, asserts that GREENSKY should have long ago been licensed by a California agency and has been violating numerous California laws for years. As just stated, Plaintiff maintains that GREENSKY is a finance lender and/or broker for the purposes of the CFL. In the alternative, Plaintiff asserts that GREENSKY should be licensed as a CSO, as described below:*

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE CREDIT SERVICES ACT OF 1984 ("CSA"),
### Cal. Civ. Code § 1789.10 *et seq.*
### (Against All Defendants)

189.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

190.   Plaintiff brings this count on behalf of the Class.

191.   Pursuant to Cal. Civ. Code § 1789.12, a "credit services organization" is "a person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration:

(1) Improving a buyer's credit record, history, or rating.

(2) *Obtaining a loan or other extension of credit for a buyer.*

(3) *Providing advice or assistance to a buyer with regard to either paragraph (1) or (2).*[46]

(emphasis added).

192.    As described throughout this Complaint, GREENSKY's entire business is built around *obtaining* loans on behalf of others. The vast bulk of its revenues have been derived directly from taking a cut of consumer loans and calling them "merchant fees." If it is somehow not a lender and/or broker for the purposes of the CFL, then GREENSKY *must* be a CSO for the purposes of the CSA.

193.    More specifically, GREENSKY sells, provides, performs, and/or represents that it can (and actually *does*) obtain credit for buyers in return for the payment of money—the "merchant fees." GREENSKY does this in ways that include, but are not limited to, the following: accepting consumer credit applications via its platform; auto-populating these applications; partnering with banks to obtain funds for consumer loans; organizing these banks into a "program" for the purposes of extending consumer credit; advertising to merchants (and, ultimately, buyers) that it can obtain credit for home improvement or elective healthcare projects; accepting and rejecting credit applications; providing consumers with GREENSKY-branded installment loan agreements; determining loan terms and conditions; (re)lending money held on bank balance sheets as GREENSKY program assets/liabilities; transmitting loan funds to merchants via the shopping passes; accepting loan payments directly from consumers; and reporting trade lines to consumer reporting agencies.

194.    A CSO is required to be licensed with the California Department of Justice; GREENSKY is not.

195.    Pursuant to Cal. Civ. Code § 1789.13(n), GREENSKY shall not "*[d]irectly or indirectly* extend credit to a buyer." (emphasis added). As stated throughout, GREENSKY has actively extended credit to buyers and is thus in violation of this provision. For at least the "promotional period" of the loans, GREENSKY is at least the de facto lender, for it is the entity

1  with the contractual repayment obligation if the consumer pays off the loan in full before that
2  promotional period ends.

3       196.   GREENSKY has further violated the CSA in ways that include, but are not limited
4  to, the following: § 1789.13(a) (because Defendants received money or other valuable
5  consideration before distributing money to merchants and/or buyers); § 1789.13(c) (because
6  Defendants received money or other valuable consideration for simply referring buyers to the
7  banks in their program for non-competitive loans and interest rates); § 1789.13(h) (because, as
8  described throughout, GREENSKY's business model is fundamentally fraudulent in that it has
9  relied on representing the company as something other than what it actually is); § 1789.13(i)
10 (because Defendants have not registered with the Department of Justice); § 1789.13(p) (because, if
11 GREENSKY were to continue to maintain that is not a lender, then it would be referring
12 consumers to credit grantors (the partner banks) with which it maintained agreements related to
13 lending, underwriting, servicing, payment processing, and/or debt collection); and § 1789.13(r)
14 (because, as stated, Defendants have relied on misrepresentations to disguise the nature of
15 GREENSKY's business so as to evade state licensing).

16      197.   GREENSKY's violations of § 1789.13(c) require further explication because they
17 are particularly important to its business model. GREENSKY, as described throughout, has
18 harvested the bulk of its revenues from "merchant fees"; the remainder consists of "incentive
19 payments" from the partner banks. GREENSKY thus clearly receives valuable consideration for
20 referring buyers to credit grantors; for the purposes of this provision, the credit granted to
21 consumer is "substantially" the same as that offered without the assistance of GREENSKY and/or
22 to the general public.

23      198.   Indeed, if the terms of credit were not "substantially" the same in this regard, then
24 GREENSKY would effectively be admitting to its role as a (re)lender (i.e., as one taking spreads
25 on money lent to its program) for, given its merchant fees plus interest rates that climb well above
26 20% (after the promotional period) for borrowers still within the "prime" credit score range, it is
27 evident that GREENSKY is not obtaining competitive rates for consumers.

28

199.   Likewise, by receiving "incentive payments" from credit grantors (the partner banks) for its extension of credit, GREENSKY is also in violation of the second prong of § 1789.13(c).

200.   Further, GREENSKY has not complied with the affirmative duties required by the CSA in ways that include but are not limited to: failure to provide a prescribed information statement, *including the right to sue the CSO and cancel the agreement within five days* (in violation of § 1789.15); failure to provide buyers with a prescribed contract, including a detachable notice of cancellation (in violation of § 1789.16); and failure to maintain a surety bond of $100,000 in California (in violation of § 1789.18).

201.   Pursuant to § 1789.21(a), "*Any buyer injured by a violation of this title or by the credit services organization's breach of a contract subject to this title may bring any action for recovery of damages, or for injunctive relief, or both. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages.*" (emphasis added).

### THIRD CAUSE OF ACTION
### DECLARATORY RELIEF
### (Against All Defendants)

202.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

203.   Plaintiff brings this count on behalf of the Class.

204.   As outlined above, GREENSKY is either a finance lender and/or broker, pursuant to Cal. Civ. Code § 22000 et seq., or a credit services organization, pursuant to Cal. Civ. Code § 1789.10 *et seq.*

205.   Plaintiff asks this Court to declare that GREENSKY operates as an unlicensed lender and/or broker in California.

/ / /

/ / /

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),**
**Bus. & Prof. § 17200**
**(Against All Defendants)**

206.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

207.    Plaintiff brings this count on behalf of the Class.

208.    The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ." as well as any acts prohibited by Chapter 1 of the False Advertising Law (Bus. & Prof. § 17500 *et seq.*; "FAL").[47]

209.    GREENSKY's acts, as described throughout, are business practices.

210.    As stated, GREENSKY's business and advertising acts and practices have systematically violated the UCL, as well as the FAL, which constitutes a violation of the UCL.

211.    Defendants' conduct has which is "Unlawful," "Unfair," or "Deceptive" includes, but is not limited to, the following:

   a.  By violating California laws (whether as a lender, broker, and/or CSO)—particularly those designed to protect consumers, as described herein;

   b.  By unfairly and unconscionably profiting, at the expense of consumers, from these violations of California law;

   c.  By fraudulently failing to disclose its (material) fees to consumers;

   d.  By unfairly and unlawfully purporting to bind consumers to "split plan" loans before disclosing the terms of those loans;

   e.  By unfairly and unlawfully purporting to bind consumers to GREENSKY-branded installment loan agreements before disclosing the terms and conditions of those loans;

/ / /

---

[47] Cal. Civ. Code § 17200.

f. By unfairly training merchants on its platform to upsell by charging consumers more for a given product while concealing the fees being paid to GREENSKY; and

g. By violating the FAL, as will be described below.

212. Defendants' misrepresentations and omissions caused Plaintiff and Class members to purchase goods or services from the merchants on GREENSKY's platform. Absent those misrepresentations and omissions, Plaintiff and Class members would not have purchased the germane goods or services or would not have purchased them at the prices they paid.

213. Accordingly, Plaintiff and Class members suffered injury in fact, including lost money or property, as a result of GREENSKY's misrepresentations and omissions.

## FIFTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"),
#### Bus. & Prof. § 17500
#### (Against All Defendants)

214. Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

215. Plaintiff brings this count on behalf of the Class.

216. The FAL prohibits advertising products using untrue or misleading statements that the speaker knows or should know are untrue or misleading.

217. GREENSKY's platform enabled billions of dollars of consumer loans to be made throughout the United States, including California. Meanwhile, GREENSKY advertised to consumers and state agencies that it was nothing more than a "program administrator," "service provider," and/or "payment platform"; these terms all have meaning and were misleading as applied to GREENSKY.

218. More specifically, a "program administrator," in general, administers some program that *is already in existence and was established by some other authority* (e.g., a PACE program); a "service provider"—a *loan* service provider—typically collects a very small amount of outstanding principal in exchange for collecting on loans *that were already in existence when it began to service them*; and a "payment platform," such as PayPal, is, generally, an interface/network

whereby one can transfer funds in exchange for, usually, the platform collecting a relatively small fee (or, for consumers, the transfer may be free) for transmitting those funds.

219.     As described throughout this complaint, GREENSKY's platform *originates* loans; it is a "program administrator" only to the extent it administers its *own* "program." As described above, GREENSKY has harvested the vast bulk of its revenues from charging substantial fees upon principal at "*the point of origination*" (emphasis added)—it is not a mere loan servicer. And, while it may be a payment platform, it is doing so to collect payments on the GREENSKY-branded loans that were originated on its own platform.

220.     GREENSKY knew or should have known that these representations were untrue and/or misleading.

221.     Further, as described throughout, GREENSKY has built its business model upon, and profited directly from, this semantic sleight of hand. GREENSKY, in essence, was able to get some number of bank partners to agree to lend *it* (GREENSKY) money for its platform on a revolving basis with whatever terms and conditions and hide the nature of its business from consumers and state agencies.

222.     As stated above, GREENSKY itself admitted that it offered loan products—at least its deferred interest products—with terms *different from those offered by the partner banks* (because GREENSKY contracted to cover the first year of interest regardless of whether the consumer was able to pay before the end of the deferment period). *Thus, GREENSKY—not the partner banks—offered deferred interest loan products*.

223.     Consumers, thinking that they were doing business strictly with a given merchant, would often be surprised to see GREENSKY-branded installment loan agreements arrive. These loan agreements would arrive with TILA disclosures but *without disclosure of the approximately, on average, 10% of principal that GREENSKY would ultimately deduct.*

224.     GREENSKY has also failed to represent the true nature of its business to state regulatory agencies.

225.     These misrepresentations and omissions resulted in an incentive structure in which merchants were expressly encouraged to upsell, often using unscrupulous methods, their products

1   using GREENSKY financing. GREENSKY likewise gave merchants the ability to access

2   GREENSKY funds with minimal due diligence, which was to GREENSKY's advantage.

3       226.    These misrepresentations and omissions resulted in a business model that relied

4   upon evading state laws.

5       227.    GREENSKY's misleading and/or untrue statements in this regard were material

6   and likely to deceive a reasonable consumer.

7       228.    Plaintiff and Class members suffered injury in fact, including the loss of money or

8   property, as a result of GREENSKY's unlawful, unfair, or deceptive practices. Absent

9   GREENSKY's misrepresentations and omissions, Plaintiff and Class members would not have

10  purchased the relevant goods or services or would not have purchased them at the prices they paid.

11      229.    GREENSKY has evinced a pattern and practice of such wrongful conduct in

12  California and across the country.

13

14                          **SIXTH CAUSE OF ACTION**
                **VIOLATION OF CONSUMER LEGAL REMEDIES ACT ("CLRA"),**
15                          **Cal. Civ. Code § 1750**
                            **(Against All Defendants)**

16      230.    Plaintiff incorporates by reference all facts and allegations contained in the

17  foregoing paragraphs as though fully set forth herein.

18      231.    Plaintiff brings this count on behalf of the Class.

19      232.    The CLRA prohibits unfair methods of competition and unfair or deceptive acts or

20  practices undertaken by any person in a transaction intended to result or which results in the sale or

21  lease of goods or services to any consumer.

22      233.    The lending services provided by GREENSKY are "services" within the meaning

23  of Cal. Civ. Code § 1761(b).

24      234.    Plaintiff and Class members are "consumers" within the meaning of Cal. Civ. Code

25  § 1761(d).

26      235.    Plaintiff, Class members, and Defendants are each "persons" within the meaning of

27  Cal. Civ. Code § 1761(c).

28

236.    As alleged herein, GREENSKY made misrepresentations and omissions regarding its role in making, brokering, and/or extending consumer loans.

237.    These misrepresentations and omissions were undertaken in transactions that were intended to, or did, result in the sale of GREENSKY's services to California consumers, so as to satisfy § 1770(a).

238.    GREENSKY's conduct, as described herein, was and is in violation of at least the following enumerated prohibitions in Cal. Civ. Code § 1770(a):

    a.  § 1770(1): Passing off goods or services as those of another.

    b.  § 1770(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.

    c.  § 1770(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.

    d.  § 1770(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

    e.  § 1770(9): Advertising goods or services with intent not to sell them as advertised.

239.    Plaintiff and Class members suffered injury in fact and actual damages resulting from GREENSKY's material misrepresentations and omissions because they paid an inflated purchase price for the relevant goods or services and/or would not have purchased the goods or services if they had known of GREENSKY's misrepresentations and omissions. At this time, however, Plaintiff does not seek those damages.

240.    Plaintiff, individually and on behalf of the class, has provided notice to GREENSKY of its violations of the CLRA concurrent with the filing of this Complaint.  Should GREENSKY fail to remedy its conduct pursuant to the notice, Plaintiff shall amend this Complaint to seek monetary damages pursuant to Cal. Civ. Code § 1780(a)(1).

241.    Pursuant to Cal. Civ. Code § 1780, Plaintiff and those similarly situated are entitled to restitution of all payments made on the GREENSKY loans, are entitled to obtain an order requiring GREENSKY to correct the misrepresentations it made to the Class, and to recover reasonable attorneys' fees and costs.

242.    Plaintiff, individually and on behalf of the Class, seeks restitution and injunctive relief pursuant to Cal. Civ. Code. § 1780.  The CLRA, Cal. Civ. Code § 1750 *et seq.*, is designed to protect consumers against unfair and deceptive business practices.  It applies to GREENSKY's conduct because it covers transactions that are intended to result, or that do in fact result, in the sale or lease of goods and services to consumers.

243.    GREENSKY knew, or should have known, that it was misrepresenting its business to consumers and state agencies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

1.    Approving of the proposed Class, certifying Plaintiff as representative of the Class and designating her counsel as counsel for the Class;

2.    Enjoining Defendants from the business practices described herein;

3.    Granting the requested declaratory judgment;

4.    Declaring that Defendants committed the violations alleged herein;

5.    Granting damages, except as limited in by the Consumer Legal Remedies Act, restitution, and/or disgorgement to Plaintiff and the Class;

6.    Granting compensatory damages, the amount of which is to be determined by jury at trial, except as limited in by the Consumer Legal Remedies Act;

7.    Granting punitive damages;

8.    Granting pre- and post-judgment interest;

9.    Granting attorneys' fees and costs; and

10.    Granting further relief as this Court may deem proper.

/ / /

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the proposed Class, hereby demands a trial by jury on all issues so triable.

/ / /

/ / /

/ / /

1   Dated: January 7, 2019

2   Respectfully submitted,

3

4   _____
    DANIEL T. LeBEL, SBN 246169

5   CONSUMER LAW PRACTICE
    OF DANIEL T. LEBEL
6   PO Box 720286

7   San Francisco, CA 94111
    T: (415) 513-1414
8   F: (877) 563-7848
    danlebel@consumerlawpractice.com
9

10  BRYCE BELL (motion for *pro hac vice* forthcoming)
    MARK W. SCHMITZ (motion for *pro hac vice* forthcoming)
11  ANDREW R. TAYLOR (motion for *pro hac vice* forthcoming)
    BELL LAW, LLC
12  2600 Grand Blvd., Suite 580
    Kansas City, MO 64108
13  T: 816-886-8206

14  F: 816-817-8500
    Bryce@BellLawKC.com
15  MS@BellLawKC.com
    AT@BellLawKC.com
16

17  *Attorneys for Plaintiff and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28

CASE NUMBER: CGC-20-582136  ELIZABETH BELYEA VS. GREENSKY, INC. A CORPORATIC

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**   **JUN-10-2020**

**TIME:**   **10:30AM**

**PLACE:**   **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

**(SEE LOCAL RULE 4)**

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



**Superior Court of California, County of San Francisco**
**Alternative Dispute Resolution**
**Information Package**



> The plaintiff must serve a copy of the ADR Information Package on each defendant along
> with the complaint. Cross-complainants must serve a copy of the ADR Information Package
> on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

**WHAT IS ADR?**
Alternative Dispute Resolution (ADR) is the term used to describe the various options available for
settling a dispute without a trial. There are many different ADR processes, the most common forms of
which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide
disputes or help parties decide disputes themselves. They can help parties resolve disputes without
having to go to trial.

**WHY CHOOSE ADR?**
It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should
participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or
some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks,
  through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than
  in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have
  reported a high degree of satisfaction.

> **\*\*Electing to participate in an ADR process does not stop the time period to
> respond to a complaint or cross-complaint\*\***

**WHAT ARE THE ADR OPTIONS?**
The San Francisco Superior Court offers different types of ADR processes for general civil matters. The
programs are described below:

**1) MANDATORY SETTLEMENT CONFERENCES**
Settlement conferences are appropriate in any case where settlement is an option. The goal of
settlement conferences is to provide participants an opportunity to reach a mutually acceptable
settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the
court and are often held near the date a case is set for trial, although they may be held earlier if
appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement
conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by
the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

(A) **MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF)**, in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

(B) **JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco Superior Court Judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

(C) **PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

(D) **COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

### 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | |
| ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, CA 94102-4514 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____<br><br>**DEPARTMENT 610** |
|---|---|

**1)   The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐   **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐   **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐   **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the internet.

☐   **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐   **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐   **Other ADR process (describe)** _____

**2)   The parties agree that the ADR Process shall be completed by (date):** _____

**3)   Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

| | |
|---|---|
| _____<br>Name of Party Stipulating | _____<br>Name of Party Stipulating |
| _____<br>Name of Party or Attorney Executing Stipulation | _____<br>Name of Party or Attorney Executing Stipulation |
| _____<br>Signature of Party or Attorney | _____<br>Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: _____ | Dated: _____ |

☐ *Additional signature(s) attached*

ADR-2  10/18            **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

## DEMAND AND NOTICE OF VIOLATION
## OF CONSUMERS LEGAL REMEDIES ACT

TO:   GREENSKY OF GEORGIA, LLC, GREENSKY, INC., AND GREENSKY, LLC

PLEASE TAKE NOTICE that you are in violation of the Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*), for the reasons stated in the Complaint ("Complaint"), filed in the Superior Court of the State of California, in and for San Francisco County, on or about January 9, 2020, entitled: **Elizabeth Belyea *v. Greensky, Inc. et al.,*** and attached hereto as Exhibit A.

This notice is served upon you on behalf of Elizabeth Belyea ("Plaintiff"). All communications or responses regarding this Notice shall be directed to Plaintiff's counsel as follows:

Daniel T. LeBel
**CONSUMER LAW PRACTICE**
PO Box 720286
San Francisco, CA  94172
(415) 513-1414

## STATEMENT OF VIOLATIONS

The Complaint alleges that Greensky, Inc., Greensky of Georgia, LLC, and Greensky, LLC ("Defendants"), violated the Consumers Legal Remedies Act by, among other things, through misrepresentations and omissions about the nature of it's service. These acts violated and continue to violate the Consumers Legal Remedies Act because Defendant:

    i.    § 1770(a)(1): Passing off goods or services as those of another.

    ii.    § 1770(a)(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.

    iii.    § 1770(a)(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.

    iv.    § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

    v.    § 1770(9): Advertising goods or services with intent not to sell them as advertised.

## CONSUMER LAW PRACTICE
### DANIEL T. LEBEL, ATTORNEY

## **STATEMENT OF REMEDIES**

IT IS HEREBY DEMANDED THAT WITHIN THIRTY (30) DAYS from the date on which this Notice is served upon you that you remedy your violations as follows:

Restore all payments made on the GREENSKY loans to Plaintiff and the proposed class; correct the omissions and misrepresentations made to Plaintiff and the Class; adopt best practices to ensure the omissions and misrepresentations are not continued; and pay Plaintiff's reasonable attorneys' fees and costs.

# *NATIONAL REGISTERED AGENTS, INC.*

## *SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM*

To: STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

SOP Transmittal #   537142496

213-337-4615 - Telephone

Entity Served:   GREENSKY OF GEORGIA, LLC  (Assumed Name)  (Domestic State: GEORGIA)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of CALIFORNIA on this 06 day of February, 2020. The following is a summary of the document(s) received:

1.   **Title of Action:**  ELIZABETH BELYEA, ETC., PLTF. vs. GREENSKY, INC, ET AL., DFTS. // TO: GREENSKY OF GEORGIA, LLC

2.   **Document(s) Served:**   Other: Summons, Complaint, Attachment

3.   **Court of Jurisdiction/Case Number:** San Francisco County - Superior Court - San Francisco, CA
Case # CGC20582136

4.   **Amount Claimed, if any:**  N/A

5.   **Method of Service:**

_X_ Personally served by:    _X_ Process Server    ___ Law Enforcement    ___ Deputy Sheriff    ___ U. S Marshall

___ Delivered Via:    ___ Certified Mail    ___ Regular Mail    ___ Facsimile

___ Other (Explain):

6.   **Date and Time of Receipt:**  02/06/2020 12:50:00 PM CST

7.   **Appearance/Answer Date:** Within 30 Calendar Days After This Summons And Legal Papers

8.   **Received From:**    Daniel T. Lebel          9.  **Carrier Airbill #** 1ZY041160194913360
Consumer Law Practice Of Daniel T. Lebel
PO BOX 720286
San Francisco, CA 94111          10.  **Call Made to:** Not required
415-513-1414

11.   **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  STEVEN E. FOX  steve.fox@greensky.com

Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com

Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com

**NATIONAL REGISTERED AGENTS, INC.**                    **CopiesTo:**

Transmitted by  Amanda Garcia

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

02-06-2020

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GREENSKY INC., a corporation, GREENSKY OF GEORGIA, LLC, GREENSKY, LLC, limited liability companies, and DOES 1-20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ELIZABETH BELYEA, individually and on behalf of all others similarly situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Francisco Superior Court<br>400 McAllister St.<br>San Francisco, CA 94102 | **CASE NUMBER:**<br>*(Número del Caso):*<br>CGC-20-582136 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel T. LeBel, PO Box 720286, San Francisco, CA 94172; (415) 513-1414

| DATE:<br>*(Fecha):* JAN 09 2020 | CLERK OF THE COURT | Clerk, by<br>*(Secretario)* DE LA VEGA-NAVARRO, Rossal | Deputy<br>*(Adjunto)* |
|---|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant
2. ☐ as the person sued under the fictitious name of (specify):

3. ☒ on behalf of (specify): Green sky of Georgia, LLC

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☒ other (specify): LLC

4. ☐ by personal delivery on (date):

**BY FAX**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 (Rev. July 1, 2009) | SUMMONS | Page 1 of 1<br>Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Daniel T. LeBel, SBN 246169
Consumer Law Practice of Daniel T. LeBel
PO Box 720286
San Francisco, CA 94172
TELEPHONE NO.: (415) 513-1414   FAX NO. (877) 563-7848
ATTORNEY FOR (Name): Elizabeth Belyea

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister St
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Unlimited Jurisdiction

CASE NAME:
Belyea v. Greensky, Inc. et al.

ENDORSED
FILED
San Francisco County Superior Court

JAN 0 9 2020

CLERK OF THE COURT
BY: ROSSALY DE LA VEGA
Deputy Clerk

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder   Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: | CGC-20-582136 |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action (specify): Cal Fin 22000; Decl Rel.; Civ Code 1750/1789.10; Cal B&P1200/17500
5. This case ☑ is ☐ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 1/7/2020
Daniel T. LeBel
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

CIVIL CASE COVER SHEET

1  DANIEL T. LEBEL, SBN 246169
2  CONSUMER LAW PRACTICE
   OF DANIEL T. LEBEL
3  PO Box 720286
   San Francisco, CA 94111
4  T: (415) 513-1414
   F: (877) 563-7848
5  danlebel@consumerlawpractice.com

6  BRYCE BELL (motion for *pro hac vice* forthcoming)
7  MARK W. SCHMITZ (motion for *pro hac vice* forthcoming)
   ANDREW R. TAYLOR (motion for *pro hac vice* forthcoming)
8  BELL LAW, LLC
   2600 Grand Blvd., Suite 580
9  Kansas City, MO 64108
10 T: 816-886-8206
   F: 816-817-8500
11 Bryce@BellLawKC.com
12 MS@BellLawKC.com
   AT@BellLawKC.com
13
   *Attorneys for Plaintiff and all others similarly situated,*
14
15            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
16                       IN THE COUNTY OF SAN FRANCISCO

17 ELIZABETH BELYEA,                    )   Case No. CGC-20-582136
   individually and on behalf of all others )
18 similarly situated,                   )
                                         )   CLASS ACTION COMPLAINT
19                          Plaintiffs,  )
                                         )   1. California Financing Law
20 v.                                    )      (Cal. Fin. Code §22000)
                                         )   2. Credit Services Act of 1984
21                                       )      (Cal. Civ. Code § 1789.10)
   GREENSKY, INC.,                       )   3. Declaratory Judgment
22 a corporation,                        )   4. California Unfair Competition Law
                                         )      (Cal. Bus. & Prof. Code §17200)
23 and                                   )   5. California False Advertising Law
                                         )      (Cal. Bus & Prof. Code §17500)
24 GREENSKY OF GEORGIA, LLC, and         )   6. Consumer Legal Remedies Act
25 GREENSKY, LLC,                        )      (Cal. Civ. Code § 1750)
   limited liability companies, and DOES 1-20 )
26                                       )
27                          Defendants.  )   DEMAND FOR JURY TRIAL
28

───────────────────────────────────────────────
CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

1.     Plaintiff brings this class action complaint against Defendants to recover damages for herself and others similarly situated caused by Defendants' failure to comply with state lending and/or credit services law, as well as multiple consumer protection laws. On information and belief, Plaintiff alleges as follows:

### PARTIES

2.     Plaintiff Elizabeth Belyea ("Plaintiff") is and, at all relevant times, has been a resident of California and a consumer.

3.     Defendants GreenSky of Georgia, LLC and GreenSky, LLC are, on information and belief, related entities that are ostensibly controlled by GreenSky, Inc., a publicly traded corporation (collectively, "GREENSKY" or "Defendants").

4.     GreenSky of Georgia, LLC is registered in California as a foreign limited liability company.

5.     GREENSKY has consistently provided California consumers (and merchants) with materials attributed to GreenSky, LLC such that that entity is properly included in this complaint.

6.     GREENSKY may be served by serving National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

7.     At all times relevant to this complaint, Defendants were engaged in the business of marketing, servicing, managing, controlling, establishing the terms of credit, originating, distributing, transmitting funds for, and/or collecting on consumer installment loan and/or credit products.

8.     The true names and capacities of Defendants sued as Does 1 through 20 are unknown to Plaintiffs at this time. Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of Does 1 through 20 when ascertained. Plaintiffs are informed and believe, and based thereon alleges, that

each Defendant is jointly and severally responsible in some manner for the damages alleged

herein.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over the Defendants in that they each solicit business and sales of their consumer loan services and products throughout California.

10.      This Court has jurisdiction over this action pursuant to § 410.10 of the California Code of Civil Procedure. Jurisdiction is also proper under California Civil Code § 17200 *et seq.*

11.      Venue is appropriate in the County of San Francisco pursuant to California Code of Civil Procedure § 395, because Defendants conduct business within this county.

12.      This is a class action for violations of California Financing Law ("CFL") or, in the alternative, California's Credit Services Act of 1984 ("CSA"), as well as the Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA").

## GREENSKY'S BUSINESS MODEL
**GREENSKY Is Not a Properly Licensed Lender, Broker, or Credit Services Organization but Takes Fees from Loans or Other Extensions of Credit Provided by Legitimate Lenders.**

13.      GREENSKY, presumably for the sake of greater profit, adopted a path that was plainly illegal in California (and many other, if not every other, state(s)): it made its money by taking undisclosed finance charges on consumer loans, in clear violation of the CFL.

14.      GREENSKY, put simply, is a contemporary iteration of what has been called a "rent-a-bank" scheme;[1] its business model on an unlicensed basis is illegal as a matter of California law. Despite the array of obfuscation and buzzwords it has offered with regard to its business, **the important question is: How does GreenSky make money? The answer is fairly simple: GREENSKY puts lending in the hands of contractors—plumbers, roofers, HVAC**

---

[1] *See, e.g.,* ATTORNEYS GENERAL FOR THE DISTRICT OF COLUMBIA, MASSACHUSETTS, CALIFORNIA, COLORADO, ILLINOIS, IOWA, MARYLAND, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, VIRGINIA, AND CONNECTICUT, *Request for Information on Small-Dollar Lending* (Jan. 22, 2019), at pp. 2-4, available at https://www.fdic.gov/regulations/laws/federal/2018/2018-small-dollar-lending-3064-za04-c-038.pdf (last visited Oct. 11, 2019) (describing traditional rent-a-bank schemes).

**installers, window installers, etc.— and takes fees for itself as a percentage of consumer loans.   These fees are _de facto_ finance charges, part of the cost of borrowing money or receiving an extension of credit, but GREENSKY calls them "merchant fees."**

15.     GREENSKY has attempted to evade state laws and regulatory regimes by declaring itself to be just a consumer loan "servicer," "program administrator," or "platform" when, in fact, it is far more. According to GREENSKY's own Initial Public Offering ("IPO") pitchbook, it is described as a "platform" that supports "the full transaction lifecycle, including credit application, underwriting, real-time allocation to bank partners, funding, settlement, and servicing."[2]

16.     That same pitchbook also assured potential investors that GREENSKY maintained a "robust [and] integrated regulatory compliance framework."[3]

17.     GREENSKY partners with, generally, larger regional banks that fund its "program," or "programs." Examples include (and/or included) Fifth Third Bank, Regions Bank, Sun Trust Bank, and Midland States Bancorp, Inc. These banks broadly have little or no knowledge whatsoever of the merchants that exist in GREENSKY's program or the many individual consumers that receive GREENSKY-branded loans.

18.     Upon information and belief, these partner banks supply general criteria—e.g., broad funding and interest rate parameters—relative to the GREENSKY program while remaining thoroughly removed from the ultimate allocation of funds to consumers and merchants.

19.     For example, Regions Bank (of Alabama), which had been one of GREENSKY's largest bank partners yet recently declined to renew its funding contract with GREENSKY, "[didn't] break out GreenSky loans in its financial statements."[4]

20.     On the April 27, 2018, Statement of Information GREENSKY filed with the California Secretary of State, it misleadingly classified itself as a mere "payment platform."

---

[2] EVOLVE CAPITAL PARTNERS, GreenSky, Inc. Summary of Initial Public Offering (May 2018), available at https://www.evolve-capital.com/wp-content/uploads/2018/06/Greensky-IPO-Profile.pdf (last visited October 11, 2019).
[3] _Id._
[4] Alan Kline, _How Buy Now is Evolving into Borrow Now_, 128 AMERICAN BANKER 15, 18 (Mar. 2018).

21. Indeed, in the aforementioned IPO pitchbook, GREENSKY was more accurately described as a "lending platform":

# GreenSky, Inc. IPO – Executive Su
**Initial Public Offering Overview**

**GreenSky**™                               **NASDAQ:GSKY**

📄 **Description**

GreenSky, Inc. is a financing and payments technology company that operates a platform that provides credit solutions. The company's lending platform enables retailers, healthcare providers, and home contractors to offer Point of Sale (PoS) credit to their customers.

22. GREENSKY has overwhelmingly derived its revenues from charging the "merchant fees,"[5] which are finance charges, as well as receiving interest rate spread-driven "incentive payments" from partner banks.

23. Importantly, GREENSKY does not disclose the amount of these finance charges to consumers.

24. Rather, buried in the fine print of the installment loan agreement provided to Plaintiff was the following statement:

**Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.**

25. GREENSKY simply possesses no reliable enforcement mechanism to ensure that contractors do not charge customers for some or all of these fees.

[5] GREENSKY, INC., Form 10-K (for the fiscal year ended Dec. 31, 2018, filed with the SEC; "2018 10-K"), at 79.

26.     Further, rather than burying such an innocuous statement deep within the fine print, an effort at genuine disclosure would dictate that GREENSKY reveal that it had taken on, average, 10% of the principal amount as part of the transaction.

27.     The reason for such concealment is simple: most of GREENSKY's business is taking finance charges on consumer transactions; however, by simply calling these "merchant fees," GREENSKY maintains that it need not be licensed under the wide variety of laws that would restrict and/or curtail and/or require disclosure of the taking of such. On the other hand, the bank partners, as chartered institutions, must reveal their relatively minor administrative fees under the Truth in Lending Act.

28.     Likewise, GREENSKY does not train the merchants in its program to disclose the amount of the merchant fees to consumers, making it that much easier to dissemble the actual nature of its business.

29.     In GREENSKY's own words: "The merchant fee is calculated by multiplying a set fee percentage (as outlined in a schedule provided to the merchants) by the dollar amount of a loan *at the point of origination*."[6]  (emphasis added). The Merchant Program Agreement GREENSKY would enter with the Merchants provided that the "Merchant will pay GreenSky a contractor or transaction fee ("Transaction Fee").  … The Transaction Fee is due and payable to GreenSky upon the funding of a Loan." In this way, GREENSKY's primary source of revenue is derived directly from the extension (not servicing) of credit.

### GREENSKY's Competitors Follow the Law

30.     GREENSKY's illegal scheme puts legitimate businesses in the same market as GREENSKY at a relative disadvantage.

31.     In GREENSKY's own words: "*We face competition from a diverse landscape of consumer lenders, including traditional banks, credit unions and credit card issuers, as well as alternative technology-enabled lenders*."[7] Indeed, it is telling that GREENSKY proclaims its primary competitors to exclusively be different forms of lenders.

---

[6] *Id.* at 78 (emphasis added).
[7] *Id.* at 8 (emphasis added).

32.    For example, San Francisco-based Affirm—which, like GREENSKY, is a point-of-sale fintech firm—reported itself to the Secretary of State as a "financial services" firm and is licensed (as Affirm Identity, #6054768), as a finance lender and broker, with the Department of Business Oversight.

33.    For example, Oakland-based Solar Mosaic, Inc., which, like GREENSKY, offers point-of-sale financing (for solar systems), also became a licensed lender (#6054631) by at least 2012.

### GREENSKY Originates Consumer Loans

34.    In GREENSKY's own words: "While many of our Bank Partners may traditionally focus on lending opportunities within their geographic footprints, ***our platform enables them to originate loans in all 50 states*** . . ."[8] Thus, GREENSKY expressly originates loans; again, the partner banks are removed from this process and in this way GREENSKY explicitly acts as a broker and originator for the partner banks.

35.    In GREENSKY's own words: "***Our platform delivers significant loan volume***, while requiring minimal upfront investment by our Bank Partners. Furthermore, our program is designed to adhere to the regulatory and compliance standards of our Bank Partners, which has helped us to gain their confidence, ***allowing them to outsource both loan facilitation and servicing functions to us***."[9]

36.    In GREENSKY's own words: "Our platform is powered by a ***proprietary*** technology infrastructure that delivers stability, speed, scalability and security. ***It supports the full transaction lifecycle, including credit application, underwriting, real-time loan allocation to our Bank Partners, document distribution, funding, settlement and servicing***, and it can be expanded to additional industry verticals as we scale our business."[10]

37.    Indeed, close examination of GREENSKY reveals that it has downplayed the nature of its business to consumers and regulators, while offering a truer picture to investors.

---

[8] *Id.* at 6 (emphasis added).
[9] *Id.* at 4 (emphasis added).
[10] *Id.* (emphasis added).

38.     In GREENSKY's own words: "***We derive most of our revenue and profitability from upfront transaction fees that merchants pay us every time they facilitate a transaction using our platform. Thus, our profitability is strongly correlated with merchant transaction volume. The transaction fee rate depends on the terms of financing selected by a consumer***. ***In addition, we collect servicing fees*** on the loan portfolios we service for our Bank Partners."[11]

39.     The penultimate sentence underlined above alludes to yet another deception that is largely inherent in GREENSKY's business model: Consumers generally do not themselves select the terms of financing. The thousands of merchant-contractors—plumbers, roofers, HVAC installers, window installers, etc.—often do not, and are indeed not equipped to, fully and adequately explain a range of financing plans to consumers; in many cases, that notion is actually absurd. Instead, these merchants are empowered to push through loan applications with ease on tablets utilizing the GreenSky platform.

40.     In GREENSKY's own words: "Our Bank Partners offer certain loan products that have a feature whereby the account holder is provided a promotional period to repay the loan principal balance in full without incurring a finance charge. For these loan products, we bill interest each month throughout the promotional period and, under the terms of the contracts with our Bank Partners, we are obligated to pay this billed interest to the Bank Partners if an account holder pays off the loan balance in full within the promotional period."[12] Thus, GREENSKY contracts to assume a particular type of credit risk before any loan is even made.

**GREENSKY Offers Loan Terms That the Bank Partners Do Not**

41.     Further, this incentive structure reveals (at least) three important aspects of GREENSKY's business model: 1) **It contracts with consumers for loan terms that are fundamentally different from those offered by the bank partners** (because the banks harvest a particular rate of interest regardless of whether the consumer pays off the loan within the promotional period), 2) **GREENSKY, not the partner banks, offers a deferred interest loan product** (i.e., GREENSKY is the true lender for at least a portion of the loan), and 3) **it behooves**

---

[11] *Id.* at 5 (emphasis added).
[12] *Id.* at 84.

1   **GREENSKY to have customers that are not able to pay off loans within the promotional**

2   **period but do not ultimately default.**

3        42.    Indeed, just this single statement reveals how fundamentally deluded GREENSKY

4   is with regard to its own business: **if the bank partners themselves did indeed "offer certain**

5   **loan products that have a feature whereby the account holder is provided a promotional**

6   **period to repay the loan principal balance in full without incurring a finance charge," then**

7   **there would be no need for GREENSKY to cover such prepayment risk.**[13]

8        43.    GREENSKY commonly refers to the amounts it must pay the banks when

9   prepayments occur as ***finance charge reversals*** ("FCRs").[14]

10        44.    GREENSKY's business model, very much unlike that of a mere loan servicer or

11   program administrator, is predicated on the bet that it can originate enough consumer loans to

12   harvest robust "merchant fees" while also mitigating prepayment risk and collecting volume

13   and/or spread "incentive payments" from the banks (and while also evading state regulatory

14   agencies).

15        45.    For example, in GREENSKY's own words: ". . . the expected increase in the fair

16   value change in the FCR liability that we expect to dissipate in the following quarters, which is

17   resulting from spread compression and margin contraction as an increase in contracted Bank

18   Partner yields . . ."[15]

19

20

---

21   [13] Prepayment risk generally refers to the potential cost to a lender of having a given borrower

22   repay a loan before the contractual termination date such that the lender does not harvest the full
amount of interest potentially generated by the debt. This complaint uses "prepayment risk," as
applied to GREENSKY, to mean the period of deferred interest, or "waived" interest, during

23   which a consumer, should they pay off the loan during such time, would realize no interest costs;
this period is usually 12 to 18 months. Obviously, lending money at 0% interest would generally

24   not be profitable and, as stated, GREENSKY's partner banks do not actually offer such loans to

25   consumers. Rather, GREENSKY offers deferred interest on its own program loans as an
enticement and performs its own risk/reward calculations with regard to this particular form of

26   prepayment risk. This also highlights the fact that GREENSKY's "merchant fees" are actually a
de facto finance charge.

27   [14] *See, e.g.,* GREENSKY, INC., Q2 2019 Earnings Call, Corrected Transcript (Aug. 6, 2019), at 5

28   (emphasis added).
[15] GREENSKY, INC., Q1 2019 Earnings Call, Corrected Transcript (May 7, 2019), at 6.

46.     Put in plainer English, this means that a key part of GREENSKY's business comes from "playing the yield curve"—i.e., realizing profits or losses based upon how much more interest (spread) it can charge relative to its fixed bank contracts as interest rates shift over varying periods of time.

47.     Hence, "The increases in [FCR] expense is due to both to the growth of the deferred interest loans in the portfolio, as well as the higher APR on deferred interest loans originated since mid-2018."[16]

48.     Even further, GREENSKY has explored "forward flow" arrangements with other cash-rich entities, such as pension funds and insurance companies. Such arrangements would likely, amongst other aspects, lower its cost of borrowing (because GREENSKY, as described, is foremost a re-lender and a broker of consumer loans, such arrangements could be profitable) while also diversifying and muting various sources of risk to its business.[17]

49.     For example, in GREENSKY's own words: "In terms of structure, what we do expect is a counterparty would write a multi-year arrangement whereby we would agree on a forward flow, we would fund up to an annual dollar amount and those commitments would be sort of billions of magnitudes. And this would sit side by side with our existing bank partners. So just think of it as another peg in our round-robin. But there appears to be quite a bit of appetite and liquidity in the market that would embrace this quality of consumer loan."[18]

50.     Regardless of whether GREENSKY ultimately utilizes such funding sources, this is but another aspect through which its rent-a-bank nature can be viewed. **GREENSKY does not simply service or administrate consumer loans that have already been made: rather, it secures funding sources for itself, originates loans, and collects finance charges thereon. This arrangement on an unlicensed basis is plainly illegal in California**.

51.     The high level of average merchant fees (~10% of principal traditionally) mentioned throughout this complaint are partially a reflection of GREENSKY covering the prepayment risk just discussed. Indeed, as the interest-waiver period increases, GREENSKY's

---

[16] GREENSKY, INC., Q2 2019 Earnings Call, Corrected Transcript (Aug. 6, 2019), at 5.
[17] *See, e.g., id.* at 4.
[18] *Id.* at 12.

merchant-fee percentage increases—that is why GREENSKY is "agnostic" as to finance plan selection.[19]

52.     In fact, this is another essential part of GREENSKY's deception: **The consumers who, according to GREENSKY, benefit from interest-waiver periods are charged *more* up front because the merchants themselves are charged more to cover the aforementioned prepayment risk and they pass this on to to consumers.**

53.     This point is further elucidated by GREENSKY's own description of its loan plan for "less creditworthy" borrowers; as seen below, GREENSKY set a flat fee of 3.25% for such products, **which do not offer deferred interest**—hence, there is no prepayment risk for GREENSKY relative to the underlying interest payments. Thus, GREENSKY simply takes an unlawful finance charge of 3.25%, in addition to possible interest rate spreads and/or "incentive payments" from the banks, of principal on loans made to low-prime and/or subprime borrowers. GREENSKY' 2017 merchant training materials explain this as follows:



**GreenSky**

## Seamless Counteroffer

- Automatically considers less creditworthy customers for our counteroffer plan
- Quick, seamless process
- No additional phone call or follow up

| Plan 7096[1] | |
|---|---|
| Terms | 96 months |
| APR Range | 19.99% - 26.99% |
| Credit Limit | Up to $8,500 |
| Contractor Fee | 3.25% |

54.     In GREENSKY's own words: "***We have developed an algorithm that underwrites potential loans against the specified credit criteria of each of our Bank Partners.***"[20]  Again, the

---

[19] *See, e.g.,* GREENSKY, INC., Q4 2018 Earnings Call, Corrected Transcript (Mar. 5, 2019), at 5.

bank partners provide only broad parameters, while GREENSKY controls the credit application process and provides a **proprietary credit-risk overlay** that determines **whether GREENSKY is willing to extend a loan**; the banks are not involved in the actual credit application approval/denial process.

55.     **Indeed, it makes no sense for a loan servicer or program administrator to "underwrite" (i.e., insure or guarantee) potential loans**; rather, GREENSKY accepts basic loan parameters from the partner banks as gateway criteria and then assesses its own willingness to adopt risks, necessarily including prepayment risk, before pushing a loan through.

56.     Further, **if the bank partners were not lending to GREENSKY as a separate entity, then they should be in competition for any given consumer loan amongst themselves; instead, it is GREENSKY that distributes loans *to* the banks on a "round-robin" basis**.

57.     Even if GREENSKY were offering consumers the exact same terms offered by the bank partners, it would still be acting as an unlicensed consumer loan broker and thereby harvesting unlawful fees.

58.     GREENSKY admittedly "auto-populates"[21] consumer credit applications, provides consumers with GREENSKY-branded loan agreements, receives payments from consumers directly, purports to take a purchase money security interest in (at least) some goods purchased with funds loaned by GREENSKY, and reports to consumer reporting agencies while the partner banks show up as little more than fine print on the GREENSKY-branded loan



---

[20] *Id.* at 7 (emphasis added).
[21] *Id.* at 6.

agreements:

# GreenSky® Installment Loan Agreement
## RETAIL INSTALMENT CREDIT AGREEMENT

59.     Where banks have traditionally maintained a protocol[22]  for the purposes of identity verification so as to, for example, help curb unauthorized transactions and money laundering, GREENSKY and/or the merchants in its program purport to fulfill this function—the partner banks are uninvolved.

**GREENSKY Defines Consumer Loan Terms and Owns Credit Risk**

60.     Further, GREENSKY contracts with the merchants, via merchant program agreements ("MPAs"), in its program so as to expressly own the "credit risk" and act as the "sole authority to prescribe the terms and conditions" of credit applications and consumer loans.

61.     Specifically, as stated in an MPA: "GreenSky may offer Loan(s) to Merchant's qualified customers as contemplated by this Agreement. As between the parties, *GreenSky has sole authority to prescribe the terms and conditions of the credit application, the Loan Agreement, and each Loan (including, without limitations, interest rate maximum amount and term).* GreenSky may at any time, *in its sole discretion (including at the direction of a Funding Bank)*, *prospectively modify such terms and conditions with respect to Loans* for which approval is granted subsequent to the time of the modification. GreenSky may *in its sole discretion (including at the direction of a Funding Bank)* *change the credit standards at any time* without notice to Merchant and may reject and accept credit applications in its sole discretion . . ." (emphasis added).

62.     Beneath this provision, the MPA also stated that "*GreenSky shall own the Loans*, including the Borrower names and other Borrower Information, and, *shall bear the credit risk for*

---

[22] For example, the Patriot Act authorized the Secretary of the Treasury to promulgate regulations pertaining to banks and reasonable due diligence in verifying customers' identities, especially when opening an account. *See* 31 U.S.C. § 5318(l). Here, though GreenSky claims that the partner banks are the actual lenders, they are two degrees (with GreenSky and the merchants in between) removed from the ultimate beneficiary of a given account.

*the Loans.* Merchant acknowledges and agrees that it shall have no ownership interest in the Loans" (emphasis added).

63.     Significantly, GREENSKY stated that this authority to establish terms of credit was **in addition to** those that may be given at the direction of its bank partners.

64.     Merchants and/or consumers do not apply for loans with the bank partners, as would typically be the case with "indirect lending."[23] Rather, **the entire process is managed by GREENSKY and done in the GREENSKY name**.

65.     Thus, GREENSKY has filled nearly every function traditionally managed by lenders despite continually claiming to not be a lender:

> ### Is GreenSky a lender? Who is my loan with?
>
> GreenSky is not a lender. We are a service provider and program administrator for federally insured, federal and state chartered banks that provide consumer loans under the GreenSky® Programs.
>
> As a borrower, you received a loan agreement that identifies the bank that is offering and funding your loan. This loan agreement is between you and the funding bank directly. However, GreenSky services your loan at the direction and control of your lender, so any questions you have should be directed to us.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

///

///

///

---

[23] For example, credit unions sometimes enter indirect lending arrangements with car dealers. This means that the dealer may direct the borrower to the credit union at the dealership but the loan application will still be submitted to the credit union with the consumer apprised of such. In this analogy, GreenSky is the credit union but, contrary to the credit union's legitimate model, points to the bank partners when issues of "lending" arise.

Borrower: _____ Date:_____    Co-Borrower: _____ Date:_____
Electronic record constitutes acceptance of this Agreement (see above)    Electronic record constitutes acceptance of this Agreement (see above)
LENDER: b/ SunTrust Bank, a Georgia banking corporation _____   Date: 07/01/2019

(This is a disclosure of the lender behind the consumer loan made to Plaintiff—
it was made at the bottom of a page; in the manner common to rent-a-bank schemes,
this would have been the extent of SunTrust's involvement with the actual consumer)

66.    While GREENSKY has seemingly not charged overtly usurious interest rates in the manner that has captured the attention of, for example, California legislators,[24] it has commonly charged aggressive interest rates to consumers on behalf of its bank partners. Specifically, GREENSKY has charged an APR of up to, approximately, 27.99% on its deferred consumer installment loan products; the upper bound on its non-deferred products has been more in the range of 13.99%. These charges, again, do not include GREENSKY's "merchant fees."

67.    In the specific case of Plaintiff, to be discussed in detail below, this resulted in a loan award of up to $35,000 with an APR of 25% despite her 835 Experian credit score; if she had taken the entire seven-year period to pay off the full amount, she would have made a total of nearly $78,000 in payments, while GREENSKY would have taken (and indeed took) approximately $2,000 off the top of the loan.

**GREENSKY Has Flouted California Law**

68.    GREENSKY's violations of California law have been harmful and willful.

69.    GREENSKY has long been on notice that it is required to be registered/licensed by state agencies. For example, on or about February 25, 2015 (more than three years before it IPO'd), an investigator with the New Jersey Department of Banking and Insurance sent GREENSKY a letter regarding its "possible unlicensed New Jersey consumer loan activity." GREENSKY eventually settled that claim for $160,000 and later registered as a "money transmitter" in New Jersey.

---

[24] See Assembly Bill 539 (capping interest rates on loans up to $10,000 at 36%).

70. In 2017, GREENSKY was sued in Florida for operating as an unlicensed credit services organization ("CSO").[25]

71. Further, as a publicly traded company with substantial revenues and a supposedly "robust [and] integrated regulatory compliance framework," GREENSKY knew, or should have known, of California lending laws. But GREENSKY"s very business model seemingly depends upon it dissembling to consumers and regulatory bodies and flouting the dictates of these laws.

### GREENSKY Consumer Loans Lack Accountability

72. GREENSKY has essentially given merchants carte blanche to push through loans using its platform, normally using tablets and electronic signatures, with minimal due diligence. Indeed, GREENSKY even stated on its website: **"There is no need to physically sign and/or return your Loan Agreement**. You accept the terms of and electronically sign the Loan Agreement when you authorize the contractor/merchant to process a transaction on your account."** (emphasis in original):

> **What does my Loan Agreement mean?**
>
> Note: There is no need to physically sign and/or return your Loan Agreement. You accept the terms of and electronically sign the Loan Agreement when you authorize the contractor/merchant to process a transaction on your account. Until (and unless) you authorize a transaction, you have no obligation on your GreenSky® Program loan.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

73. Likewise, GREENSKY touted: "*No sales contracts or completion certificates required for funding*."[26]:

/ / /

/ / /

---

[25] *See Locicero v. Intrust Bank, N.A.*, Case No. 17-61484-CIV-DPG, 2018 WL 4374908, at *6-7 (S.D. Fla. Sept. 13, 2018) (denying GreenSky's motion to dismiss in part because GreenSky was plausibly a credit services organization).

[26] Taken from GreenSky Trade Credit, LLC's own 2015 marketing materials (emphasis added).

> ## No sales contracts or completion certificates required for funding*

74.     While GREENSKY may classify loan-type selection as a matter of consumer choice, the reality is that merchants are able, and incentivized, to make this choice for consumers and/or to misleadingly inform them in this regard. Again, the merchants, typically using tablets (with screens that may be hard for many to properly see) and electronic signatures, purport to bind consumers to loans before the terms have been disclosed. Many consumers have no idea who GREENSKY is until they start receiving bills from it and justifiably think that GREENSKY is a bank or credit card company. After all, those bills ask for payment to be sent directly to GREENSKY.

75.     With regard to upselling, GREENSKY offered merchants "Sample Plans to Close More Deals at a Higher Ticket," including how to "Turn an $8,000 job to a $10,000 dream project":[27]

/ / /

/ / /

/ / /

_____

[27] Taken from GreenSky, LLC's own 2017 merchant training materials.

**GreenSky**

## Sample Plans to Close More Deals at a Higher Ticket

Turn an $8,000 job to a
$10,000 dream project.

76.     It is not evident how an additional $2,000 would turn a mere "job" into a "dream project" and, based on GREENSKY's business model, as described throughout, a significant portion of that increase would simply be GREENSKY taking its cut of principal with the consumer absorbing a deceptive markup.

77.     This particular practice—training and encouraging merchants on its platform to upsell and/or build GREENSKY's finance charge into the cost of a project—is an important part of GREENSKY's deception. At no point does, for example, a given consumer see that a given merchant might otherwise charge $20,000 for a project but charges the consumer $22,000, knowing that GREENSKY will charge (on average) that merchant 10% to access credit; the consumer will not see that, say, Fifth Third Bank wired $22,000 to the "GREENSKY program" and that GREENSKY would eventually keep $2,000 of those funds while the merchant would retain its standard $20,000.

78.     **This lack of disclosure is deceptive and harms consumers, who wind up paying most of GREENSKY's revenues** (the "merchant fees") while still paying standard to high interest rates.

79.     Given, as described throughout, the nature of GREENSKY's business model, it seems likely that it would only have the potential for viability, when combined with general evasion of state laws, in industries—e.g., home improvement contracting, elective healthcare,

auto mechanics—where the given merchant generally has a high level of specialization and autonomy relative to the consumer and can more easily deceive them.

80.     In building such a business model, GREENSKY has also outsourced critical lending functions—e.g., general transparency, identity verification, filling out of application forms, explanation of terms and conditions, disclosure of fees—to thousands of random contractors.

**GREENSKY Is Clearly More than Just a Servicer or Program Administrator**

81.     Because GREENSKY claims to just be a sort of middle-man—a neutral program administrator or servicer—it is able to play parties off one another when there is a dispute, even though GREENSKY is the essential "link" that "bring[s] everyone together." Indeed, GREENSKY does not just service credit—it actively facilitates its extension, with minimal due diligence.

## General Information

Who is GreenSky and what does it do?

The GreenSky® Programs make it easy for contractors to offer affordable financing to customers like you. GreenSky is the servicer for one of the nation's largest bank lending programs. Banks in the GreenSky® Programs have financed more than one million home improvement projects. We service loans on behalf of more than a dozen leading banks across the nation.

You can think of GreenSky as a link between contractors, their customers and banks. We bring everyone together and simplify the loan process, from application, to decision/approval, to payments.

(taken from GREENSKYONLINE.COM, Consumer FAQs on Oct. 17, 2019)

82.     Even that bit of "general information" is further deceptive in that it claims "GreenSky" is the "servicer" of the GREENSKY programs. In fact, per the GREENSKY installment loan agreement sent to Plaintiff, **a totally different GREENSKY entity—GreenSky**

**Servicing, LLC—has been created for the purpose of *servicing* loans**. This again highlights the fact that GREENSKY is much more than a mere servicer:



of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

83. GREENSKY can transmit funds *before* the consumer has even seen an installment loan agreement. Its business model enables merchants to "[*a]ccept downpayment the same day the customer is approved*" regardless of whether a given consumer has actually authorized a loan or seen its terms (emphasis added):



## Why Use the GreenSky® Program

### Simple & quick process
- Paperless application and approvals
- Easily accept customer payments
- Providing copies of Sales contracts and Certificates of Completion are not required for every transaction[1]
- Accept downpayment the same day customer is approved[2]
- No pre-payment penalties

(taken from GreenSky, LLC's own 2017 merchant training materials)

84. On information and belief, most, if not all, states have lending laws and credit services laws that place a cap on certain fees/charges and/or prescribe "cooling off" periods, not to mention cost money and time to comply with. If GREENSKY were to properly comply with such laws, it is doubtful that much would be left of its business model.

85. GREENSKY's motivations in this regard are clear: it is easier and cheaper to evade compliance with state regulations; it is easier for merchants to push "hard-sell" or fraudulent transactions through when there is no mandated "cooling off" period or cancellation form; and it is

vastly more profitable to charge fees of, say, 10% of principal when you are unregulated in a state with a cap on such charges.

86.     Further, on information and belief, GREENSKY suffers from poor internal controls and high employee turnover. This has, in part, led to spotty compliance, inconsistent growth, and insufficient due diligence of merchants on its platform, including investigation of consumer complaints. While it is hardly dispositive of the issue, it is telling that GREENSKY ranked dead last in a ranking of best "notable" fintech companies to work for (based on Glassdoor reviews):[28]

///

///

///

---

[28] EFINANCIALCAREERS.COM, *available at* https://news.efinancialcareers.com/uk-en/329766/best-worst-fintech-companies-work (last visited Oct. 22, 2019).

| Rank | Company | Avg. Employee Review |
|------|---------|---------------------|
| 1 | Robinhood | 4.9 |
| 2 | Kabbage | 4.7 |
| 2 | TransferWise | 4.7 |
| 4 | Coinbase | 4.6 |
| 5 | Stripe | 4.5 |
| 6 | Betterment | 4.3 |
| 7 | Affirm | 4.1 |
| 7 | Square | 4.1 |
| 9 | Ayden | 3.9 |
| 10 | Credit Karma | 3.8 |
| 11 | PayPal | 3.7 |
| 12 | Avant | 3.6 |
| 12 | Prosper | 3.6 |
| 12 | SoFi | 3.6 |
| 15 | Markit | 3.3 |
| 16 | Lending Club | 3.1 |
| 17 | GreenSky | 2.9 |

87.   <u>Another way to conceptualize GREENSKY as a business is to think of it as a technology platform that acts as a broker of bank loans</u>. In essence, GREENSKY developed an application and supporting infrastructure, based primarily on enabling merchants to use tablets to generate loans, in a manner that was useful to some banks and/or in a manner that the banks could not, or were not willing to, do.

88.     In essence, **GREENSKY contracts to borrow excess reserves** from partner banks and then lends them to consumers.

89.     In GREENSKY's own words: "We believe our Bank Partners would require significant time and investment to build such a technology solution and merchants network themselves."; "*Our platform alleviates the need for our Bank Partners to bear any marketing, software development or technology infrastructure costs to originate loans.*"[29]

90.     It is not difficult to imagine a lawful version of GREENSKY—for example, one in which it derived revenues from licensing its software to chartered banks or one in which it was properly licensed as a lender/broker (or credit services organization) and derived its revenue from taking lawful and transparent fees on loans and/or other extensions of credit.

91.     For the sake of comparison, the aforementioned point-of-sale fintech firm Affirm, which is licensed as a lender and broker in California (#6054768), generally makes its money by lending at APRs up to 30% or so (lawful in California) while taking very small, *disclosed* fees on transactions (lawful in California).

92.     GREENSKY, on the other hand, effectively brokers loans on an unlicensed basis (unlawful) while taking substantial, undisclosed fees on consumer loans (unlawful). Its primary strategy in its defense seems to simply be proclaiming that it is "not a lender" and taking a calculated risk, or simply hoping, that no one figures out that its business model is plainly illegal in California.

93.     **In aggregate, then, GREENSKY can be viewed as a non-depository finance lender and/or broker whose loans are underwritten by the partner banks.** Thus, GREENSKY should be licensed under the CFL. GREENSKY therefore takes fees on consumer transactions that

---

[29] 2018 10-K, at 6 (emphasis added).

are illegal as a matter of California law.

94.    As such, pursuant to Cal. Fin. Code § 22750, because GREENSKY has quite clearly and willfully taken fees that are "other than" and "in excess of" those permitted by the CFL, GREENSKY-branded loans issued to California consumers during the proposed class period must be declared void and amounts paid to the GREENSKY program, including the "merchant fees," must be disgorged.

95.    In the alternative, should GREENSKY be found to be an (unlicensed) "credit services organization," then the remedy, pursuant to Cal. Civ. Code § 1789.21(a), is essentially the same: it must disgorge all fees and other charges paid to it by California consumers as a result of aiding in unlicensed extensions of credit.

## GREENSKY CEO AND BOARD CHAIRMAN DAVID ZALIK

96.    GREENSKY was co-founded in 2006 by David Zalik ("Zalik"),[30] who currently serves as CEO and Chairman of the Board.

97.    Zalik also co-founded RockBridge Commercial Bank ("RockBridge") as a Georgia-chartered bank in 2007.

98.    RockBridge was funded with a then-state-record $37 million in equity.

99.    Zalik was also an officer and/or director of RockBridge.

100.   In late 2009, RockBridge was shuttered by the Georgia Department of Banking and Finance, with the FDIC named receiver of RockBridge's balance sheet.

101.   The FDIC reported that, as of June 2010, RockBridge's estimated loss to its Deposit Insurance Fund would be approximately $100 million.

102.   In assessing RockBridge's swift demise, the FDIC's 2010 Material Loss Review found: "RockBridge's failure [could] be attributed to (1) *inadequate management and Board of Directors (Board) oversight*; (2) a high concentration in Commercial Real Estate lending; and

---

[30] *See, e.g.,* https://www.forbes.com/profile/david-zalik/#36544a812d23 (last visited January 3, 2020).

(3) *poor credit underwriting and credit administration. Management and the Board pursued a business strategy that deviated from its original business plan without having the appropriate management expertise and internal controls in place to adequately mitigate the corresponding risks*." (emphasis added).

103.   Accordingly, GREENSKY is following a pattern Zalik has developed: trading compliance for profits.

## GREENSKY AND THE SOLAR SECTOR

104.   GREENSKY, Inc. IPO'd in 2018 at a price of $23/share. As of January 3, 2020, it was trading at approximately $8.56/share.

105.   Given, primarily, GREENSKY's precipitous collapse during an otherwise up-market and, per Zalik, that decline owing almost exclusively to the company's allegedly unanticipated and undisclosed shift away from lending for solar energy systems, the company was hit with multiple shareholder suits.[31]

106.   The gravamen of these shareholder suits was that GREENSKY, Inc. had abandoned its most lucrative line of business—lending for solar systems—and had not properly informed the shareholders of this strategic plan.[32]   This, of course, begged the question of *why* a for-profit company would abandon its most lucrative line of business.

107.   In this vein, GREENSKY made the unusual assertion, back in 2015, in its "Sponsor/Merchant Compliance Guidelines for GreenSky Loan Programs" that: "*Although all merchants may be subject to claims of unfair, deceptive or abusive acts or practices, merchants who specialize in energy efficiency and alternative energy face additional risk from customers claiming deception during the sales process if they are not satisfied with the projects*." (emphasis added). The guidelines did not say *why* this entirely non-intuitive assertion would be true.

---

[31] *See, e.g., Mustafin v. GreenSky, Inc.*, Case No. 1:18-cv-11071-PAE (filed Nov. 27, 2018, S.D.N.Y).

[32] *See, e.g., id.* at 6 ("The Offering Documents failed to disclose the substantial change in the composition of GreenSky's merchant business mix and the resulting diminution in transaction-fee revenue.")

108.   Indeed, on information and belief, GREENSKY long turned a blind eye to the predatory, and sometimes outright fraudulent, practices that were especially rampant among various solar merchants on its platform. To the contrary, as outlined above, GREENSKY is itself predatory and implicitly endorses this kind of conduct by merchants. This bad behavior involved, among other aspects, aggressive and deceptive sales practices aimed especially at vulnerable populations, such as lower-income racial minorities and the elderly,[33] as well as unsubstantiated promises of government subsidies that would eventually arrive to substantially cover the cost of such solar systems.

109.   This assertion is in keeping with GREENSKY's aforementioned odd statement about alternative-energy merchants facing undue claims of deception from customers.

110.   It is also in keeping with, per the *Mustafin* shareholder suit, the claim that GREENSKY generally charged its solar merchants *twice* the level of fees—14% versus 7%—when compared to other merchants on its platform.[34]  With GREENSKY taking 14% of *principal* on solar transactions, the only likely way that solar merchants accessing GREENSKY's credit would be competitive would be through undue predatory, misleading, and/or subprime  (or low-prime) lending.

111.   Even though GREENSKY derived approximately 20% of its revenues—and, per the numbers above, a substantially larger percentage of its profits—from the solar sector in the years before 2018, GREENSKY derived just 4% of its merchant-fee revenue from solar in 2018.[35] This move away from solar was, on information and belief, a deliberate decision by GREENSKY because, at least in part, it had determined that the consumer complaints and accordant risk of litigation stemming from unscrupulous solar merchants on its platform had grown too great[36]

---

[33] *See, e.g.,* Katherine Proctor, *Solar Power Firm Called Elder Abuser*, COURTHOUSE NEWS SERVICE (July 13, 2015), https://www.courthousenews.com/solar-power-firm-called-elder-abuser/.

[34] *Mustafin* at 5.

[35] *Id.*

[36] When looking at consumer litigation against GreenSky, one is struck by the disproportionate number of complaints, given their relatively modest share of the home improvement market nationally, involving solar merchants. *See, e.g., Farris v. Energy One Solar*, No. 4:19-cv-02361-JCH (E.D. Mo. Aug. 16, 2019); *Terlizzi v. Altitude Marketing, Inc.*, No. 16-cv-1712-WJM-STV, 2018 WL 2196090 (D. Colo. May 14, 2018); *Wilkinson v. SunTrust Bank*, No. 2:18-cv-00256-TS

and/or the recent decline in green-energy subsidies had substantially pared away the most predatory, uncompetitive alternative energy firms, which had dominated the GREENSKY platform.

112.   GREENSKY harvested windfall profits for years by failing to reasonably monitor various merchants—particularly solar merchants—in its program while also evading state lending and/or credit services laws. Given the numbers above, it is entirely possible that GREENSKY would not have been able to IPO without embracing such unlawful conduct in its business model.

113.   Likewise, the merchant-fee numbers given above broadly accord with those given in the 2018 10-K: GREENSKY reported total revenue of approximately $415 million on transaction volume (loans made via its platform) of approximately $3.8 billion, which amounts to a volume-to-revenue margin of about 10.9%. This amount, again, is nearly the same as its "merchant fees," which are taken upon loan origination and on principal.

114.   For the sake of comparison, actual loan servicing fees are typically quite small—for example, a normal loan servicing fee (a "strip") may be set at an APR of 0.25% (.0025) of principal, taken monthly.[37] On a solar system loan of $25,000, this would enable GREENSKY to collect about $5.20 per month.   Using Plaintiff's loan as an example, this would amount to approximately $612.50 *over the life of the loan with no reduction in principal*—i.e., even that figure substantially overstates typical loan servicing fees over the longer term. But by using the masked "merchant fee" method, GREENSKY could take approximately $1,600-2,000 **upon origination**.

115.   Further, GREENSKY *also* charges the bank partners a (high) loan servicing fee of approximately 1.00% APR.

116.   As these numbers reveal, GREENSKY's entire business model largely depends on how it has classified itself and it has done so deceptively, at the expense of individual consumers and state agencies.

---

(D. Utah Mar. 23, 2018); *Alfortish v. GreenSky, LLC*, No. 16-15084, 2017 WL 699830, at *1 (E.D. La. Feb. 22, 2017); *Davy v. Duke Energy Carolinas, LLC*, No. 7:15-cv-4927-MGL, 2016 WL 852696, at *3 (D. S.C. Mar. 4, 2016).

[37]*See,     e.g.,     *INVESTOPEDIA,     Loan     Servicing     Definition, https://www.investopedia.com/terms/l/loan_servicing.asp (last visited Oct. 18, 2019).

117.   In a *Forbes* article about Zalik and GREENSKY, that magazine noted that the company's "financial technology model is robust because it transfers a lot of the risk and work to banks and contractors."[38] Indeed, as described throughout this complaint, **this model has largely relied on violating state laws, whether they be lending laws or credit services laws—this is what has allowed GREENSKY to "transfer risk." Further, much of this risk is actually transferred *to consumers*—**indeed, the banks essentially do nothing in this regard other than transmit money to the GREENSKY "program" with GREENSKY, in effect, brokering the loans while also being contractually obligated to assume prepayment risk.

118.   GREENSKY's failure to properly register as a lender and/or broker under the CFL or, alternatively, as a credit services organization under the CSA deprives consumers of the protections of such licensure, including but not limited to fee-limitation, disclosure, and monitoring requirements.

119.   GREENSKY's failure to properly register as a lender and/or broker under the CFL or, alternatively, as a credit services organization under the CSA has enabled it to unlawfully and unfairly hide the nature of its business from consumers.

120.   GREENSKY's business model and trajectory thus bear uncanny resemblances to those of RockBridge, whose mismanagement and resultant swift demise ultimately cost the FDIC approximately $100 million. For example, within just, approximately, a year-and-a-half of its IPO, GREENSKY was trading at less than one-third of its offering price, being sued by shareholders for undisclosed changes to its core business strategy, while evincing poor management expertise, internal controls, credit administration, and portfolio concentration. Further, a substantial portion of whatever earnings GREENSKY has generated have been *directly* derived from willful evasion of state lending and/or credit servicing laws.

---

[38] Nathan Vardi, *A Fintech Billionaire's Consumer Loans Come Under Fire in Alabama*, FORBES (July 25, 2019), https://www.forbes.com/sites/nathanvardi/2019/07/25/a-billionaires-consumer-loans-come-under-fire-in-alabama/#44dc9a1f25d7.

## PLAINTIFF'S EXPERIENCE WITH GREENSKY

121.    Plaintiff Elizabeth "Liz" Belyea is a resident of California; she retired in 2016 after a career in education, as both a teacher and an administrator.

122.    Plaintiff supplements her retirement income by renting a house that she owns. The location of that house is 2609 Castro Way, Sacramento, California 95818.

123.    Tenants who were renting that home, which was built in 1925, began experiencing drainage problems sometime during June 2019.

124.    Soon thereafter, following an inspection by a plumbing company, it became apparent that the old pipes in the rental house were failing.

125.    As the plumbing company uncovered further issues, three different estimates for the necessary underlying work were generated: the first was for $5,750.00; the second was for $4,800; and the third was for $23,600.00, not including the eventual $571.50 in floor repair costs.

126.    Plaintiff was able to cover the first two bills, totaling $10,550.00, out-of-pocket.

127.    However, the third bill, for $23,600, was too much for her to cover out-of-pocket; an agent of the plumbing company (the "plumber") told Plaintiff that she could finance through an affiliate of the company.

128.    The plumber told her that she could obtain that financing under the condition that, if she were able to pay the loan back within eighteen months, interest would be waived.

129.    The plumber selected a financing plan for Plaintiff.

130.    Her Experian credit score at that time was 835.

131.    Despite this nearly perfect credit score, she eventually discovered that the GREENSKY-branded loan came with an APR of 25.03%, subject to eighteen months of interest-waiver. Plaintiff was shocked when she saw that APR.  Over the life of the loan—seven years—she would have had to pay a total of $77,867.22 (over half of which would be interest).

132.    Alarmed by the possibility of ever paying such an interest rate, Plaintiff withdrew retirement funds in November 2019 so that she could pay off the loan.

133.    GREENSKY collected an unlawful financing charge—the "merchant fee"—on the consumer loan made to Plaintiff.

## CALIFORNIA FINANCING LAW ("CFL"),
### Cal. Fin. Code § 22000 et seq.

134.   Pursuant to Cal. Fin. Code § 22001, the CFL is to be "liberally construed" to "promote its underlying purposes and policies," which include "foster[ing] competition among finance lenders, *protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders*," "encourag[ing] the development of fair and economically sound lending practices," and "*protect[ing] property owners from deceptive and misleading practices that threaten the efficacy and viability of property-assessed clean energy financing programs*." (emphasis added).

135.   Pursuant to Cal. Fin. Code § 22009, a "finance lender" means "any person who is engaged in the business of making consumer loans or making commercial loans."

136.   Pursuant to Cal. Fin. Code § 22004, a "'broker' includes any person who is engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender."

137.   Pursuant to Cal. Fin. Code § 22100(a), "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner [of Business Oversight]."

138.   Pursuant to Cal. Fin. Code § 22101 et seq., the CFL requires finance lenders and brokers to follow a number of particular steps and abide by specified rules and procedures with regard to becoming, and existing as, a licensed entity.

139.   Pursuant to Cal. Fin. Code § 22200, "'Charges' include the aggregate interest, fees, bonuses, commissions, brokerage, discounts, expenses, and other forms of costs charged, contracted for, or received by a licensee or any other person in connection with the investigating, arranging, negotiating, procuring, guaranteeing, making, servicing, collecting, and enforcing of a loan or forbearance of money, credit, goods, or things in action, or any other service rendered."

140.   Pursuant to Cal. Fin. Code § 22203, a "'consumer loan' means a loan, whether secured by either real or personal property, or both, or unsecured, the proceeds of which are intended by the borrower for use primarily for personal, family, or household purposes."

141.    Pursuant to Cal. Fin. Code § 22305, "a licensee may contract for and receive an administrative fee, which shall be fully earned immediately upon making the loan, with respect to a loan of a bona fide principal amount of *not more than two thousand five hundred dollars ($2,500) at a rate not in excess of 5 percent of the principal amount (exclusive of the administrative fee) or fifty dollars ($50), whichever is less, and with respect to a loan of a bona fide principal amount in excess of two thousand five hundred dollars ($2,500), at an amount not to exceed seventy-five dollars ($75)*." (emphasis added).

142.    Pursuant to Cal. Fin. Code § 22306, "*No amount in excess of that allowed by this article shall be <u>directly or indirectly charged</u>, contracted for, or received by any person, and the total charges of the finance lender and broker and any other person in the aggregate shall not exceed the maximum rate provided for in this article.*" (emphasis added).

143.    Pursuant to Cal. Fin. Code § 22309, "Except as provided in Section 22305 and Article 4 (commencing with Section 22400), *no charges on loans made pursuant to this division shall be paid, deducted, or received in advance, or compounded . . .*" (emphasis added).

144.    Pursuant to Cal. Fin. Code § 22327, "No licensee shall induce or permit any borrower to be or to become obligated directly or indirectly, or both, under more than one contract of loan at the same time with the same licensee for the purpose or with the result of obtaining a higher rate of charge than would otherwise be permitted by this article . . .".

145.    Pursuant to Cal. Fin. Code § 22333, "*No licensee shall take any instrument in which blanks are left to be filled in after execution.*" (emphasis added).

146.    Pursuant to Cal. Fin. Code § 22112(a), "A licensee shall maintain a surety bond in accordance with this subdivision in a minimum amount of twenty-five thousand dollars ($25,000)."

147.    Pursuant to Cal. Fin. Code § 22337(a), each licensed financed lender shall "Deliver or cause to be delivered to the borrower, or any one thereof, *at the time the loan is made*, a statement showing in clear and distinct terms the name, address, and license number of the *finance lender and the broker, if any*." (emphasis added). Per the CFL, GreenSky's "merchant fee" should have been disclosed on a form such as this one:

```
+--------------------------------------------------------------------+
|          CALIFORNIA FINANCE LENDERS LAW STATEMENT OF LOAN          |
|                                                                    |
|   Date:                                                            |
|                                                                    |
|   Lender Name:                                                     |
|                                                                    |
|   Lender Address:                                                  |
|                                                                    |
|   Lender's License Number:                                        |
|                                                                    |
|   Borrower Name(s):                                                |
|                                                                    |
|   Borrower Address:                                                |
|                                                                    |
|   1. This loan is made pursuant to the California Finance Lenders  |
|      Law, Division 9 (commencing with Section 22000) of the       |
|      Finance Code. The above-named lender is a licensed finance   |
|      lender, Department of Corporations California Finance        |
|      Lenders License No.                                           |
|           FOR INFORMATION CONTACT THE DEPARTMENT OF               |
|              CORPORATIONS, STATE OF CALIFORNIA.                   |
|   2. The California Finance Lenders Law requires that a licensed  |
|      finance lender obtain a signed statement from a borrower     |
|      as to whether any person has performed any act as a broker  |
|      in connection with the making of a loan.                     |
|                                                                    |
|   Has any person performed any act as a broker in connection      |
|   with the making of your loan    [ ] Yes   [ ] No               |
|                                                                    |
|   If your answer is yes, please indicate below the name of the   |
|   person who will receive payment for broker service services     |
|   and a statement of all sums paid or payable to such person:    |
+--------------------------------------------------------------------+
```

148. Pursuant to Cal. Fin. Code § 22750, "*If any amount other than, or in excess of, the charges permitted by this division is willfully charged, contracted for, or received, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction*." (emphasis added).

## CALIFORNIA'S CREDIT SERVICES ACT OF 1984 ("CSA"), Cal. Civ. Code § 1789.10 et. seq.

149. Recognizing the importance of consumer credit and that "[c]ertain advertising and business practices of some credit service organizations have worked a financial hardship upon the people in this state, often those who are of limited economic means and inexperienced in credit matters," California legislators enacted the CSA to "protect the public from unfair or deceptive advertising and business practices."[39]

150. The CSA is to be "construed liberally" in order to achieve these purposes.[40]

151. The CSA was enacted in order to capture, for the purposes of regulation, new types of credit-related businesses that were not already subject to regulation by the state.[41]

---

[39] Cal. Civ. Code § 1789.11(a)-(c).

[40] *Id.* at § 1789.11(c).

152.    The CSA defines a "credit services organization" is "a person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration:

(1) Improving a buyer's credit record, history, or rating.

(2) *Obtaining a loan or other extension of credit for a buyer*.

(3) *Providing advice or assistance to a buyer with regard to either paragraph (1) or (2).*"[42] (emphasis added).

153.    A CSO shall not do any of the following in California:[43]

"(a) *Charge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer.*

(b) Fail to perform the agreed services within six months following the date the    buyer signs the contract for those services.

(c) *Charge or receive any money or other valuable consideration for referral of the buyer to a retail seller or other credit grantor who will or may extend credit to the buyer, if either of the following apply*:

    (1) *The credit that is or will be extended to the buyer (A) is upon substantially the same terms as those available to the general public or (B) is upon substantially the same terms that would have been extended to the buyer without the assistance of the credit services organization.*
    (2) *The money or consideration is paid by the credit grantor or is derived from the buyer's payments to the credit grantor for costs, fees, finance charges, or*

---

[41] *See id.* at § 1789.12(b)(1)-(7).

[42] *Id.* at § 1789.12.

[43] *Id.* at § 1789.13(a)-(r).

*principal*.

(d) Make, or counsel or advise a buyer to make, a statement that is untrue or misleading and that is known, or that by the exercise of reasonable care should be known, to be untrue or misleading, to a consumer credit reporting agency or to a person who has extended credit to a buyer or to whom a buyer is applying for an extension of credit, such as statements concerning a buyer's identification, home address, creditworthiness, credit standing, or credit capacity.

(e) Remove, or assist or advise the buyer to remove, adverse information from the buyer's credit record which is accurate and not obsolete.

(f) Create, or assist or advise the buyer to create, a new credit record by using a different name, address, social security number, or employee identification number.

(g) Make or use untrue or misleading representations in the offer or sale of the services of a credit services organization, including either of the following:

(1) Guaranteeing or otherwise stating that the organization is able to delete an adverse credit history, unless the representation clearly discloses, in a manner equally as conspicuous as the guarantee, that this can be done only if the credit history is inaccurate or obsolete and is not claimed to be accurate by the creditor who submitted the information.

(2) Guaranteeing or otherwise stating that the organization is able to obtain an extension of credit, regardless of the buyer's previous credit problems or credit history, unless the representation clearly discloses, in a manner equally as conspicuous as the guarantee, the eligibility requirements for obtaining an extension of credit.

(h) *Engage, directly or indirectly, in an act, practice, or course of business that operates or would operate as a fraud or deception upon a person in connection with the offer or sale of the services of a credit services organization*.

(i) *Advertise or cause to be advertised, in any manner, the services of the credit services organization, without being registered with the Department of Justice*.

(j) Fail to maintain an agent for service of process in this state.

(k) Transfer or assign its certificate of registration.

(l) Submit a buyer's dispute to a consumer credit reporting agency without the       buyer's

knowledge.

(m) Use a consumer credit reporting agency's telephone system or toll-free

telephone number to represent the caller as the buyer in submitting a dispute of a buyer

or requesting disclosure without prior authorization of the buyer.

(n) *Directly or indirectly extend credit to a buyer*.

(o) Refer a buyer to a credit grantor that is related to the credit services organization

by a common ownership, management, or control, including a common owner,

director, or officer.

(p) *Refer a buyer to a credit grantor for which the credit services organization*

*provides, or arranges for a third party to provide, services related to the extension of*

*credit such as underwriting, billing, payment processing, or debt collection*.

(q) *Provide a credit grantor with an assurance that a portion of an extension of credit to*

*a buyer referred by the credit services organization will be repaid, including providing a*

*guaranty, letter of credit, or agreement to acquire a part of the credit grantor's*

*financial interest in the extension of credit*.

(r) *Use a scheme, device, or contrivance to evade the prohibitions contained in   this*

*section*."

(emphasis added).

154.    Further, the CSA provides for affirmative duties on the part of CSOs. Per Cal. Civ.

Code §§ 1789.14 and 1789.15, a CSO—"prior to the execution of a contract or agreement between

the buyer and a credit services organization"—"shall provide the buyer a statement in writing,

containing . . .

> (a) A complete and detailed description of the services to be performed
> by the credit services organization for or on behalf of the buyer and the total
> amount the buyer will have to pay, or become obligated to pay, for the services.
> (b) The buyer's right to proceed against the bond under the
> circumstances and in the manner set forth in Section 1789.18.

(c) The name and address of the surety company which issued the bond.

(d) A complete and accurate statement of the availability of nonprofit credit counseling services.

The information statement shall be printed in at least 10-point boldface type and shall include the following statement or any substantially equivalent alternative that is approved by the Department of Justice:

'CONSUMER CREDIT FILE RIGHTS UNDER STATE AND FEDERAL LAW You have a right to obtain a copy of your credit file from a consumer credit reporting agency. You may be charged a reasonable fee not exceeding eight dollars   ($8). There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The consumer credit reporting agency must provide someone to help you interpret the information in your credit file. You have a right to dispute inaccurate information by contacting the consumer credit reporting agency directly. However, neither you nor any credit repair company or credit services organization has the right to have accurate, current, and verifiable information removed from your credit report. Under the Federal Fair Credit Reporting Act, the consumer credit reporting agency must remove accurate, negative information from your report only if it is over seven years old. Bankruptcy information can be reported for 10 years. If you have notified a credit reporting agency in writing that you dispute the accuracy of information in your credit file, the consumer credit reporting agency must then reinvestigate and modify or remove inaccurate information. The consumer credit reporting agency may not charge a fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the consumer credit reporting agency. If reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the consumer credit reporting agency to keep in your file, explaining why you think the record is inaccurate. The consumer credit reporting agency must include your statement about disputed information in any report it issues about you. *You have a right to cancel the contract for any reason within five working days from the date you signed it. If for any reason you do cancel the contract during this time, you do not owe any money. You have a right to sue a credit services organization if it misleads you.*'"

(emphasis added).

155.    Further, Cal. Civ. Code § 1789.16 provides that a CSO "shall not provide any service to a buyer except pursuant to a written contract that complies with this section," which section includes, among other provisions, the requirements of a five-day "cooling-off period" and preprinted notice of cancellation.

156.    Cal. Civ. Code § 1789.18 mandates that *"[n]o credit services organization shall conduct business in this state unless the credit services organization has first obtained a surety bond in the principal amount of one-hundred thousand dollars ($100,000)* issued by an admitted

surety and the bond complies with the following . . .". (emphasis added). On information and belief, GREENSKY has not obtained such a bond.

157.   Cal. Civ. Code § 1789.20 provides that any person who violates the CSA shall be guilty of a misdemeanor.

158.   Importantly, the CSA also provides for a private cause of action: "*Any buyer injured by a violation of this title or by the credit services organization's breach of a contract subject to this title may bring any action for recovery of damages, or for injunctive relief, or both. Judgment shall be entered for actual damages, <u>but in no case less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs.</u> An award, if the trial court deems it proper, may be entered for punitive damages.*"[44] (emphasis added).

## CLASS ACTION ALLEGATIONS

159.   Plaintiff seeks to certify a statewide class comprising: **California consumers who transacted business with and/or received funds from or through GREENSKY ("Class") for a period beginning four years prior to the date this complaint is filed until the date of class certification ("Class Period").**

160.   This action has been brought and may properly be maintained as a class action, pursuant to the provisions of California Code of Civil Procedure section 382, because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

161.   <u>Numerosity</u>. Upon information and belief, there are hundreds, if not thousands, of members of the proposed Class. Joinder of all members is therefore impracticable.

162.   <u>Commonality and Predominance</u>. Common questions of fact and law exist as to all Class members such that those questions predominate over questions affecting Plaintiff or individual Class members. These common questions include, but are not limited to, the following:

---

[44] Cal. Civ. Code § 1789.21(a).

a. Does GREENSKY's conduct and failure to obtain licensure in California illegal?

b. Is GREENSKY's conduct and failure to obtain licensure violate the CFL and/or CSA?

c. Did GREENSKY fail to inform consumers as to the "merchant fees" it was charging?

d. Was GREENSKY's charging of fees beyond the CFL's cap unconscionable or, alternatively, Did GREENSKY "directly or indirectly" extend credit to buyers on an unlicensed basis?

e. Did GREENSKY violate the CFL and/or CSA?

f. Did GREENSKY also violate other laws, as described herein?

g. Did GREENSKY harvest windfall profits at the expense of consumers as a result of its violations of California laws?

h. Should GREENSKY be compelled to disgorge funds, including principal, interest, and/or other charges as a result of its violations of California law?

i. Are Plaintiff and Class members entitled to damages or any other monetary relief and, if so, in what amount?

j. Should GREENSKY be enjoined from continuing to operate on an unlicensed basis in California?

163.    Typicality. Plaintiff is informed and believes and thereon alleges that each member of the Class herein was subjected to the same general forms of misrepresentation outlined above. More specifically, these forms include but are not limited to: that GREENSKY lent (as a lender/broker) or directly or indirectly extended credit (as a CSO) to Plaintiff and every Class member on an unlicensed basis; in so doing, misrepresented that it could lawfully do so under California law; failed to disclose the nature and amount of its "merchant fees"; misrepresented that it could lawfully collect these under California law; and generally misrepresented the nature of its enterprise to the detriment of consumers. The factual and legal bases of GREENSKY's liability to Plaintiff and each Class member are the same, resulting in injury to Plaintiff and each Class

1  member as a result of GREENSKY's conduct described herein. GREENSKY has acted or failed to

2  act on grounds generally applicable to Plaintiff and members of the proposed Class, thereby

3  making final declaratory relief and injunctive relief, as described below, appropriate.

4        164.    Adequacy. Plaintiff will fairly and adequately represent and protect the interests of

5  other Class members. Plaintiff has retained counsel with substantial experience in litigating

6  complex cases, including class actions. Both Plaintiff and her counsel will vigorously prosecute

7  this action on behalf of the Class and have the financial ability to do so. Neither Plaintiff nor

8  counsel has any interest adverse to the other Class members.

9        165.    Superiority. A class action is superior to all other available methods for the fair and

10  efficient adjudication of this matter. As alleged herein, GREENSKY acted and failed to act on

11  grounds generally applicable to Plaintiff and other Class members. Such conduct requires the

12  Court's imposition of uniform relief to ensure compatible standards of conduct towards Class

13  members and to make corresponding declaratory relief and injunctive relief appropriate for all

14  Class members. Upon information and belief, no overlapping class actions have been filed against

15  GREENSKY in California. Management of this case will not be difficult given the nature and

16  significance of the common questions.

17        166.    Individual Control. The interests of individual Class members are best served by

18  certifying this case as a class action. Class members' individual damages may only measure

19  thousands or tens of thousands of dollars. By contrast, the undersigned counsel believe they will

20  likely be compelled to invest tens, or hundreds, of thousands of dollars in time, costs, and

21  expenses in prosecution of this controversy so as to best prosecute and win these Class claims. If

22  counsel represented only Plaintiff, they would likely be compelled to expend substantially all of

23  the same time, costs, and expenses in the prosecution of this action. Further, as described

24  throughout, the fundamental nature of GREENSKY's business model is deceptive and difficult to

25  detect by any given consumer. In the absence of a class action, individual Class members would be

26  unlikely to effectively prosecute their claims.

27

28  / / /

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA FINANCING LAW ("CFL"),
#### Cal. Fin. Code § 22000 *et seq.*
#### (Against All Defendants)

167.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

168.    Plaintiff brings this count on behalf of the Class.

169.    Per Cal. Fin. Code § 22009, a "finance lender" means "any person who is engaged in the business of making consumer loans or making commercial loans." The CFL defines the "business of making consumer loans or commercial loans" as "including lending money and taking, in the name of the lender, or in any other name, in whole or in part, as security for a loan, any contract or obligation involving the forfeiture of rights in or to personal property, the use and possession of which property is retained by other than the mortgagee or lender, or any lien on, assignment of, or power of attorney relative to wages, salary, earnings, income, or commission."

170.    As described above, GREENSKY is a "finance lender" because it is engaged in the business of making consumer loans. Additionally, with respect to at least loans extended for solar products, GREENSKY took a security interest for its own benefit in the products as a loan condition.

171.    Pursuant to Cal. Fin. Code § 22004, a "'broker' includes any person who is engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender."

172.    As described above, GREENSKY is a broker because it is engaged in the business of negotiating, selling, marketing, and/or distributing loans made by a finance lender (the partner banks).

173.    More specifically, GREENSKY's engagement in the business of making and/or brokering consumer loans includes, but is not limited to, the following: obtaining funds from partner banks; setting interest rate and other loan-term parameters; auto-populating credit applications; processing credit applications; retaining the right to accept/reject credit applications;

verifying consumer identities and credit scores via its proprietary software; "allocating" funds to its bank partners using its own proprietary system; (re)lending funds borrowed from its partner banks; transmitting/disbursing funds; providing merchants and/or consumers with GREENSKY-branded "shopping passes"; providing consumers with GREENSKY-branded installment loan agreements; directing consumers to make loan payments directly to GREENSKY; reporting such loans to consumer reporting agencies; (at least sometimes) attempting to take a purchase money security interest in the goods purchased with such loans; controlling which merchants are in its program; purporting to train these merchants to use its platform; purporting to perform due diligence on these merchants that use its platform; and deriving revenues that are a function of loan volume, loan origination, interest rates, and/or interest rate spreads on unsecured and/or secured loans that are primarily for family/household purposes.

174.    Indeed, as stated above, the partner banks really have little or nothing at all to do with this process: GREENSKY has built a business on de facto (re)lending/brokering, using the bank partners' state or federal charters as a shield, and disguising this fact with nothing more than semantics.

175.    On information and belief, GREENSKY is not licensed with the Commissioner of the Department of Business Oversight.

176.    GREENSKY's evasion of the CFL has been willful. More specifically, as described above, GREENSKY has long been on notice that it should be registered with state agencies as a consumer lender and/or broker (or CSO).

177.    GREENSKY does not qualify for any of the germane exemptions and the burden of proof would lie with Defendant should it claim such an exemption. *See* Cal. Fin. Code § 22053.

178.    GREENSKY's loans were "consumer loans" for the purposes of the CFL.

179.    GREENSKY harvested windfall profits as a direct result of evading the CFL.

180.    GREENSKY's charging of fees well in excess of the CFL's cap on such fees was unconscionable.

181.    GREENSKY's evasion of the CFL caused ascertainable injury to California consumers.

182.   GREENSKY's multiple misrepresentations to consumers and, particularly, its failure to properly disclose the "merchant fees" it received, were misleading and unconscionable.

183.   GREENSKY's unconscionable actions in this regard also give rise to a private cause of action under the Unfair Competition Law ("UCL").[45]

184.   GREENSKY's violations of the CFL have been systematic and multitudinous. Defendant's very business model, including, but not limited to, how it represents itself to consumers and state agencies, the consecution by which it obtains and disburses consumer loans, the fees it charges on such loans, and its reporting and/or collecting on these loans, entails numerous violations of the CFL spread over many individual California consumers.

185.   More specifically, GREENSKY's violations of the CFL include, but are not limited to: § 22100(a) (because Defendants have engaged in the business of a finance lender without a license from the commissioner); § 22101 (because Defendants have, on information and belief, not applied for such a license); § 22102 (because Defendants have operated throughout California without submitting applications for branch licenses); § 22103 (because, on information and belief, Defendants have not paid any application or related fees); § 22104 (because Defendants have not filed financial documents with the commissioner); § 22106 (because Defendants have not applied for a license for a location either inside or outside of California); § 22107 (because Defendants have not paid the commissioner its pro rata share of administrative costs/expenses); § 22151 (because Defendants have not obtained a license that may be "conspicuously posted"); § 22159 (because Defendants have not filed annual reports with the commissioner); § 22161 (multiple provisions) (because Defendants have, broadly, made, directly and indirectly, numerous materially false and/or misleading statements to consumers in California and violated § 17200 of the Business and Professions Code); § 22305 (because Defendants have charged administrative fees much greater than, respectively, $50 or $75); § 22309 (because Defendants have charged fees on loans not provided for, as stated); § 22320.5 (because Defendants have collected delinquency fees greater than, respectively, the stated amounts); § 22325 (because Defendants have not displayed such a schedule in licensed place(s) of business); § 22327 (because, in some cases, Defendants

---

[45] *See De La Torre v. Cashcall, Inc.*, 422 P.3d 1004, 1019-20 (Cal. 2018).

have induced borrowers into "split plan" loans, the terms of which may not comport with the charges allowed by this article; that is, for split loans of $2,500 or less, the charges may exceed those allowed for in § 22303); and § 22112(a) (because Defendants have not obtained such a surety bond).

186.    As described above, GREENSKY has acted as an unlicensed finance lender and/or broker in California and has violated the CFL in numerous ways.

187.    As described above, GREENSKY has charged fees on principal—it does not really matter whether one terms them "loan origination," "financing," "administrative," or "merchant" fees, as they are taken *immediately upon principal* and according to *a schedule set by GREENSKY*; these fees, which have averaged around 10% of principal (including on loans of $25,000+), are proscribed by Cal. Fin. Code §§ 22305-06.

188.    Pursuant to Cal. Fin. Code § 22750, the consumer installment loans made and/or brokered by GREENSKY during the Class Period must be declared void and GREENSKY has no right to collect the interest, principal, or other charges there upon.

*Plaintiff, as made clear in this complaint, asserts that GREENSKY should have long ago been licensed by a California agency and has been violating numerous California laws for years. As just stated, Plaintiff maintains that GREENSKY is a finance lender and/or broker for the purposes of the CFL. In the alternative, Plaintiff asserts that GREENSKY should be licensed as a CSO, as described below:*

### SECOND CAUSE OF ACTION
### VIOLATIONS OF THE CREDIT SERVICES ACT OF 1984 ("CSA"),
### Cal. Civ. Code § 1789.10 *et seq.*
### (Against All Defendants)

189.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

190.    Plaintiff brings this count on behalf of the Class.

191.    Pursuant to Cal. Civ. Code § 1789.12, a "credit services organization" is "a person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration:

(1) Improving a buyer's credit record, history, or rating.

(2) *Obtaining a loan or other extension of credit for a buyer*.

(3) *Providing advice or assistance to a buyer with regard to either paragraph (1) or (2).*"[46]

(emphasis added).

192.   As described throughout this Complaint, GREENSKY's entire business is built around *obtaining* loans on behalf of others. The vast bulk of its revenues have been derived directly from taking a cut of consumer loans and calling them "merchant fees." If it is somehow not a lender and/or broker for the purposes of the CFL, then GREENSKY *must* be a CSO for the purposes of the CSA.

193.   More specifically, GREENSKY sells, provides, performs, and/or represents that it can (and actually *does*) obtain credit for buyers in return for the payment of money—the "merchant fees." GREENSKY does this in ways that include, but are not limited to, the following: accepting consumer credit applications via its platform; auto-populating these applications; partnering with banks to obtain funds for consumer loans; organizing these banks into a "program" for the purposes of extending consumer credit; advertising to merchants (and, ultimately, buyers) that it can obtain credit for home improvement or elective healthcare projects; accepting and rejecting credit applications; providing consumers with GREENSKY-branded installment loan agreements; determining loan terms and conditions; (re)lending money held on bank balance sheets as GREENSKY program assets/liabilities; transmitting loan funds to merchants via the shopping passes; accepting loan payments directly from consumers; and reporting trade lines to consumer reporting agencies.

194.   A CSO is required to be licensed with the California Department of Justice; GREENSKY is not.

195.   Pursuant to Cal. Civ. Code § 1789.13(n), GREENSKY shall not "*[d]irectly or indirectly* extend credit to a buyer." (emphasis added). As stated throughout, GREENSKY has actively extended credit to buyers and is thus in violation of this provision. For at least the "promotional period" of the loans, GREENSKY is at least the de facto lender, for it is the entity

1   with the contractual repayment obligation if the consumer pays off the loan in full before that

2   promotional period ends.

3       196.    GREENSKY has further violated the CSA in ways that include, but are not limited

4   to, the following: § 1789.13(a) (because Defendants received money or other valuable

5   consideration before distributing money to merchants and/or buyers); § 1789.13(c) (because

6   Defendants received money or other valuable consideration for simply referring buyers to the

7   banks in their program for non-competitive loans and interest rates); § 1789.13(h) (because, as

8   described throughout, GREENSKY's business model is fundamentally fraudulent in that it has

9   relied on representing the company as something other than what it actually is); § 1789.13(i)

10  (because Defendants have not registered with the Department of Justice); § 1789.13(p) (because, if

11  GREENSKY were to continue to maintain that is not a lender, then it would be referring

12  consumers to credit grantors (the partner banks) with which it maintained agreements related to

13  lending, underwriting, servicing, payment processing, and/or debt collection); and § 1789.13(r)

14  (because, as stated, Defendants have relied on misrepresentations to disguise the nature of

15  GREENSKY's business so as to evade state licensing).

16      197.    GREENSKY's violations of § 1789.13(c) require further explication because they

17  are particularly important to its business model. GREENSKY, as described throughout, has

18  harvested the bulk of its revenues from "merchant fees"; the remainder consists of "incentive

19  payments" from the partner banks. GREENSKY thus clearly receives valuable consideration for

20  referring buyers to credit grantors; for the purposes of this provision, the credit granted to

21  consumer is "substantially" the same as that offered without the assistance of GREENSKY and/or

22  to the general public.

23      198.    Indeed, if the terms of credit were not "substantially" the same in this regard, then

24  GREENSKY would effectively be admitting to its role as a (re)lender (i.e., as one taking spreads

25  on money lent to its program) for, given its merchant fees plus interest rates that climb well above

26  20% (after the promotional period) for borrowers still within the "prime" credit score range, it is

27  evident that GREENSKY is not obtaining competitive rates for consumers.

28

199.   Likewise, by receiving "incentive payments" from credit grantors (the partner banks) for its extension of credit, GREENSKY is also in violation of the second prong of § 1789.13(c).

200.   Further, GREENSKY has not complied with the affirmative duties required by the CSA in ways that include but are not limited to: failure to provide a prescribed information statement, *including the right to sue the CSO and cancel the agreement within five days* (in violation of § 1789.15); failure to provide buyers with a prescribed contract, including a detachable notice of cancellation (in violation of § 1789.16); and failure to maintain a surety bond of $100,000 in California (in violation of § 1789.18).

201.   Pursuant to § 1789.21(a), *"Any buyer injured by a violation of this title or by the credit services organization's breach of a contract subject to this title may bring any action for recovery of damages, or for injunctive relief, or both. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages."* (emphasis added).

## THIRD CAUSE OF ACTION
## DECLARATORY RELIEF
### (Against All Defendants)

202.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

203.   Plaintiff brings this count on behalf of the Class.

204.   As outlined above, GREENSKY is either a finance lender and/or broker, pursuant to Cal. Civ. Code § 22000 et seq., or a credit services organization, pursuant to Cal. Civ. Code § 1789.10 *et seq.*

205.   Plaintiff asks this Court to declare that GREENSKY operates as an unlicensed lender and/or broker in California.

/ / /

/ / /

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),**
**Bus. & Prof. § 17200**
**(Against All Defendants)**

206.    Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

207.    Plaintiff brings this count on behalf of the Class.

208.    The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ." as well as any acts prohibited by Chapter 1 of the False Advertising Law (Bus. & Prof. § 17500 *et seq.*; "FAL").[47]

209.    GREENSKY's acts, as described throughout, are business practices.

210.    As stated, GREENSKY's business and advertising acts and practices have systematically violated the UCL, as well as the FAL, which constitutes a violation of the UCL.

211.    Defendants' conduct has which is "Unlawful," "Unfair," or "Deceptive" includes, but is not limited to, the following:

      a.  By violating California laws (whether as a lender, broker, and/or CSO)— particularly those designed to protect consumers, as described herein;

      b.  By unfairly and unconscionably profiting, at the expense of consumers, from these violations of California law;

      c.  By fraudulently failing to disclose its (material) fees to consumers;

      d.  By unfairly and unlawfully purporting to bind consumers to "split plan" loans before disclosing the terms of those loans;

      e.  By unfairly and unlawfully purporting to bind consumers to GREENSKY-branded installment loan agreements before disclosing the terms and conditions of those loans;

/ / /

---

[47] Cal. Civ. Code § 17200.

        f.  By unfairly training merchants on its platform to upsell by charging consumers more for a given product while concealing the fees being paid to GREENSKY; and

        g.  By violating the FAL, as will be described below.

212.   Defendants' misrepresentations and omissions caused Plaintiff and Class members to purchase goods or services from the merchants on GREENSKY's platform. Absent those misrepresentations and omissions, Plaintiff and Class members would not have purchased the germane goods or services or would not have purchased them at the prices they paid.

213.   Accordingly, Plaintiff and Class members suffered injury in fact, including lost money or property, as a result of GREENSKY's misrepresentations and omissions.

### FIFTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"),
### Bus. & Prof. § 17500
### (Against All Defendants)

214.   Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

215.   Plaintiff brings this count on behalf of the Class.

216.   The FAL prohibits advertising products using untrue or misleading statements that the speaker knows or should know are untrue or misleading.

217.   GREENSKY's platform enabled billions of dollars of consumer loans to be made throughout the United States, including California. Meanwhile, GREENSKY advertised to consumers and state agencies that it was nothing more than a "program administrator," "service provider," and/or "payment platform"; these terms all have meaning and were misleading as applied to GREENSKY.

218.   More specifically, a "program administrator," in general, administers some program that *is already in existence and was established by some other authority* (e.g., a PACE program); a "service provider"—a *loan* service provider—typically collects a very small amount of outstanding principal in exchange for collecting on loans *that were already in existence when it began to service them*; and a "payment platform," such as PayPal, is, generally, an interface/network

1  whereby one can transfer funds in exchange for, usually, the platform collecting a relatively small
2  fee (or, for consumers, the transfer may be free) for transmitting those funds.

3      219.    As described throughout this complaint, GREENSKY's platform *originates* loans;
4  it is a "program administrator" only to the extent it administers its *own* "program." As described
5  above, GREENSKY has harvested the vast bulk of its revenues from charging substantial fees
6  upon principal at "*the point of origination*" (emphasis added)—it is not a mere loan servicer. And,
7  while it may be a payment platform, it is doing so to collect payments on the GREENSKY-
8  branded loans that were originated on its own platform.

9      220.    GREENSKY knew or should have known that these representations were untrue
10  and/or misleading.

11     221.    Further, as described throughout, GREENSKY has built its business model upon,
12  and profited directly from, this semantic sleight of hand. GREENSKY, in essence, was able to get
13  some number of bank partners to agree to lend *it* (GREENSKY) money for its platform on a
14  revolving basis with whatever terms and conditions and hide the nature of its business from
15  consumers and state agencies.

16     222.    As stated above, GREENSKY itself admitted that it offered loan products—at least
17  its deferred interest products—with terms *different from those offered by the partner banks*
18  (because GREENSKY contracted to cover the first year of interest regardless of whether the
19  consumer was able to pay before the end of the deferment period). *Thus, GREENSKY—not the*
20  *partner banks—offered deferred interest loan products*.

21     223.    Consumers, thinking that they were doing business strictly with a given merchant,
22  would often be surprised to see GREENSKY-branded installment loan agreements arrive. These
23  loan agreements would arrive with TILA disclosures but *without disclosure of the approximately,*
24  *on average, 10% of principal that GREENSKY would ultimately deduct.*

25     224.    GREENSKY has also failed to represent the true nature of its business to state
26  regulatory agencies.

27     225.    These misrepresentations and omissions resulted in an incentive structure in which
28  merchants were expressly encouraged to upsell, often using unscrupulous methods, their products

using GREENSKY financing. GREENSKY likewise gave merchants the ability to access GREENSKY funds with minimal due diligence, which was to GREENSKY's advantage.

226. These misrepresentations and omissions resulted in a business model that relied upon evading state laws.

227. GREENSKY's misleading and/or untrue statements in this regard were material and likely to deceive a reasonable consumer.

228. Plaintiff and Class members suffered injury in fact, including the loss of money or property, as a result of GREENSKY's unlawful, unfair, or deceptive practices. Absent GREENSKY's misrepresentations and omissions, Plaintiff and Class members would not have purchased the relevant goods or services or would not have purchased them at the prices they paid.

229. GREENSKY has evinced a pattern and practice of such wrongful conduct in California and across the country.

## SIXTH CAUSE OF ACTION
## VIOLATION OF CONSUMER LEGAL REMEDIES ACT ("CLRA"),
### Cal. Civ. Code § 1750
**(Against All Defendants)**

230. Plaintiff incorporates by reference all facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

231. Plaintiff brings this count on behalf of the Class.

232. The CLRA prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.

233. The lending services provided by GREENSKY are "services" within the meaning of Cal. Civ. Code § 1761(b).

234. Plaintiff and Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

235. Plaintiff, Class members, and Defendants are each "persons" within the meaning of Cal. Civ. Code § 1761(c).

236.   As alleged herein, GREENSKY made misrepresentations and omissions regarding its role in making, brokering, and/or extending consumer loans.

237.   These misrepresentations and omissions were undertaken in transactions that were intended to, or did, result in the sale of GREENSKY's services to California consumers, so as to satisfy § 1770(a).

238.   GREENSKY's conduct, as described herein, was and is in violation of at least the following enumerated prohibitions in Cal. Civ. Code § 1770(a):

   a.   § 1770(1): Passing off goods or services as those of another.

   b.   § 1770(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.

   c.   § 1770(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.

   d.   § 1770(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

   e.   § 1770(9): Advertising goods or services with intent not to sell them as advertised.

239.   Plaintiff and Class members suffered injury in fact and actual damages resulting from GREENSKY's material misrepresentations and omissions because they paid an inflated purchase price for the relevant goods or services and/or would not have purchased the goods or services if they had known of GREENSKY's misrepresentations and omissions. At this time, however, Plaintiff does not seek those damages.

240.   Plaintiff, individually and on behalf of the class, has provided notice to GREENSKY of its violations of the CLRA concurrent with the filing of this Complaint. Should GREENSKY fail to remedy its conduct pursuant to the notice, Plaintiff shall amend this Complaint to seek monetary damages pursuant to Cal. Civ. Code § 1780(a)(1).

241.   Pursuant to Cal. Civ. Code § 1780, Plaintiff and those similarly situated are entitled to restitution of all payments made on the GREENSKY loans, are entitled to obtain an order requiring GREENSKY to correct the misrepresentations it made to the Class, and to recover reasonable attorneys' fees and costs.

242.   Plaintiff, individually and on behalf of the Class, seeks restitution and injunctive relief pursuant to Cal. Civ. Code. § 1780.  The CLRA, Cal. Civ. Code § 1750 *et seq.*, is designed to protect consumers against unfair and deceptive business practices.  It applies to GREENSKY's conduct because it covers transactions that are intended to result, or that do in fact result, in the sale or lease of goods and services to consumers.

243.   GREENSKY knew, or should have known, that it was misrepresenting its business to consumers and state agencies.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

1.   Approving of the proposed Class, certifying Plaintiff as representative of the Class and designating her counsel as counsel for the Class;

2.   Enjoining Defendants from the business practices described herein;

3.   Granting the requested declaratory judgment;

4.   Declaring that Defendants committed the violations alleged herein;

5.   Granting damages, except as limited in by the Consumer Legal Remedies Act, restitution, and/or disgorgement to Plaintiff and the Class;

6.   Granting compensatory damages, the amount of which is to be determined by jury at trial, except as limited in by the Consumer Legal Remedies Act;

7.   Granting punitive damages;

8.   Granting pre- and post-judgment interest;

9.   Granting attorneys' fees and costs; and

10.   Granting further relief as this Court may deem proper.

///

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the proposed Class, hereby demands a trial by jury on all issues so triable.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

1  Dated: January 7, 2019

2  Respectfully submitted,

3

4  DANIEL T. LeBEL, SBN 246169
5  **CONSUMER LAW PRACTICE**
   **OF DANIEL T. LeBEL**
6  PO Box 720286
7  San Francisco, CA 94111
   T: (415) 513-1414
8  F: (877) 563-7848
   danlebel@consumerlawpractice.com
9

10  BRYCE BELL (motion for *pro hac vice* forthcoming)
    MARK W. SCHMITZ (motion for *pro hac vice* forthcoming)
11  ANDREW R. TAYLOR (motion for *pro hac vice* forthcoming)
    **BELL LAW, LLC**
12  2600 Grand Blvd., Suite 580
    Kansas City, MO 64108
13  T: 816-886-8206
14  F: 816-817-8500
    Bryce@BellLawKC.com
15  MS@BellLawKC.com
    AT@BellLawKC.com
16

17  *Attorneys for Plaintiff and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28

CASE NUMBER: CGC-20-582136  ELIZABETH BELYEA VS. GREENSKY, INC. A CORPORATIC

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **JUN-10-2020** |
| **TIME:** | **10:30AM** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA 94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



## Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Information Package



The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

**WHAT IS ADR?**
Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

**WHY CHOOSE ADR?**
It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint\*\***

**WHAT ARE THE ADR OPTIONS?**
The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

**1) MANDATORY SETTLEMENT CONFERENCES**
Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF), in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

(B) JUDICIAL MEDIATION PROGRAM provides mediation with a San Francisco Superior Court Judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

(C) PRIVATE MEDIATION: Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

(D) COMMUNITY BOARDS MEDIATION SERVICES: Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

### 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

#### (A) JUDICIAL ARBITRATION

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

#### (B) PRIVATE ARBITRATION

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. <u>YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS.   THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.</u>

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | |
| ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, CA 94102-4514 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |
| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: _____<br><br>DEPARTMENT 610 |

**1)   The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐   **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per  party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐   **Mediation Services of Community Boards (CB)** -- Service in conjunction with DRPA, CB provides case development and one three-hour mediation session.  Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available  to those who qualify. communityboards.org

☐   **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐   **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no  equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this  program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐   **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is  no  fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐   **Other ADR process (describe)** _____

**2)   The parties agree that the ADR Process shall be completed by (date):** _____
**3)   Plaintiff(s) and Defendant(s) further agree  as follows:**

_____

| | |
|---|---|
| _____<br>Name of Party Stipulating | _____<br>Name of Party Stipulating |
| _____<br>Name of Party or Attorney Executing Stipulation | _____<br>Name of Party or Attorney Executing Stipulation |
| _____<br>Signature of Party or Attorney | _____<br>Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: _____ | Dated: _____ |

☐   *Additional signature(s) attached*

CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

## DEMAND AND NOTICE OF VIOLATION
## OF CONSUMERS LEGAL REMEDIES ACT

To:   GREENSKY OF GEORGIA, LLC, GREENSKY, INC., AND GREENSKY, LLC

PLEASE TAKE NOTICE that you are in violation of the Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*), for the reasons stated in the Complaint ("Complaint"), filed in the Superior Court of the State of California, in and for San Francisco County, on or about January 9, 2020, entitled: **Elizabeth Belyea v. Greensky, Inc. et al.**, and attached hereto as Exhibit A.

This notice is served upon you on behalf of Elizabeth Belyea ("Plaintiff"). All communications or responses regarding this Notice shall be directed to Plaintiff's counsel as follows:

Daniel T. LeBel
**CONSUMER LAW PRACTICE**
PO Box 720286
San Francisco, CA  94172
(415) 513-1414

## STATEMENT OF VIOLATIONS

The Complaint alleges that Greensky, Inc., Greensky of Georgia, LLC, and Greensky, LLC ("Defendants"), violated the Consumers Legal Remedies Act by, among other things, through misrepresentations and omissions about the nature of it's service. These acts violated and continue to violate the Consumers Legal Remedies Act because Defendant:

  i.     § 1770(a)(1): Passing off goods or services as those of another.
  ii.    § 1770(a)(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.
  iii.   § 1770(a)(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.
  iv.    § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.
  v.     § 1770(9): Advertising goods or services with intent not to sell them as advertised.

## Consumer Law Practice
### Daniel T. LeBel, Attorney

## **STATEMENT OF REMEDIES**

IT IS HEREBY DEMANDED THAT WITHIN THIRTY (30) DAYS from the date on which this Notice is served upon you that you remedy your violations as follows:

Restore all payments made on the GREENSKY loans to Plaintiff and the proposed class; correct the omissions and misrepresentations made to Plaintiff and the Class; adopt best practices to ensure the omissions and misrepresentations are not continued; and pay Plaintiff's reasonable attorneys' fees and costs.

# NATIONAL REGISTERED AGENTS, INC.
## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

SOP Transmittal #  **537182077**

213-337-4615 - Telephone

Entity Served:  GreenSky, LLC  (Domestic State: GEORGIA) (Served as Greensky, Inc., et al., Dfts. Name discrepancy noted.)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of CALIFORNIA on this 12 day of February, 2020. The following is a summary of the document(s) received:

1.  **Title of Action:**  Elizabeth Belyea, Pltf. vs. Greensky, Inc., et al., Dfts.

2.  **Document(s) Served:**   Other: Demand, Notice, Statement

3.  **Court of Jurisdiction/Case Number:** None Specified
Case # None Specified

4.  **Amount Claimed, if any:**  N/A

5.  **Method of Service:**

___ Personally served by:        ___ Process Server        ___ Law Enforcement        ___ Deputy Sheriff        ___ U. S Marshall

_X_ Delivered Via:        _X_ Certified Mail        ___ Regular Mail        ___ Facsimile

___ Other (Explain):

6.  **Date of Receipt:**  02/12/2020

7.  **Appearance/Answer Date:**  Within 30 Days from the Date on Which This Notice Is Served Upon You

8.  **Received From:**   Daniel T. LeBel
Consumer Law Practice
PO Box 720286
San Francisco, CA 94172
(415) 513-1414

9.  **Carrier Airbill #** 1ZY041160198916421

10.  **Call Made to:** Not required

11.  **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  STEVEN E. FOX  steve.fox@greensky.com

Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com

Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com

REMARKS : According to the California Secretary of State, the only entity registered beginning with the name Greensky, Inc is Greensky,LLC

**NATIONAL REGISTERED AGENTS, INC.**                    CopiesTo:

Transmitted by   Amanda Garcia

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

Consumer Law Practice
PO Box 720286
SF CA 94172

RETURN RECEIPT
REQUESTED




U.S. POSTAGE PAID
FCM LETTER
SAN FRANCISCO, CA
94110
FEB 10, 20
AMOUNT

**$6.95**

R2304W121778-13

1000

90017



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

7018 1830 0001 5115 2304

National Registered Angents, Inc.
c/o Greensky, Inc.
818 West Seventh St., Ste 930
Los Angeles, CA 90017

### Consumer Law Practice
Daniel T. LeBel, Attorney

## DEMAND AND NOTICE OF VIOLATION
## OF CONSUMERS LEGAL REMEDIES ACT

To:    Greensky of Georgia, llc, Greensky, Inc., and Greensky, LLC

PLEASE TAKE NOTICE that you are in violation of the Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*), for the reasons stated in the Complaint ("Complaint"), filed in the Superior Court of the State of California, in and for San Francisco County, on or about January 9, 2020, entitled: **Elizabeth Belyea *v. Greensky, Inc. et al.*,** and attached hereto as Exhibit A.

This notice is served upon you on behalf of Elizabeth Belyea ("Plaintiff"). All communications or responses regarding this Notice shall be directed to Plaintiff's counsel as follows:

Daniel T. LeBel
**Consumer Law Practice**
PO Box 720286
San Francisco, CA 94172
(415) 513-1414

## STATEMENT OF VIOLATIONS

The Complaint alleges that Greensky, Inc., Greensky of Georgia, LLC, and Greensky, LLC ("Defendants"), violated the Consumers Legal Remedies Act by, among other things, through misrepresentations and omissions about the nature of it's service. These acts violated and continue to violate the Consumers Legal Remedies Act because Defendant:

i.     § 1770(a)(1): Passing off goods or services as those of another.
ii.    § 1770(a)(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.
iii.   § 1770(a)(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.
iv.    § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.
v.     § 1770(9): Advertising goods or services with intent not to sell them as advertised.

## CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

## **STATEMENT OF REMEDIES**

IT IS HEREBY DEMANDED THAT WITHIN THIRTY (30) DAYS from the date on which this Notice is served upon you that you remedy your violations as follows:

Restore all payments made on the GREENSKY loans to Plaintiff and the proposed class; correct the omissions and misrepresentations made to Plaintiff and the Class; adopt best practices to ensure the omissions and misrepresentations are not continued; and pay Plaintiff's reasonable attorneys' fees and costs.

# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To: STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

SOP Transmittal #   537182066

213-337-4615 - Telephone

Entity Served:  GreenSky, LLC  (Domestic State: GEORGIA)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of CALIFORNIA on this 12 day of February, 2020. The following is a summary of the document(s) received:

1. **Title of Action:**  Elizabeth Belyea, Pltf. vs. Greensky, LLC, et al., Dfts

2. **Document(s) Served:**   Other: Demand, Notice, Statement

3. **Court of Jurisdiction/Case Number:** None Specified
   Case # None Specified

4. **Amount Claimed, if any:**  N/A

5. **Method of Service:**

    ___ Personally served by:        ___ Process Server        ___ Law Enforcement        ___ Deputy Sheriff        ___ U. S Marshall

    _X_ Delivered Via:        _X_ Certified Mail        ___ Regular Mail        ___ Facsimile

    ___ Other (Explain):

6. **Date of Receipt:**  02/12/2020

7. **Appearance/Answer Date:**  Within 30 Days from the Date on Which This Notice Is Served Upon You

8. **Received From:**   Daniel T. LeBel        9. **Carrier Airbill #** 1ZY041160198916421
   Consumer Law Practice
   PO Box 720286
   San Francisco, CA 94172        10. **Call Made to:** Not required
   (415)513-1414

11. **Special Comments:**

SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  STEVEN E. FOX  steve.fox@greensky.com

Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com

Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com

**NATIONAL REGISTERED AGENTS, INC.**                    CopiesTo:

Transmitted by  Amanda Garcia

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

Consumer Law Center

PO Box 720286

SF CA 94172

RETURN RECEIPT
REQUESTED



U.S. POSTAGE PAID
FCM LETTER
SAN FRANCISCO, CA
94110
FEB 10, 20
AMOUNT

**$6.95**

90017
R2304W121778-13

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

7018 1830 0001 5115 2281

National Registered Angents, Inc.

c/o Greensky, LLC

818 West Seventh St., Ste 930

Los Angeles, CA 90017

90017=347630

CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

## DEMAND AND NOTICE OF VIOLATION
## OF CONSUMERS LEGAL REMEDIES ACT

TO:   GREENSKY OF GEORGIA, LLC, GREENSKY, INC., AND GREENSKY, LLC

PLEASE TAKE NOTICE that you are in violation of the Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*), for the reasons stated in the Complaint ("Complaint"), filed in the Superior Court of the State of California, in and for San Francisco County, on or about January 9, 2020, entitled: **Elizabeth Belyea v. Greensky, Inc. et al.**, and attached hereto as Exhibit A.

This notice is served upon you on behalf of Elizabeth Belyea ("Plaintiff"). All communications or responses regarding this Notice shall be directed to Plaintiff's counsel as follows:

Daniel T. LeBel
**CONSUMER LAW PRACTICE**
PO Box 720286
San Francisco, CA 94172
(415) 513-1414

## STATEMENT OF VIOLATIONS

The Complaint alleges that Greensky, Inc., Greensky of Georgia, LLC, and Greensky, LLC ("Defendants"), violated the Consumers Legal Remedies Act by, among other things, through misrepresentations and omissions about the nature of it's service. These acts violated and continue to violate the Consumers Legal Remedies Act because Defendant:

     i.   § 1770(a)(1): Passing off goods or services as those of another.
     ii.  § 1770(a)(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.
     iii. § 1770(a)(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.
     iv. § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.
     v.  § 1770(9): Advertising goods or services with intent not to sell them as advertised.

## CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

### STATEMENT OF REMEDIES

IT IS HEREBY DEMANDED THAT WITHIN THIRTY (30) DAYS from the date on which this Notice is served upon you that you remedy your violations as follows:

Restore all payments made on the GREENSKY loans to Plaintiff and the proposed class; correct the omissions and misrepresentations made to Plaintiff and the Class; adopt best practices to ensure the omissions and misrepresentations are not continued; and pay Plaintiff's reasonable attorneys' fees and costs.

# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

SOP Transmittal #   537181339

213-337-4615 - Telephone

Entity Served:  GREENSKY OF GEORGIA, LLC  (Assumed Name)  (Domestic State: GEORGIA)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of CALIFORNIA on this 12 day of February, 2020. The following is a summary of the document(s) received:

1.  **Title of Action:**  RE: Elizabeth Belyea // To: Greensky of Georgia, LLC

2.  **Document(s) Served:**  Other: Demand, Notice, Statement

3.  **Court of Jurisdiction/Case Number:** None Specified
Case # None Specified

4.  **Amount Claimed, if any:**  N/A

5.  **Method of Service:**

___ Personally served by:        ___ Process Server        ___ Law Enforcement        ___ Deputy Sheriff        ___ U. S Marshall

_X_ Delivered Via:        _X_ Certified Mail        ___ Regular Mail        ___ Facsimile

___ Other (Explain):

6.  **Date of Receipt:**  02/12/2020

7.  **Appearance/Answer Date:**  Within 30 Days from the Date on Which This Notice Is Served Upon You

8.  **Received From:**   Daniel T. LeBel          9.  **Carrier Airbill #** 1ZY041160199786356
Consumer Law Practice
PO Box 720286
San Francisco, CA 94172          10.  **Call Made to:** Not required
(415)513-1414

11.  **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  STEVEN E. FOX  steve.fox@greensky.com

Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com

Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com

**NATIONAL REGISTERED AGENTS, INC.**                    CopiesTo:

Transmitted by  Amanda Garcia

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

Consumer Law Practice
PO Box 720286
SF CA 94172

SAN FRANCISCO
CA 940

10 FEB

PM 4

1000

USPS
UNITED STATES
POSTAL SERVICE

90017

U.S. POSTAGE PAID
FCM LETTER
SAN FRANCISCO, CA
94110
FEB 10, 20
AMOUNT

**$6.95**

R2304W121778-13

RETURN RECEIPT
REQUESTED

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

7018 1830 0001 5115 2298

National Registered Angents, Inc.
c/o Greensky of Georgia, LLC
818 West Seventh St., Ste 930
Los Angeles, CA 90017

9001713407

CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

## DEMAND AND NOTICE OF VIOLATION
## OF CONSUMERS LEGAL REMEDIES ACT

TO:   GREENSKY OF GEORGIA, LLC, GREENSKY, INC., AND GREENSKY, LLC

PLEASE TAKE NOTICE that you are in violation of the Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*), for the reasons stated in the Complaint ("Complaint"), filed in the Superior Court of the State of California, in and for San Francisco County, on or about January 9, 2020, entitled: **Elizabeth Belyea v. Greensky, Inc. et al.**, and attached hereto as Exhibit A.

This notice is served upon you on behalf of Elizabeth Belyea ("Plaintiff"). All communications or responses regarding this Notice shall be directed to Plaintiff's counsel as follows:

Daniel T. LeBel
CONSUMER LAW PRACTICE
PO Box 720286
San Francisco, CA 94172
(415) 513-1414

## STATEMENT OF VIOLATIONS

The Complaint alleges that Greensky, Inc., Greensky of Georgia, LLC, and Greensky, LLC ("Defendants"), violated the Consumers Legal Remedies Act by, among other things, through misrepresentations and omissions about the nature of it's service. These acts violated and continue to violate the Consumers Legal Remedies Act because Defendant:

     i.    § 1770(a)(1): Passing off goods or services as those of another.
    ii.   § 1770(a)(2): Misrepresenting the source, sponsorship, approval, or certification of goods or services.
   iii.  § 1770(a)(3): Misrepresenting the affiliation, connection, or association with, or certification by, another.
   iv.  § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.
    v.   § 1770(9): Advertising goods or services with intent not to sell them as advertised.

## CONSUMER LAW PRACTICE
DANIEL T. LEBEL, ATTORNEY

## **STATEMENT OF REMEDIES**

IT IS HEREBY DEMANDED THAT WITHIN THIRTY (30) DAYS from the date on which this Notice is served upon you that you remedy your violations as follows:

Restore all payments made on the GREENSKY loans to Plaintiff and the proposed class; correct the omissions and misrepresentations made to Plaintiff and the Class; adopt best practices to ensure the omissions and misrepresentations are not continued; and pay Plaintiff's reasonable attorneys' fees and costs.

**Timothy Moore**

| | |
|---|---|
| **From:** | SOPDelivery@wolterskluwer.com |
| **Sent:** | Wednesday, February 12, 2020 8:39 PM |
| **To:** | Camille Gordon-Johnson |
| **Subject:** | ATTENTION: First Serve SOP received in CALIFORNIA (OurTransmittal #537181339) |

**External Email Message! Please proceed with caution. If you believe this email to be malicious, please click the PhishMe button.**

# NATIONAL REGISTERED AGENTS, INC.

## SOP Process 537181339 received in California

To access the First Serve scan for the above Service of Process, please click on the following link. You will need your NRAI user ID and password

View 537181339 Document

If you have trouble accessing the above URL, you can also access by visiting NRAI's Client Service Area Login at www.NRAI.com.Once accessed,

## Service of Process Summary Transmittal Form

**To:**
STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

| | |
|---|---|
| **1) Entity Served:** | **GREENSKY OF GEORGIA, LLC  (Assumed Name)  (Domestic State: GEORGIA)** |
| **1a) Domestic State:** | GEORGIA |
| **2) Title Of Action:** | RE: Elizabeth Belyea // To: Greensky of Georgia, LLC |
| **3) Document(s) Served:** | Other: Demand, Notice, Statement |
| **4) Court of Jurisdiction:** | None Specified |
| **5) Case Number:** | |
| **6) Amount Claimed:** | |
| **7) Method of Service:** | Delivered Via: Certified Mail |
| **8) Date of Receipt:** | 02/12/2020 |
| **9) Appearance/Answer Date:** | Within 30 Days from the Date on Which This Notice Is Served Upon You |
| **10) Received From:** | Daniel T. LeBel |
| | Consumer Law Practice |
| | PO Box 720286 |
| | San Francisco, CA 94172 |
| | (415)513-1414 |
| **11) Carrier Airbill:** | 1ZY041160199786356 |
| **12) Calls Made To:** | Not required |
| **13) Special Comments:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  STEVEN E. FOX  steve.fox@greensky.com |
| | Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com |
| | Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com |
| **14) Transmitted By:** | Amanda Garcia |

**Timothy Moore**

| | |
|---|---|
| **From:** | SOPDelivery@wolterskluwer.com |
| **Sent:** | Wednesday, February 12, 2020 11:45 PM |
| **To:** | Camille Gordon-Johnson |
| **Subject:** | ATTENTION: First Serve SOP received in CALIFORNIA (OurTransmittal #537182066) |

**External Email Message! Please proceed with caution. If you believe this email to be malicious, please click the PhishMe button.**

# NATIONAL REGISTERED AGENTS, INC.

## SOP Process 537182066 received in California

To access the First Serve scan for the above Service of Process, please click on the following link. You will need your NRAI user ID and passwor

View 537182066 Document

If you have trouble accessing the above URL, you can also access by visiting NRAI's Client Service Area Login at www.NRAI.com.Once accessed,

## Service of Process Summary Transmittal Form

**To:**
STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

| | |
|---|---|
| **1) Entity Served:** | GreenSky, LLC  (Domestic State: GEORGIA) |
| **1a) Domestic State:** | GEORGIA |
| **2) Title Of Action:** | Elizabeth Belyea, Pltf. vs. Greensky, LLC, et al., Dfts |
| **3) Document(s) Served:** | Other: Demand, Notice, Statement |
| **4) Court of Jurisdiction:** | None Specified |
| **5) Case Number:** | |
| **6) Amount Claimed:** | |
| **7) Method of Service:** | Delivered Via: Certified Mail |
| **8) Date of Receipt:** | 02/12/2020 |
| **9) Appearance/Answer Date:** | Within 30 Days from the Date on Which This Notice Is Served Upon You |
| **10) Received From:** | Daniel T. LeBel |
| | Consumer Law Practice |
| | PO Box 720286 |
| | San Francisco, CA 94172 |
| | (415)513-1414 |
| **11) Carrier Airbill:** | 1ZY041160198916421 |
| **12) Calls Made To:** | Not required |
| **13) Special Comments:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  STEVEN E. FOX  steve.fox@greensky.com |
| | Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com |
| | Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com |
| **14) Transmitted By:** | Amanda Garcia |

1

**Timothy Moore**

| | |
|---|---|
| **From:** | SOPDelivery@wolterskluwer.com |
| **Sent:** | Wednesday, February 12, 2020 11:50 PM |
| **To:** | Camille Gordon-Johnson |
| **Subject:** | ATTENTION: First Serve SOP received in CALIFORNIA (OurTransmittal #537182077) |

**External Email Message! Please proceed with caution. If you believe this email to be malicious, please click the PhishMe button.**

# NATIONAL REGISTERED AGENTS, INC.

## SOP Process 537182077 received in California

To access the First Serve scan for the above Service of Process, please click on the following link. You will need your NRAI user ID and passwo

View 537182077 Document

If you have trouble accessing the above URL, you can also access by visiting NRAI's Client Service Area Login at www.NRAI.com.Once accessed,

## Service of Process Summary Transmittal Form

**To:**
STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

| | |
|---|---|
| **1) Entity Served:** | GreenSky, LLC  (Domestic State: GEORGIA)  (Served as Greensky, Inc., et al., Dft |
| **1a) Domestic State:** | GEORGIA (Served as Greensky, Inc., et al., Dfts. Name discrepancy noted.) |
| **2) Title Of Action:** | Elizabeth Belyea, Pltf. vs. Greensky, Inc., et al., Dfts.  Name discrepancy noted. |
| **3) Document(s) Served:** | Other: Demand, Notice, Statement |
| **4) Court of Jurisdiction:** | None Specified |
| **5) Case Number:** | |
| **6) Amount Claimed:** | |
| **7) Method of Service:** | Delivered Via: Certified Mail |
| **8) Date of Receipt:** | 02/12/2020 |
| **9) Appearance/Answer Date:** | Within 30 Days from the Date on Which This Notice Is Served Upon You |
| **10) Received From:** | Daniel T. LeBel |
| | Consumer Law Practice |
| | PO Box 720286 |
| | San Francisco, CA 94172 |
| | (415) 513-1414 |
| **11) Carrier Airbill:** | 1ZY041160198916421 |
| **12) Calls Made To:** | Not required |
| **13) Special Comments:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  STEVEN E. FOX  steve.fox@greensky.com |
| | Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com |
| | Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com |
| **14) Transmitted By:** | Amanda Garcia |

1

**Timothy Moore**

| | |
|---|---|
| **From:** | SOPDelivery@wolterskluwer.com |
| **Sent:** | Thursday, February 6, 2020 9:12 PM |
| **To:** | Camille Gordon-Johnson |
| **Subject:** | ATTENTION: First Serve SOP received in CALIFORNIA (OurTransmittal #537142254) |

<span style="color:red">**External Email Message! Please proceed with caution. If you believe this email to be
malicious, please click the PhishMe button.**</span>

# NATIONAL REGISTERED AGENTS, INC.

## SOP Process 537142254 received in California

To access the First Serve scan for the above Service of Process, please click on the following link. You will need your NRAI user ID and passwor

View 537142254 Document

If you have trouble accessing the above URL, you can also access by visiting NRAI's Client Service Area Login at www.NRAI.com.Once accessed,

## Service of Process Summary Transmittal Form

**To:**
STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

| | |
|---|---|
| **1) Entity Served:** | <span style="color:red">**GreenSky, LLC  (Domestic State: GEORGIA)**</span> |
| **1a) Domestic State:** | GEORGIA |
| **2) Title Of Action:** | ELIZABETH BELYEA, ETC., PLTF. vs. GREENSKY, INC, ETC., ET AL., DFTS. // TO: GR |
| **3) Document(s) Served:** | Other: SUMMONS, COMPLAINT, ATTACHMENT |
| **4) Court of Jurisdiction:** | San Francisco County - Superior Court - San Francisco, CA |
| **5) Case Number:** | CGC20582136 |
| **6) Amount Claimed:** | |
| **7) Method of Service:** | Delivered Via: Process Server |
| **8) Date/Time of Receipt:** | 02/06/2020 12:50:00 PM |
| **9) Appearance/Answer Date:** | WITHIN 30 CALENDAR DAYS AFTER THIS SUMMONS AND LEGAL PAPERS |
| **10) Received From:** | Daniel T. Lebel |
| | Consumer Law Practice Of Daniel T. Lebel |
| | 2600 Grand Blvd., Suite 580 |
| | San Francisco, CA 94111 |
| | 816-886-8206 |
| **11) Carrier Airbill:** | 1ZY041160194913360 |
| **12) Calls Made To:** | Not required |
| **13) Special Comments:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  STEVEN E. FOX  steve.fox@greensky.com |
| | Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com |
| | Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com |
| **14) Transmitted By:** | Amanda Garcia |

**Timothy Moore**

| | |
|---|---|
| **From:** | SOPDelivery@wolterskluwer.com |
| **Sent:** | Thursday, February 6, 2020 10:07 PM |
| **To:** | Camille Gordon-Johnson |
| **Subject:** | ATTENTION: First Serve SOP received in CALIFORNIA (OurTransmittal #537142635) |

**External Email Message! Please proceed with caution. If you believe this email to be malicious, please click the PhishMe button.**

# NATIONAL REGISTERED AGENTS, INC.

## SOP Process 537142635 received in California

To access the First Serve scan for the above Service of Process, please click on the following link. You will need your NRAI user ID and password

View 537142635 Document

If you have trouble accessing the above URL, you can also access by visiting NRAI's Client Service Area Login at www.NRAI.com.Once accessed,

## Service of Process Summary Transmittal Form

**To:**
STEVEN E. FOX
GreenSky, LLC
5565 GLENRIDGE CONNECTOR, SUITE 700
ATLANTA, GA 30342

| | |
|---|---|
| **1) Entity Served:** | GreenSky, LLC  (Domestic State: GEORGIA)  (Served as GREENSKY, INC., ET AL., |
| **1a) Domestic State:** | GEORGIA (Served as GREENSKY, INC., ET AL., DFTS. // TO: GREENSKY, LLC Name di |
| **2) Title Of Action:** | ELIZABETH BELYEA, ETC., PLTF. vs. GREENSKY, INC., ET AL., DFTS. // TO: GREENSK |
| **3) Document(s) Served:** | Other: Summons, Complaint, Attachment |
| **4) Court of Jurisdiction:** | San Francisco County - Superior Court - San Francisco, CA |
| **5) Case Number:** | CGC20582136 |
| **6) Amount Claimed:** | |
| **7) Method of Service:** | Delivered Via: Process Server |
| **8) Date/Time of Receipt:** | 02/06/2020 12:50:00 PM |
| **9) Appearance/Answer Date:** | Within 30 Calendar Days After This Summons And Legal Papers |
| **10) Received From:** | Daniel T. Lebel |
| | Consumer Law Practice Of Daniel T. Lebel |
| | PO BOX 720286 |
| | San Francisco, CA 94111 |
| | 415-513-1414 |
| **11) Carrier Airbill:** | 1ZY041160194913360 |
| **12) Calls Made To:** | Not required |
| **13) Special Comments:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  STEVEN E. FOX  steve.fox@greensky.com |
| | Email Notification,  ANN BROUSSARD  ann.broussard@greensky.com |
| | Email Notification,  CAMILLE JOHNSON  camille.johnson@greensky.com |
| **14) Transmitted By:** | Amanda Garcia |