UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH BELYEA, et al.,

Plaintiffs,

v.

GREENSKY, INC., et al.,

Defendants.

Case No.  20-cv-01693-JSC

**ORDER RE: MOTION TO EXCLUDE REPORT AND OPINIONS, MOTION FOR SUMMARY JUDGMENT, AND MOTION FOR CLASS CERTIFICATION**

Public Redacted Version

Re: Dkt. No. 241, 248, 254

Plaintiffs bring this putative class action against Greensky, alleging the company's business practices violate California consumer protection statutes.  Before the Court is GreenSky's motion to exclude the report and opinions of Plaintiffs' proposed expert, GreenSky's motion for summary judgment as to the claims of the two named plaintiffs, and Plaintiffs' motion for class certification.  (Dkt. Nos. 241, 248, 254.)  Having carefully considered the briefing, and with the benefit of oral argument on November 14, 2024, the Court DENIES GreenSky's *Daubert* motion, GRANTS in part and DENIES in part GreenSky's motion for summary judgment, and GRANTS Plaintiffs' motion for class certification as to the transaction fee claims.

## BACKGROUND

I.        RELEVANT FACTS

Greensky partners with contractors and banks to provide point-of-sale loans to consumers for home-improvement and home-maintenance projects.  (Dkt. No. 235-5 at 4; Dkt. No. 242-3 ¶ 5.)[1]  Home-improvement and home-maintenance contractors ("merchants") use a technology

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

platform developed by GreenSky to offer financing options to consumers. (Dkt. No. 235-5 at 4.) The consumer completes an application on the platform. (Dkt. No. 242-3 ¶ 10.) GreenSky's bank partners fund the loans. (Dkt. No. 235-8 at 5; Dkt. No. 242-3 ¶¶ 7-8.) "[I]f the application meets the bank's criteria, the bank directs GreenSky to have its technology deliver the loan offer to the customer." (Dkt. No. 242-3 ¶ 8.) The process "typically permits a consumer to apply and be approved for financing in less than 60 seconds at the point of sale." (Dkt. No. 235-5 at 4.)

After originating loans for consumers, GreenSky collects two types of fees. First are "transaction fees," also referred to as "merchant fees." Each time a merchant's customer uses the GreenSky Program loan to pay the merchant, the merchant pays GreenSky a transaction fee, calculated as a percentage of the loan amount. (Dkt. No. 242-3 ¶ 17.) GreenSky sets the fee, (Dkt. No. 235-7 at 28), which averages around ■. (Dkt. No. 235-12 at 2; Dkt. No. 235-13 at 2.) The Merchant Program Agreement, which every merchant must sign, states merchants shall not surcharge or otherwise pass through to their customers any part of the transaction fee. (Dkt. Nos. 242-3 ¶ 13; 237-1 at 4 ("Merchant shall not require, through a surcharge, an increase in price or otherwise, any Borrower to pay any finance or Loan related fees, including any part of any charge or fee imposed by GreenSky on Merchant."); 235-7 at 38 (explaining the agreement "prohibits the merchant from adding a surcharge to cover their merchant fees").) Nevertheless, the GreenSky Managing Director explained transaction fees "should be effectively built into the sales process and contract price making it a homeowner expense." (Dkt. No. 239-6 at 2.) GreenSky provides a "tool" to show merchants "how to add the cost [of the merchant fee] into the margins so the merchant's [sic] don't lose a penny when [GreenSky] collect[s] [its] fees." (Dkt. No. 239-9 at 2.)

The second type of fee GreenSky collects are "performance fees," also called "incentive payments," which GreenSky receives from its bank partners. Incentive payment calculations are performed monthly at the end of the month. (Dkt. No. 235-7 at 33.) The incentive payment includes "all amounts billed to the borrowers, fees and finance charges, less the fixed servicing fee, less all credit losses, [and] less the bank margin or the yield that . . . the servicing fee sets forth that is due to the lender." (Dkt. No. 235-7 at 33.) "[T]o the extent that the result of that calculation is a positive number," GreenSky is due the remainder as a performance fee. (*Id.*) The

United States District Court
Northern District of California

1  calculation aggregates "all loans in the portfolio simultaneously, meaning it cannot be calculated

2  on a loan-by-loan basis."  (Dkt. No. 235-7 at 33.)

3  ## II.   NAMED PLAINTIFFS

4        In September 2016, Heidi Barnes "contacted Reliable Home Improvement, Inc., to build a

5  custom concrete patio at her home."  (Dkt. No. 216 ¶ 72.)  The contractor informed Ms. Barnes

6  "that the project cost would exceed $10,000" and said GreenSky "can help finance the project."

7  (Dkt. Nos. 216 ¶ 73; 241-54 at 15.)  Ms. Barnes thought the terms offered on the $7,500 loan—

8  "with the 6.99 percent interest . . . and interest-only payments for the first five months"— "seemed

9  like a pretty good deal at the time."  (Dkt. No. 241-54 at 16; Dkt. No. 216 ¶ 74.)  She accepted the

10  terms by electronically signing the GreenSky agreement on the contractor's phone.  (Dkt. No. 241-

11  54 at 54.)  Ms. Barnes "began making monthly payments on her loan on November 13, 2016."

12  (Dkt. No. 216 ¶ 76.)  "The loan balance is still outstanding."  (*Id.*)

13        In September 2018, a representative from Peter Levi Plumbing, Inc., inspected a furnace at

14  David Ferguson's home.  (Dkt. No. 216 ¶ 82.)  The representative informed Mr. Ferguson "the

15  cost for the repairs would exceed $1,500."  (*Id.* ¶ 83.)  Mr. Ferguson said he could not afford it.

16  (Dkt. No. 241-55 at 16.)  The representative informed Mr. Ferguson financing was available and

17  pulled out a tablet.  (*Id.*)  "Using the GreenSky app, the representative proceeded to procure a

18  loan on Ferguson's behalf" in the amount of $1,791.  (Dkt. No. 216 ¶¶ 83-84.)  The loan provided

19  that if Mr. Ferguson paid "off [the] entire purchase balance before the end of the promotional

20  period, all billed interest would be waived."  (Dkt. No. 241-55 at 27.)  Mr. Ferguson paid off the

21  loan during the promotional period.  (Dkt. No. 241-55 at 39, 41.)

22  ## III.   PROCEDURAL HISTORY

23        In January 2020, Elizabeth Belyea filed this putative class action in the Superior Court for

24  the County of San Francisco, alleging GreenSky fails to comply with state lending, credit

25  servicing, and consumer protection laws.  (Dkt. No. 1-1 at 5.)  GreenSky removed the action to

26  this Court and filed a motion to compel arbitration. (Dkt. Nos. 1, 5.)  The Court denied the motion

27  to compel, finding GreenSky failed to prove by a preponderance of the evidence Ms. Beylea

28  agreed to arbitrate.  (Dkt. No. 40.)  Ms. Beylea filed an amended complaint, adding Heidi Barnes,

United States District Court
Northern District of California

3

1    Hazel Lodge, and David Ferguson as representative plaintiffs.  (Dkt. No. 52.)  The Court partially

2    granted GreenSky's motion to dismiss.  (Dkt. No. 92.)

3        After additional briefing, the Court compelled arbitration as to Ms. Belyea, Ms. Lodge, and

4    Mr. Ferguson.  (Dkt. No. 159.)  Ms. Barnes's claims remained pending, as she was not subject to

5    the arbitration agreement.  (Dkt. No. 163.)  Ms. Belyea and Ms. Lodge dismissed their claims with

6    prejudice.  (Dkt. Nos. 175, 199.)  Mr. Ferguson appealed.  (Dkt. No. 165.)  The Ninth Circuit

7    reversed the Court's order compelling arbitration as to Mr. Ferguson's claims.  (Dkt. No. 188.)

8    So, Ms. Barnes and Mr. Ferguson became the two named plaintiffs.

9        GreenSky moved for judgment on the pleadings, (Dkt. No. 206), which the Court granted

10    in part, dismissing Plaintiffs' Consumer Legal Remedies Act claim.  (Dkt. No. 212.)

11        In January 2024, Plaintiffs filed the now-operative third amended complaint alleging (I)

12    violations of the Credit Services Act of 1984, (II) violations of California's Unfair Competition

13    Law, and (III) unjust enrichment.  (Dkt. No. 216.)  Specifically, Count I alleges Greensky, as "a

14    credit service organization as defined by Civil Code § 1789.12," violates the Credit Services Act

15    ("Credit Act"), including by collecting transaction and performance fees, failing to provide

16    specific disclosures, and failing to register with the California Department of Justice.  (Dkt. No.

17    216 ¶¶ 102-112.)  Count II alleges GreenSky violates California's Unfair Competition Law by

18    violating the Credit Act, as alleged in Count I, and by violating the California Financing Law

19    ("Financing Law").  As to the Financing Law, Plaintiffs' allegations include that GreenSky "acts

20    as a finance lender for consumer loans" but is not licensed, has not obtained a surety bond, and

21    charges excessive administrative fees.  (*Id.* ¶¶ 113-122.)  Count III alleges it would be "inequitable

22    and unjust for GreenSky to retain" the benefit Plaintiffs and class members conferred upon

23    GreenSky.  (*Id.* ¶¶ 123-129.)

## DISCUSSION

25    **I.    *DAUBERT* MOTION**

26        In support of their motion for class certification and in opposition to GreenSky's motion

27    for summary judgment, Plaintiffs rely on an expert report by Michael A. Williams.  (Dkt. No. 239-

28    14.)  Dr. Williams, who holds M.A. and Ph.D. degrees in economics from the University of

Chicago, "specialize[s] in the fields of economics referred to as industrial organization and applied Econometrics." (Dkt. No. 239-14 ¶ 1.) Dr. Williams calculated class-wide damages for transaction and performance fees.

GreenSky moves to exclude Dr. Williams's report, arguing his opinion does "not come close to passing muster under *Daubert*." (Dkt. No. 247-5.) GreenSky provides a rebuttal expert report from Stuart D. Gurrea. (Dkt. No. 247-3.) Dr. Gurrea, who received his master's degree and Ph.D. in economics from Northwestern University, "reviewed Dr. Williams' proposed methodologies and analyses in light of the accepted principles of economics and financial economics." (Dkt. No. 247-3 ¶¶ 3, 6.)

Dr. Williams and Dr. Gurrea each submitted reply declarations in response to the others' findings. (Dkt. Nos. 247-5; 262-4.) Over the objections of the parties, the Court considers both.

Under Federal Rule of Evidence 702, a witness may offer expert testimony if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.* The court's "task ... is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995).

### A.    Transaction Fees

Dr. Williams set out to determine "whether GreenSky transaction fees to merchants were passed through (partially or completely) to the Class Members" in the form of inflated project costs. (Dkt. No. 239-14 ¶ 39.) Dr. Williams "built an economic model to estimate the differences between (1) what Class Members paid for a project funded through a GreenSky-program loan and

United States District Court
Northern District of California

(2) what Class Members would have paid for the project in the but-for world where GreenSky did not charge the allegedly unlawful GreenSky transaction fees." (*Id.* ¶ 40.)  To determine values for the but-for world, Dr. Williams "estimate[d] the pass-through rate by merchants to Class Members based on GreenSky's transaction data" by "employ[ing] a multivariate pass-through regression." (*Id.* ¶ 48.)  He determined "the common pass-through rate to Class Members is 42.5%" with "over a 95% chance to be correct in rejecting that the pass-through rate is lower than 38.0% or higher than 46.9%." (*Id.* ¶¶ 48, 55.)  This means, "all else equal, for a one dollar GreenSky transaction fee to a merchant, 42.5 cents are passed-through to the Class Members by the merchant to consumers using a GreenSky-program loan." (*Id.* ¶ 56.)

Having arrived at a pass-through rate, Dr. Williams performed "five separate common-impact analyses" to confirm "that at least a portion of the GreenSky transaction fees was passed through to all Class Members." (*Id.* ¶ 57.)  First, Dr. Williams observed the 42.5% pass through rate "is economically and statistically significant," meaning "it is highly likely at least part of GreenSky's transaction fees were passed through in at least one transaction to all Class Members during the Class Period." (*Id.* ¶¶ 58 – 60.)  Second, he "re-estimat[ed] [his] pass-through regression for sub-groups of transactions based on categories of loan durations, two alternative definitions of groups of loan plans, and merchant size." (*Id.* ¶ 61.)  "[P]ositive and statistically significant pass-through rates [were] found for all categories." (*Id.* ¶ 63.)  Third, he observed "[l]ong-established economic theory demonstrates that price increases in cost components . . . will be passed through to all consumers." (*Id.* ¶ 65.)  Fourth, he concluded the home improvement industry has the characteristics of a highly competitive market, and "[t]he more competitive an industry, the higher the pass-through rate" because "profit margins are small, leaving firms little to no room to absorb costs." (*Id.* ¶ 69.)  And fifth, he reviewed GreenSky's communications encouraging merchants to pass the transaction fees on to consumers.  (*Id.* ¶ 76.)

As the final step, Dr. Williams estimated "[t]otal Classwide damages from GreenSky transaction fees equal $67.8 million, which is the product of (1) the total GreenSky transaction fee and (2) the pass-through rate." (*Id.* ¶ 84.)

**1.    Reliability**

Plaintiffs have established the statistical regression model Dr. Williams used was reliable. "A regression analysis is a common statistical tool . . . designed to isolate the influence of one particular factor . . . on a dependent variable." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1183 n.9 (9th Cir. 2002); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc., On Behalf of Itself & All Others Similarly Situated*, 143 S. Ct. 424, 214 L. Ed. 2d 233 (2022) (*"*Regression analyses are used to determine the relationship between an unknown [dependent] variable . . . and one or more independent variables . . . that are thought to impact the dependent variable.") Accordingly, using GreenSky's transaction data, Dr. Williams conducted a regression analysis to "isolate[] the effect of the GreenSky transaction fees on the loan principal by accounting for other factors that affect the loan principal." (Dkt. No. 239-14 ¶ 50.)

GreenSky's critiques of the regression analysis are not grounds for exclusion. First, GreenSky asserts Dr. Williams's opinions are not limited to damages" but also go to causation and injury—on which Dr. Williams has no expertise. (Dkt. No. 247-5 at 13.) GreenSky's argument is premised on a district court excluding Dr. Williams's report in a case about false advertising in the addiction treatment industry. *Grasshopper House, LLC v. Clean & Sober Media LLC*, No. 2:18-CV-00923-SVW-RAO, 2019 WL 12074086, at *11 (C.D. Cal. July 1, 2019). In *Grasshopper*, in conducting his regression analysis, Dr. Williams made decisions about the significance (or lack thereof) of factors—such as bad publicity about an addiction facility—when he had no expertise in false advertising or the addiction treatment industry on which to base them. *Id.* The court reasoned Dr. Williams's report was unreliable because he was "not qualified to be an expert in the field of causation of damages in the false advertising context, because to be so qualified, Dr. Williams would need to be an expert in false advertising." *Id.* But GreenSky has not identified opinions Dr. Williams rendered in this case he was not qualified to make. While Dr. Williams opined the home improvement industry "exhibit[s] the structural characteristics of highly competitive markets," this opinion was in the context of one of "five separate common-impact analyses" Dr. Williams conducted, not a part of his regression analysis. (Dkt. No. 239-14 ¶¶ 57,

7

1    69-75.)

2    At oral argument, GreenSky argued Dr. Williams assumed transaction fees result in an

3    increase in cost to the merchant.  But Dr. Williams, who "specialize[s] in the field[] of economics

4    referred to as industrial organization," was within his area of expertise in making such

5    determination.  (Dkt. No. 239-14 ¶ 1).  *See industrial economics,* Cambridge English Dictionary,

6    https://dictionary.cambridge.org/dictionary/english/industrial-economics ("the study of how

7    businesses in different industries operate and compete against each other and why they succeed or

8    fail").  And he supported his determination with literature demonstrating overcharges, including

9    those "driven by unlawful fees[,] . . . are ultimately borne by the final consumers of the affected

10   products or services."  (Dkt. No. 239-14 ¶¶ 65-66; *id.* at 66-73.)

11   What's more, GreenSky itself lacks evidence to support its assertion transaction fees do

12   not result in an increase in cost to the merchant.  To undermine Dr. Williams's assumption,

13   GreenSky relies on a conversation between its expert, Dr. Gurrea, and GreenSky's CEO.  From

14   this conversation, Dr. Gurrea came to "understand that merchants in the GreenSky Program may

15   experience increased sales volumes because of the easier access to credit they can offer to

16   consumers" and "[b]y spreading overhead costs over a greater volume of sales, merchants may

17   maintain or increase their profitability *without* needing to pass through merchant fees to

18   consumers."  (Dkt. No. 247-3 ¶ 40.)  Likewise, Dr. Gurrea "understand[s] that GreenSky estimates

19   that some 30 to 40 percent of merchants in the GreenSky Program" "take[] the merchant fees out

20   of the salesperson's commission," so Dr. Williams's assumption "that the imposition of merchant

21   fees increases merchants' costs" is incorrect.  (Dkt. No. 247-3 ¶ 38.)  But Dr. Gurrea's

22   understanding of GreenSky's model, gleaned from a conversation with GreenSky's CEO, is

23   insufficient to render Dr. Williams's assumption unreliable so as to warrant exclusion.  Put

24   another way, the Court has no reason to disregard Dr. Williams's attestation that if "30-40% of

25   merchants have a practice of taking the merchant fees out of salesperson' commissions[,] . . . that

26   effect would be reflected in the class transaction data [he] used," which would in turn "be reflected

27   in the results of [his] pass-through regression and robustness checks."  (Dkt. No. 255-4 ¶ 7.)

28   Furthermore, Dr. Williams's findings are both premised on and consistent with GreenSky's

United States District Court
Northern District of California

8

"internal communications and documents demonstrating that GreenSky encouraged merchants to pass on the GreenSky transaction fee to consumers." (Dkt. No. 239-14 ¶¶ 76-80.) For example, Dr. Williams observes the GreenSky training manual instructs merchants "if you assume that 50% of your customers will use financing and your average merchant fee [GreenSky transaction fee] will be 5%, you could increase all prices by 2.5%." (*Id.* ¶ 77.) Dr. Williams also reviewed an email from GreenSky's Client Growth Manager to a merchant in which the Client Growth Manager "provided three loan plans offered by GreenSky and helped [the merchant] calculate the total contract prices he should charge to consumers to compensate for the GreenSky transaction fees." (*Id.* ¶ 80.) So, contrary to GreenSky's insistence that Dr. Williams's assumptions are unsubstantiated, record evidence supports Dr. Williams's findings.

Finally, in a footnote in its reply, GreenSky writes "[a]s Dr. Gurrea observes, Williams' regression suffers from endogeneity, a point Plaintiffs fail to address in their Opposition and that Williams fails to address in his 'Responsive Declaration.'" (Dkt. No. 262-3 at 7 n.3.) Plaintiffs fail to address endogeneity in their Opposition because GreenSky did not raise it in its Motion. So, the "endogeneity" reply brief footnote argument is waived. *See Autotel v. Nevada Bell Tel. Co.,* 697 F.3d 846, 852 n.3 (9th Cir. 2012). In any event, in his report, Dr. Williams acknowledges his regression model "may suffer from . . . 'endogeneity,' which may lead to a biased estimate of the pass-through rate." (Dkt. No. 239-14 ¶ 51.) He therefore applies a "well-known and widely accepted solution" through use of an instrument variable "which (1) is correlated with the explanatory variable (the GreenSky transaction fees), (2) does not affect the loan principal directly, and (3) is not correlated with the error term." (*Id.* ¶ 52.) GreenSky's single footnote does not explain why the solution Dr. Williams employed was inherently unreliable, so any endogeneity in Dr. Williams's equation goes to weight, not admissibility.

### 2.   Common Impact

In addition to challenging the premise of Dr. Williams's report, GreenSky argues the report is unreliable because it is incapable of demonstrating class-wide impact. First, GreenSky refers to Dr. Gurrea's observation that applying Dr. Williams's regression model, "nearly one-third of the proposed class, including Plaintiff Heidi Barnes, was not impacted by the merchant fees." (Dkt.

United States District Court
Northern District of California

No. 247-3 at 19-20.)  Dr. Gurrea explains that when the loan amount equals the credit limit, "the loan amount is perfectly predicted by the credit limit, and therefore the pass-through rate is zero under [Dr. Williams's] model."  (Dkt. No. 247-3 at 20.)  The Court is not persuaded.  Whereas Dr. Williams's regression analysis was based on all available GreenSky transaction data, Dr. Gurrea's finding was based on a pre-selected subset of that data.  As Dr. Williams explains and demonstrates by running his regression on samples when the loan amount is a fixed proportion of the credit limit, such pre-selection or "cherry-picking" of data "guarantees ex ante that the regression will find a zero pass-through rate regardless of the values of loan amounts and merchant fees in the actual data sample."  (Dkt. No. 255-4 ¶¶ 17-18.)  So, Dr. Gurrea's selection of data with a specified relationship between two of the variables does not render Dr. Williams's finding of classwide impact unreliable.

Second, Dr. Gurrea contends the substantial variation in the robustness checks refutes common impact.  In his report, after determining the estimated pass-through rate, Dr. Williams conducted five common-impact analyses.  (Dkt. No. 239-14 ¶ 57.)  In one of the analyses, Dr. Williams ran his regression on subsamples of loans to determine whether the regression produced a "positive and statistically significant pass-through rate[]" for each level."  (*Id.* ¶ 63.)  As Dr. Gurrea observed, when Dr. Williams categorized loans by duration (<= 3 years, > 3 & <= 5 years, >5 & <= 10 years, and > 10 years), there was a disparity of 70 percentage points in the pass through-rate estimates: the average pass-through rate estimate for loans with a duration of less than three years was 87.9%, and the average pass-through rate for loans with a duration of between three and five years was 17.9%.  (Dkt. No. 247-3 at 27.)  Dr. Gurrea contends this variation undermines Dr. Williams's finding of common impact pursuant to the publication Dr. Williams cites in his report, which states where robustness checks reveal "estimated effects that vary widely or are nonsensical," this "would suggest that the alleged misconduct did not result in a common impact for all members of the proposed class."  (Dkt. No. 247-3 at 24-25 (quoting American Bar Association, *Econometrics: Legal, Practical, and Technical Issues* 357 (2nd ed. 2014) ("ABA Econometrics")).)  While such disparities may render Dr. Williams's model unpersuasive to a jury, they are not a basis for exclusion.  The analysis Dr. Gurrea critiques was

10

one of five conducted to confirm common impact, so the purpose was not to estimate the pass-through rate—which would be inappropriate given subsets of data were used—but to determine whether the rate was positive and statistically significant.  (*Id.* ¶¶ 63-64.)  Moreover, the ABA Econometrics text states a wide variance "*would suggest* that the alleged misconduct did not result in a common impact," not that such variance necessarily precludes a finding of common impact. (Dkt. No. 247-3 at 26 (emphasis added).)

Finally, GreenSky argues the 42.5% figure merely represents average impact, not common impact.  But Dr. Williams's methodology for assessing common impact was consistent with the literature both parties cite.  While a regression analysis "yields an estimate of *average* impact," "additional regression specifications[] may be used to test whether the average effect represented by a single coefficient from a classwide regression masks widely varying individual effects that require individualized inquiry, *or whether it truly reflects common impact*."  ABA Econometrics at 357 (emphases added).  As described above, Dr. Williams ran "five separate common-impact analyses" to verify "at least a portion of the GreenSky transaction fees were passed through to all Class Members."  (Dkt. No. 239-14 at 27.)  So, in accordance with the literature both parties cite, Dr. Williams's methodology to determine common impact was reliable.

So, the Court DENIES GreenSky's motion to exclude Dr. Williams's opinion as to transaction fees.

### B.    Performance Fees

To calculate performance fees, Dr. Williams reviewed an "all-bank monthly servicing report produced by GreenSky that contains performance fees across all banking partners" for a five-month period.  (Dkt. No. 239-14 ¶ 87.)  From these reports, he confirmed "that total performance fees from GreenSky's 10-K's are reliable."  (*Id.*)  Dr. Williams also reviewed "monthly datasets on performance fees," which "provide[d] a second validation that the total performance fees from GeenSky's 10-K's are reliable."  (*Id.* ¶ 88.)  From these figures, Dr. Williams calculated "California consumers' share among national consumers," and then "class members' share of California performance fees."  (*Id.* at 46-50.)  Dr. Williams determined California performance fees amount to ███ of the national performance fees and class members

11

1    amount to 80.1% of California consumers.  (*Id.* ¶ 94.)  He thus estimated the damages in

2    GreenSky performance fees to class members at $67,251,816.  (*Id.*)

3    GreenSky argues Dr. Williams's analysis should be excluded because it incorrectly

4    assumes every putative class member paid interest that contributed to performance fees.  But as

5    Plaintiffs point out, "Dr Williams never opined that all class members paid interest that triggered

6    performance fees"; rather, his "analysis was confined to calculating classwide damages resulting

7    from performance fees."  (Dkt. No. 255-3 at 29.)

8    GreenSky also argues for exclusion on the ground Dr. Williams "does not offer any

9    methodology whatsoever for quantifying injury attributable to performance fees for any individual

10    putative Class member."  (Dkt. No. 247-5 at 29 (quoting Dkt. No. 247-3 ¶ 90).)  While

11    individualized questions as to damages may preclude class certification, they are not a basis for

12    challenging the reliability of Dr. Williams's assessment of classwide damages.  So, the Court

13    DENIES GreenSky's motion to exclude Dr. Williams's opinion on performance fees.

## II.    SUMMARY JUDGMENT

15    GreenSky asserts it is entitled to summary judgment on each of Plaintiffs' claims because

16    Plaintiffs have failed to adduce evidence of injury.  Alternatively, GreenSky argues summary

17    judgment should be entered on (1) two of Plaintiffs' UCL claims, and (2) Ms. Barnes's Credit Act

18    and unjust enrichment claims.  Finally, GreenSky seeks summary judgment on Plaintiffs' claims

19    for injunctive relief.

### A.    Legal Standard

21    Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant

22    shows that there is no genuine dispute as to any material fact and the movant is entitled to

23    judgment as a matter of law."  The moving party bears the initial burden of demonstrating the lack

24    of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  "[T]he burden then moves to

25    the opposing party, who must present significant probative evidence tending to support its claim."

26    *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (cleaned up).

27    In ruling on a motion for summary judgment, the Court must "view the evidence presented

28    through the prism of the substantive evidentiary burden."  *Anderson v. Liberty Lobby, Inc.*, 477

United States District Court
Northern District of California

12

1  U.S. 242, 254 (1986).  The evidence of the non-movant is to be believed, and all justifiable

2  inferences are to be drawn in the non-movant's favor.  *Id.* at 255.  "Credibility determinations, the

3  weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

4  functions, not those of a judge… ruling on a motion for summary judgment."  *Id.*

5  **B.  Injury**

6  GreenSky asserts it is entitled to summary judgment on each of Plaintiffs' causes of action

7  because Plaintiffs have failed to adduce evidence of injury.  Specifically, GreenSky argues

8  Plaintiffs have failed to produce evidence (1) GreenSky Program merchants passed through to

9  them any portion of the transaction fee, and (2) Plaintiffs paid any part of the performance fee.

10  Each of Plaintiffs' claims requires proof of injury.  *See* Cal. Civ. Code § 1789.21 ("[a]ny

11  consumer injured by a violation" of the Credit Act "may bring any action for recovery of damages,

12  or for injunctive relief, or both"); Cal. Bus. & Prof. Code § 17204 (under the UCL, "a person who

13  has suffered injury in fact and has lost money or property as a result of the unfair competition"

14  may seek relief); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1594 (2008) (requiring

15  plaintiff to allege "actual injury to bring an unjust enrichment claim").  Plaintiffs allege financial

16  harm as their injury, arguing they "paid more than [they] otherwise would have . . . including in

17  the form of increased project costs."  (Dkt. No. 216 ¶¶ 77, 87.)  As explained below, Plaintiffs

18  presented evidence creating a dispute of fact as to injury resulting from transaction fees, but

19  Plaintiffs have not presented evidence creating a dispute of fact as to performance fees.

20  **1.  Transaction Fees**

21  Plaintiffs assert Ms. Barnes and Mr. Ferguson were injured by GreenSky's transaction fees

22  because their contractors passed through a portion of the transaction fee to them.  (Dkt. No. 216 ¶¶

23  77, 87.)  Plaintiffs provide sufficient evidence tending to support their claim of injury through Dr.

24  Williams's report.  (Dkt. No. 239-14.)  Dr. Williams concluded every class member paid

25  transaction fees in the form of inflated project costs.  (Dkt. No. 239-14 ¶ 57.)  This means Ms.

26  Barnes and Mr. Ferguson paid transaction fees in the form of inflated project costs, too.

27  GreenSky contends Dr. Williams's report contradicts the sworn declaration of the

28  president of Reliable Home Improvement, Inc., the company Ms. Barnes contracted with for the

United States District Court
Northern District of California

United States District Court
Northern District of California

patio project.  (Dkt. No. 263-2.)  The Reliable Home Improvement president attests the company has never "passed through[] any portion of the merchant fee to its customers that use a GreenSky[] Program loan to pay," and specifically, as to Ms. Barnes, the company "did not pass through, or surcharge, any portion of that merchant fee" to her.  (*Id.* ¶¶ 7, 13.)  But "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor."  *See Anderson*, 477 U.S. at 255.  In light of Dr. Williams's report, there is a genuine dispute as to whether Ms. Barnes paid a portion of the transaction fee and thus suffered an economic injury.

The same is true for GreenSky's critiques of Dr. Williams's report, which it raises in a footnote.  (Dkt. No. 253-3 at 19 n.2.)  GreenSky essentially asks the Court to discredit Dr. Williams's conclusion "that at least a portion of the GreenSky transaction fees was passed through to all Class Members."  (Dkt. No. 239-14 ¶ 57.)  Having concluded the report is admissible, *see supra,* such weighing of evidence is inappropriate on a motion for summary judgment.

The Court is not persuaded by GreenSky's emphasis on Ms. Barnes's and Mr. Ferguson's testimony.  As GreenSky observes, Ms. Barnes and Mr. Ferguson testified they do not know whether any portion of the merchant fee was passed on to them.  (Dkt. No. 241-54 at 48 ("Q. Well, my question was, you don't know if you paid more, sitting here today; correct? . . . A [Ms. Barnes]. Correct."); Dkt. No. 241-55 at 33 ("Q: [D]o you have any facts today that would support your belief that notwithstanding that contractual statement, that your merchant is prohibiting from surcharging you to cover the cost of these transaction fees, that Peter Levi Plumbing did it anyway? . . . [MR. FERGUSON]: Sitting here at the table today, I don't have any facts in front of me.").)  But GreenSky does not explain why Ms. Barnes and Mr. Ferguson would or should possess knowledge about how merchants build overhead costs—including, according to Plaintiffs' allegations, transaction fees—into their quoted estimates.

Meanwhile, GreenSky does not meaningfully address Plaintiffs' evidence supporting an inference merchants passed on at least a portion of the transaction fee in accordance with GreenSky's instructions.  (Dkt. No. 239-8 at 13 (GreenSky e-book advising merchants to treat the transaction fee "as a marketing expense," which "spreads the cost among all of your customers"); Dkt. No. 239-19 (GreenSky Merchant Training slides instructing merchants to "treat financing

1  costs like any overhead and build the cost of financing into all projects").)  Because Dr.

2  Williams's report provides evidence Ms. Barnes and Mr. Ferguson were injured by the transaction

3  fees, the Court declines to enter summary judgment on this ground.

### 2.   Performance Fees

5  Regarding performance fees (also referred to as "incentive payments"), Plaintiffs allege

6  "[t]he cost of the incentive payments are . . . borne directly by consumer-borrowers as the

7  incentive payments are taken from the interest paid by consumer-borrowers on their loans." (Dkt.

8  No. 216 ¶ 46.)  So, under Plaintiffs' theory, the borrower must have paid interest on their

9  GreenSky loan to suffer injury.  It is undisputed Mr. Ferguson did not pay interest on his loan.

10 (Dkt. No. 241-55 at 39, 41.)  So, Plaintiffs agree to dismiss his claims related to performance fees.

11 (Dkt. No. 266-3 at 32.)

12 As to Ms. Barnes, Plaintiffs set forth several theories of injury.  First, Plaintiffs assert

13 GreenSky's collection of performance fees violates section 1789.13(d)(2) of the Credit Act, and

14 such violation constitutes an injury.  Section 1789.13(d)(2) prohibits a credit services organization

15 that refers a consumer to another lender from receiving money derived from the consumer's

16 payments to that lender:

> A credit services organization . . . shall not . . . [c]harge or receive any
> money or other valuable consideration for referral of the consumer to
> a retail seller or other credit grantor who will or may extend credit to
> the consumer, if . . . [t]he money or consideration is paid by the credit
> grantor or is derived from the consumer's payments to the credit
> grantor for costs, fees, finance charges, or principal.

21 Cal. Civ. Code § 1789.13(d)(2).  Plaintiffs assert GreenSky, as a credit services organization,

22 violated this provision by receiving money derived from Ms. Barnes's payments to her lender,

23 InTrust Bank.  They provide the following evidence: (1) GreenSky referred Ms. Barnes to another

24 credit grantor, InTrust Bank (Dkt. No. 241-54 at 15); (2) Ms. Barnes paid interest on her loan to

25 InTrust Bank (Dkt. No. 267-7); (3) during the period Ms. Barnes paid interest, GreenSky received

26 money from InTrust Bank  (Dkt. No. 239-18 at 5); and (4) the amount of money GreenSky

27 received from InTrust Bank was based in part on interest payments.  (Dkt. No. 235-7 at 33.)

28 Drawing all inferences in Plaintiffs' favor, the money InTrust paid GreenSky was derived in part

United States District Court
Northern District of California

from Ms. Barnes's interest paid to InTrust—a violation of section 1789.13(d)(2).

But Plaintiffs' argument that such violation alone establishes injury is unpersuasive. Plaintiffs cite cases when the payment of an illegal fee constituted injury, but those cases were premised on the notion that injury occurs when "plaintiffs spen[d] money that, absent defendants' actions, they would not have spent." *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011). That is, because the defendant could not lawfully charge the fee, the plaintiffs in those cases—by paying the fee—spent money they otherwise would not have spent. *See Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 801 (N.D. Cal. 2021) (the plaintiff "has shown such an injury each time he paid the $7.50 fee charged by the defendants"); *Miller v. Travel Guard Grp., Inc.*, No. 21-CV-09751-TLT, 2023 WL 7106479, at *1 (N.D. Cal. Sept. 15, 2023) (finding injury when the plaintiffs alleged they "were charged a fee for [the defendants'] supposed assistance service on top of the applicable insurance premium rate Defendants were authorized to charge"); *Foreman v. Bank of Am., N.A.*, 401 F. Supp. 3d 914, 917 (N.D. Cal. 2019) (finding injury where "Plaintiffs allege that [the defendant's] $30 stop-payment fee violate[d] the Electronic Fund Transfer Act"). Here, in contrast, Ms. Barnes did not pay a fee GreenSky was not authorized to levy; Plaintiffs do not contend Ms. Barnes was entitled to an interest-free loan. If Ms. Barnes paid the same amount of interest she paid, and GreenSky did not collect any portion of it, Ms. Barnes was not injured. So, by itself, Ms. Barnes's payment of interest on the loan GreenSky originated does not constitute injury.

Plaintiffs' alternative injury theory—that GreenSky set the interest rate on Ms. Barnes's loan at a rate higher than the bank would otherwise require, so Ms. Barnes spent money she would not have spent absent GreenSky's allegedly unlawful conduct—lacks sufficient evidentiary support. ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████ (Dkt. Nos. 235-8 at 5 (████████████████████████████████████████████
████████████████████████████
██████████); 235-16 at 44 (████████████████████████████████████████
██████████); *id.* at 141 (████████████████████████████████████████████████); 235-18 at 3-4

16

(████████████████████████████████████████████████████████████████████

████); Dkt. No. 235-8 at 6 (████████████████████████████████████████

██████████████████████████████████); *id.* at 8 (███████████████████).)

Plaintiffs also presented evidence it is in GreenSky's interest to increase interest rates to

generate higher performance fees.  For example, in its Form 10-K, GreenSky states:

> The fixed interest rates charged on the loans that our Bank Partners
> originate are calculated based on margin above the market benchmark
> at the time of origination.  **Increases in the market benchmark
> would result in increases in the interest rates on new loans, and
> correspondingly an increase in the agreed upon Bank Partner
> portfolio yield, which impacts future incentive payments**. . . . We
> are able to manage some of the interest rate risk impact on our FCR
> liability through the types of loan products that we design and make
> available to our Bank Partners for funding (e.g. **higher interest rate
> products, all else equal, result in higher incentive payments**.)

(Dkt. No. 235-5 at 8 (emphases added); Dkt. No. 266-5 at 3 █████████████████████

████████████████).)  But assuming a reasonable trier of fact could find Greensky had an incentive

(and ability) to set interest rates to maximize performance fees, the record does not include

evidence GreenSky did so for every loan.  In fact, the evidence Plaintiffs cite describes risks

involved in setting high interest rates:

> [I]ncreased interest rates may adversely impact the spending levels of
> our merchants' customers and their ability and willingness to borrow
> money.  Higher interest rates often lead to higher payment
> obligations, which may reduce the ability of customers to remain
> current on their obligations to our Bank Partners and, therefore, lead
> to increased delinquencies, defaults, customer bankruptcies and
> charge-offs, and decreasing recoveries, all of which could have a
> material adverse effect on our business.

Dkt. No. 235-5 at 8.)  So, the record does not support a finding Greensky always set interest rates

higher than what the consumer could otherwise obtain.

Nor does the evidence support a finding Ms. Barnes in particular paid more interest than

InTrust (or any other bank) would have charged her for a similar loan, let alone that the higher rate

was caused by the performance fees.  There are no documents from InTrust reflecting interest

rates.  No deposition testimony.  And no expert regression analysis.  And, indeed, Ms. Barnes

herself thought she received a good interest rate.   (Dkt. No. 241-54 at 50 ("I don't think the

interest rate is too high.  It's a good interest rate.").  In light of this record, no reasonable trier of

fact could find Ms. Barnes in particular paid a higher interest rate than she would have paid absent InTrust's payment of performance fees and so "spent money that, absent defendants' actions, [she] would not have spent." *See Maya*, 658 F.3d at 1069.

Plaintiffs have yet a third theory of injury. They insist Ms. Barnes was injured because she contributed to GreenSky's unjust enrichment. "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (9th Cir. 2020). Under this theory, "Plaintiffs must allege they retain a stake in the profits garnered . . . because the circumstances are such that, as between the two [parties], it is *unjust* for [the defendant] to retain it." *Id.* (cleaned up). But the cases Plaintiffs cite for this theory of injury involved individuals' stake in their online data. *Id.*; *see also Brooks v. Thomson Reuters Corp.*, No. 21-CV-01418-EMC, 2023 WL 9316647, at *7 (N.D. Cal. Aug. 10, 2023) ("Plaintiffs have alleged that their data carries financial value and that the defendant profited from this valuable data") (quotation marks omitted); *In re Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1012 (N.D. Cal. 2020) ("Plaintiffs have also shown that they retain a stake in the profits garnered from their search terms in that the search terms were disclosed without Plaintiffs' consent and in spite of Google's promises to the contrary."). These cases are inapposite as Ms. Barnes does not allege Greensky profited from her personal data without paying for it. At bottom, this injury theory is no different from Plaintiffs' unsuccessful first theory that Ms. Barnes was injured so long as the performance fee was unlawful.

Finally, even apart from Ms. Barnes' failure to show she suffered injury as required by the statutes, the summary judgment record also suggests she did not suffer an injury sufficient to satisfy Article III standing for the performance fee claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding the plaintiff bears the burden of establishing standing by showing the challenged conduct caused an injury-in-fact); *see also Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."); *Iten v. Los Angeles*, 81 F.4th 979, 984 (9th Cir. 2023) ("federal courts have a duty to raise, sua sponte, questions of standing"). While "an intangible injury may be concrete if

United States District Court
Northern District of California

United States District Court
Northern District of California

it presents a material risk of tangible harm or has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts, like common law torts or certain constitutional violations," *Phillips*, 74 F.4th at 991 (internal quotation marks and citations omitted), Ms. Barnes paying interest on a loan does not fall into those categories.

In sum, the Court DENIES GreenSky's motion for summary judgment on the transaction fee claims but GRANTS the motion for summary judgment on the performance fee claims.

## C.    UCL Claims (Count II)

In the alternative to arguing summary judgment should be entered on all of Ms. Barnes and Mr. Ferguson's claims, GreenSky seeks summary judgment on two UCL claims. As the Court has granted summary judgment on the performance fees claims, it considers GreenSky's arguments only in connection with the transaction fee claims.

### 1.    California Financing Law

The California Financing Law applies to a "finance lender," defined as any person "engaged in the business of making of consumer loans." Cal. Fin. Code § 22009. The Law also applies to a "broker," defined as any person "engaged in the business of negotiating or performing any act as broker in connection with loans made by a finance lender." *Id.* § 22004. The Law provides that no person shall engage as a finance lender or broker without being licensed by the state. *Id.* § 22100. Plaintiffs allege Greensky is a finance lender and/or broker, but did not obtain a license, and that it violated several Financing Law provisions. (Dkt. No. 216 ¶¶ 115-16.) Greensky moves for summary judgment on Plaintiffs' UCL claim to the extent it is predicated on a violation of sections 22305 and 22400.

#### a.    Section 22305

Section 22305 provides:

> [A] licensee may contract for and receive an administrative fee, which shall be fully earned immediately upon making the loan, with respect to a loan of a bona fide principal amount of not more than two thousand five hundred dollars ($2,500) at a rate not in excess of 5 percent of the principal amount (exclusive of the administrative fee) or fifty dollars ($50), whichever is less, and with respect to a loan of a bona fide principal amount in excess of two thousand five hundred

dollars ($2,500), at an amount not to exceed seventy-five dollars ($75).

Cal. Fin. Code § 22305. So, it caps administrative fees at $50 and $75, depending on the size of the loan. But the cap "do[es] not apply to any loan of a bona fide principal amount of five thousand dollars ($5,000) or more." Cal. Fin. Code § 22250(b). Plaintiffs allege GreenSky charges administrative fees in excess of $50 (for loans of $2500 or less) and $75 (for loans more than $2500) in violation of § 22305. Greensky moves for summary judgment on the grounds that—assuming it is a financial lender or broker within the meaning of the Finance Law— no reasonable trier of fact could find it charges Ms. Barnes or Mr. Ferguson an unlawful administrative fee.

Because Ms. Barnes's loan was more than $5,000, and the Financing Law cap does not apply to loans over $5,000, GreenSky is entitled to summary judgment on her section 22305 claim. (Dkt. No. 216 ¶ 74 (stating Ms. Barnes "financed $7,500 through the GreenSky loan program")); Cal. Fin. Code § 22250(b).

As to Mr. Ferguson's loan, drawing all inferences in his favor, the evidence is sufficient to support a violation of section 22305. Plaintiffs provide evidence Mr. Ferguson's contractor paid GreenSky a transaction fee of $107.79, which exceeds the $50 fee a licensee may collect on his loan of $1,791. (Dkt. No. 239-15 at 2-3.) *See* Cal. Fin. Code § 22305 (on a loan where the principal amount is less than $2,500, "a licensee may contract for and receive an administrative fee . . . at a rate not in excess of . . . fifty dollars"). So, a reasonable trier of fact could find GreenSky violated the statute's plain text.

Moreover, Plaintiffs present evidence this violation of section 22305 injured Mr. Ferguson even though his contractor paid the fee to GreenSky. According to Dr. Williams, all merchants passed through at least some of the transaction fee to the borrower. (Dkt. No. 239-14 ¶ 57.) Specifically, Dr. Williams found a common pass-through rate of 42.5%. (*Id.* ¶ 56.) Accepting Plaintiffs' evidence as true, of the $107.79 transaction fee Mr. Ferguson's contractor paid GreenSky, Mr. Ferguson paid about $46 ($107.79 x .425 = $45.81). Had GreenSky complied with section 22305 and collected a $50 transaction fee from Mr. Ferguson's contractor, applying the

same 42.5% pass-through rate, Mr. Ferguson would have paid approximately $21 ($50 x .425 = $21.25).  The delta between what Mr. Ferguson paid on the $107.79 transaction fee and what he would have paid on a $50 transaction fee constitutes injury.

GreenSky argues that, accepting Dr. Williams's pass-through rate, Mr. Ferguson himself paid less than $50 in pass-through costs and therefore section 22305 was not violated.  But the plain language of section 22305 does not cap the fee paid by the borrower; instead, it caps the fee the finance lender/ broker "may contract for *and receive*."  Cal. Fin. Code § 22305 (emphasis added); *see also Garcia v. McCutchen,* 16 Cal. 4th 469, 476 (1997) (explaining the "first step" in interpreting a California statute "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning").  GreenSky does not cite any statutory language to support its narrow reading of the statute as applying only to amounts *paid by the consumer* as opposed to amounts *received by the finance lender/broker.*  As the record supports a finding GreenSky *received* more than $50 on Mr. Ferguson's loan, Greensky has not met its burden of proving it did not violate section 22305 as a matter of law.

Plaintiffs argue in the alternative section 22305 permits only licensees to receive administrative fees, so GreenSky violated this provision by charging administrative fees without a license.  As a preliminary matter, Plaintiffs' Third Amended Complaint does not plead this theory of a section 22305 violation.  Instead, its UCL claim predicated on Financing Law violations pleads only that Greensky received a fee in excess of the applicable cap, not that it had no right to charge a fee in the first instance.  (Dkt. No. 216 ¶ 116(f) ("In connection with making and brokering consumer loans, GreenSky charges administrative fees in excess of $50 for loans of $2500 or less, and $75 for loans more than $2500, in violation of Cal. Fin. Code § 22305").)

Second, by its plain terms section 22305 does not prohibit non-licensees from charging a fee; instead, it sets caps for licensees. The cases Plaintiffs cite, which involve entirely different circumstances, do not stand for the proposition a party violates section 22305 by operating without a license.  In *Chaudhry v. Smith*, for example, the court considered whether the plaintiffs adequately alleged a violation of their procedural due process rights.  No. 1:16-CV-1243-LJO-MJS, 2016 WL 8730762, at *5, 8 (E.D. Cal. Dec. 16, 2016).  The *Chaudhry* court did not find a

United States District Court
Northern District of California

1  violation of the California Health and Safety Code due to a party's lack of license; instead, it

2  observed the plaintiff's lack of licensee status precluded an opportunity to challenge findings

3  made against him.  *Id.* at *8; *see also Pankratz Lumber Co. v. FERC,* 824 F.2d 774, 776 (9th Cir.

4  1987) (discussing "the issuance of licenses to construct and operate hydroelectric projects").

5       In sum, because Plaintiffs provide evidence GreenSky violated section 22305 by receiving

6  more than $50 on Mr. Ferguson's loan, the Court DENIES summary judgment as to his claim.

7  The Court GRANTS summary judgment on Ms. Barnes's section 22305 claim.

8           **b.**     **Section 22400**

9       GreenSky contends it is entitled to summary judgment on Plaintiffs' claim under the UCL

10  that "[d]espite precomputing its charges, GreenSky does not provide borrowers a rebate of the pro-

11  rata portion of the precomputed charge when the loan contract is paid off in full, in violation of

12  Cal. Fin. Code § 22400."  (Dkt. No. 253-3 at 24 (quoting Dkt. No. 216 ¶ 116(h).)  Plaintiffs agree

13  to dismissal.  (Dkt. No. 266-3 at 32 ("Neither Plaintiff intends to pursue claims under Cal. Fin.

14  Code § 22400.).)  So, the Court enters summary judgment in favor of GreenSky on Plaintiffs'

15  UCL claim predicated on section 22400.

16       **D.**     **Statute of Limitations**

17       Next, Greensky argues Ms. Barnes's Credit Act and unjust enrichment claims are barred

18  by the three-year statutes of limitations.  *See* Cal. Civ. P. § 338 (setting three-year statute of

19  limitations for liability based on a statute like the Credit Act); *Fed. Deposit Ins. Corp. v. Dintino*,

20  167 Cal. App. 4th 333, 348 (2008) (stating unjust enrichment claim is governed by the three-year

21  statute of limitations set forth in Cal. Code Civ. Pro § 338(d)).  It is undisputed Ms. Barnes

22  obtained her GreenSky loan more than three years before the present case was filed.  (Dkt. No.

23  266-3 at 24.)

24           **1.**     **Discovery Rule**

25       Plaintiffs argue the statutes of limitations for Ms. Barnes claims were tolled pursuant to the

26  discovery rule, which "postpones accrual of a cause of action until the plaintiff discovers, or has

27  reason to discover, the cause of action."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 807

28  (2005).  A "plaintiff has reason to discover a cause of action when he or she has reason at least to

suspect a factual basis for its elements." *Id.* (quotation marks omitted). "Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." *Id.* "[T]o rely on the discovery rule for delayed accrual of a cause of action," a plaintiff must establish "(1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.'" *Id.* (quotation marks omitted).

Ms. Barnes has done so here. First, the evidence supports an inference Ms. Barnes first learned about GreenSky's unlawful activities in February 2020 when she read about Ms. Belyea's lawsuit against GreenSky on the Top Class Actions website. (Dkt. No. 66-1 ¶ 5; 267-5 at 9; 241-54 at 61-62.) Second, the evidence supports an inference Ms. Barnes could not have discovered the unlawful conduct earlier. The loan agreement Ms. Barnes received from GreenSky in 2016 explicitly stated the contractor (not the borrower) paid the transaction fee. (Dkt. No. 241-9 at 7.) The agreement continued that the contractor "is prohibited from surcharging you to cover the costs of these transaction fees." (*Id.*) So, a reasonable trier of fact could find Ms. Barnes would have no reason to suspect she paid a portion of the transaction fee.

GreenSky contends the loan agreement gave rise to a duty to investigate, but a "plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate." *Nelson v. Indevus Pharms., Inc.*, 142 Cal. App. 4th 1202, 1206 (2006). A trier of fact could find a reasonable consumer would assume a loan agreement stating the contractor cannot pass through fees indicates the contractor did not pass through fees. *See Bally v. State Farm Life Ins. Co.*, 536 F. Supp. 3d 495, 516 (N.D. Cal. 2021) (concluding "class members had no duty to inquire into the calculations behind [the defendant's] cost of insurance rates because. . . a reasonable policyholder could understand that the cost of insurance rate . . . did not include expenses."). Because the loan agreement disclaimed the conduct Plaintiffs allege is illegal, Ms. Barnes was under no obligation to call GreenSky to inquire further. *See Dan's Deals LLC v. Sunspotweb, Inc.*, No. SACV 19-01248-CJC (PLAx), 2019 WL 8621439, at *3 (C.D. Cal. Dec. 10, 2019) ("[U]nder California law, a contracting party has no obligation to continually monitor whether the other party is performing

1   some act inconsistent with one of the many possible terms in a contract") (quotation marks

2   omitted).

3        In sum, Plaintiffs have presented sufficient evidence to create a genuine dispute of fact as

4   to whether Ms. Barnes's claims were tolled under the discovery rule, so the Court DENIES

5   GreenSky's request to enter summary judgment in its favor on this basis.[2]

6                    **2.      Voluntary Payment Doctrine**

7        GreenSky also argues Ms. Barnes's claims are barred by the voluntary payment doctrine,

8   which "bars the recovery of money that was voluntarily paid with full knowledge of the facts."

9   *Hilario v. Allstate Ins. Co.*, No. 20-CV-05459-WHO, 2020 WL 7643233, at *6 (N.D. Cal. Dec.

10  23, 2020).  As GreenSky observes, Ms. Barnes "still made payments" on her GreenSky loan after

11  learning in February 2020 of GreenSky's alleged legal violations.  (Dkt. No. 241-54 at 70.)  So,

12  according to GreenSky, "the voluntary payment doctrine bars Barnes from recovering the

13  payments she knowingly and voluntarily paid after supposedly discovering GreenSky's alleged

14  acts and omissions."  (Dkt. No. 253-3 at 29.)

15       While "the California Supreme Court and Ninth Circuit have yet to address whether the

16  voluntary payment doctrine applies to consumer protection claims," "courts within this circuit . . .

17  have held that applying the defense to such claims contravenes the public policy underlying

18  consumer fraud statutes."  *Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 800 (N.D.

19  Cal. 2021); *see, e.g.*, *Bautista v. Valero Mktg. & Supply Co.*, No. 15-CV-05557-RS, 2018 WL

20  11356583, at *4 (N.D. Cal. Dec. 4, 2018) ("California's policy of liberally construing consumer

21  protection statutes . . . strongly suggests applying the voluntary payment defense here would run

22  contrary to public policy and legislative intent."); *Sanders v. LoanCare, LLC*, No. CV 2:18-09376

23  SJO (RAOx), 2019 WL 12340195, at *8 (C.D. Cal. Sept. 16, 2019) ("applying the voluntary

24  payment doctrine here [to the plaintiffs' UCL claims] would be contrary to public policy").

25

26

27  _____

    [2] Plaintiffs also contend tolling is appropriate pursuant to fraudulent concealment and the
28  continuous-accrual doctrine.  Because the Court concludes there is a genuine dispute of fact under
    the discovery rule, it does not address arguments on either doctrine.

                                                24

United States District Court
Northern District of California

1    GreenSky states this is "not a majority position in GreenSky's view" but provides no

2    corresponding citations.  (Dkt. No. 268-3 at 15.)

3         Because the voluntary payment doctrine would undermine the goal of protecting

4    consumers and borrowers expressed in the Credit Act and Financing Law, the Court declines to

5    apply the doctrine to bar Ms. Barnes's claims.  *See* Cal. Civ. Code § 1789.11(b) (stating purpose

6    of the Credit Act is "to protect the public from unfair or deceptive advertising and business

7    practices"); Cal. Fin. Code § 22001(a)(4) (stating purposes of the Financing Law is "[t]o protect

8    borrowers against unfair practices by some lender").

9         **E.    Injunctive Relief**

10        GreenSky next contends it is "entitled to summary judgment on Plaintiffs' request for

11   injunctive relief on the basis that they lack standing to obtain such relief."  (Dkt. No. 253-3 at 29.)

12   Plaintiffs seek to require GreenSky to obtain the requisite licenses, provide consumers with the

13   requisite information, and form a written agreement before carrying out its services.  (Dkt. No.

14   216 at 23; Dkt. No. 235-3 at 32-33.)  Plaintiffs also seek to prohibit GreenSky from collecting fees

15   that exceed what is permitted by law.

16        Because such relief is prospective, Plaintiffs must demonstrate they "ha[ve] suffered or

17   [are] threatened with a 'concrete and particularized' legal harm . . . coupled with 'a sufficient

18   likelihood that [they] will again be wronged in a similar way.'"  *Bates v. United Parcel Service,*

19   *Inc.,* 511 F.3d 974, 985 (9th Cir. 2007) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111

20   (1983)).   A plaintiff must establish a "real and immediate threat of repeated injury."  *Bates,* 511

21   F.3d at 985.  The elements of standing "must be supported in the same way as any other matter on

22   which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required

23   at the successive stages of the litigation."  *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th

24   Cir. 2023).  So, at the summary judgment stage, "viewing the evidence in the light most favorable

25   to the nonmoving party," the Court determines whether there are any genuine issues of material

26   fact regarding Plaintiffs' standing to seek injunctive relief.  *In re ATM Fee Antitrust Litig.*, 686

27   F.3d 741, 748 (9th Cir. 2012).  If the movant establishes a genuine dispute as to any material fact,

28   "the court shall not grant summary judgment."  *Id.* at 747.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    GreenSky is entitled to summary judgment on Mr. Ferguson's claim for injunctive relief

2  because there is no evidence Mr. Ferguson will be injured again by GreenSky.  When asked

3  whether he had any home improvement plans "in the future, such as in the year 2024," Mr.

4  Ferguson said "No. I do -- I do as much as I can myself, self repair."  (Dkt. No. 241-55 at 19.)  He

5  later reiterated his intent to do repairs himself.  (*Id.* at 56 ("Q. I think you said earlier you don't

6  have present plans . . . in 2024 to make any home improvement projects; is that right? A. Yes. Q.

7  Or at least some that you would not self-fund or pay in cash? A. Yeah. I might do the work

8  myself, but – yeah.").)  In light of Mr. Ferguson's attestation he will conduct repairs himself or use

9  cash to pay for them, Mr. Ferguson has not established he faces "an imminent or actual threat of

10  future harm due to" GreenSky's allegedly unlawful practices. *Davidson v. Kimberly-Clark Corp.*,

11  889 F.3d 956, 971 (9th Cir. 2018).

12    Drawing all inferences in her favor, Ms. Barnes has established a real threat of repeated

13  injury.  Initially, when asked at her deposition whether she would "consider using the GreenSky

14  program for any future projects [she] might need to finance at [her] home," Ms. Barnes

15  equivocated:

16         Sure, if they want to tell me what the merchant fee is. No, I don't
       know.  I don't know.  I want to try not to finance things, if I don't
17         have to at this point.  And I don't have any big projects that I need to
       have done on the house.
18

19  (Dkt. No. 241-54 at 83.)  When asked again whether she would use the GreenSky program if it

20  was definitively shown her contractor did not pass through any portion of the transaction fee, Ms.

21  Barnes stated it was possible:

22         I'd still have to think about the terms of the loan, what the interest rate
       is, and if I actually knew that I wasn't being charged a fee, if there
23         weren't any hidden fees, if everything was up front, possibly.

24   (*Id.*)  With the reply brief, Ms. Barnes submitted a declaration describing home repair projects

25  she plans to undertake "[w]ithin the foreseeable future."  (Dkt. No. 267-6 ¶ 7.)  Ms. Barnes attests

26  she believes "it is more likely than not that in the next year or two [she] will undertake a project

27  for which [she] would like to obtain financing if available":

28

> Whether I would want to use cash or financing on a project would
> generally depend on the project and how much it costs.  Between the
> home-improvement projects I plan to do as of today, and the periodic
> home-repair projects that tend to arise, I believe it is more likely than
> not that in the next year or two I will undertake a project for which I
> would like to obtain financing if available.

(*Id.* ¶ 8.)  She continues she "would like to be able to finance those projects using a GreenSky

loan, but only if [she] could trust that GreenSky is no longer breaking the law." (*Id.*)

As an initial matter, the Court declines GreenSky's request to strike Ms. Barnes's

declaration as a sham affidavit.  To trigger this rule, "the district court must make a factual

determination that the contradiction is a sham, and the inconsistency between a party's deposition

testimony and subsequent affidavit must be clear and unambiguous to justify striking the

affidavit." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quotation marks omitted); *Van

Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quotation marks omitted) ("the

sham affidavit rule should be applied with caution").  Because Ms. Barnes equivocated during her

deposition—ultimately concluding she would "possibly" seek another GreenSky loan—her

subsequent attestation that she would "more likely than not" finance a project using GreenSky is

not clearly and unambiguously inconsistent so as to trigger the sham affidavit rule.

Drawing inferences in Plaintiffs' favor, the evidence that Ms. Barnes will likely seek

financing from GreenSky for a future home repair project creates a genuine dispute as to Ms.

Barnes's threat of future harm.  The cases GreenSky cites to dispute this conclusion are

distinguishable.  Those cases involved physical products, which plaintiffs can possess a concrete

plan to purchase in the future, so plaintiffs who have no intention of re-purchasing such products

lack standing. *See, e.g.*, *In re Coca-Cola Prods. Mktg. & Sales Pracs. Litig*. No. 20-15742, 2021

WL 3878654, at *2 (9th Cir. Aug. 31, 2021) ("Without any stated desire to purchase Coke in the

future, [the plaintiffs] do not have standing to pursue injunctive relief."); *Lanovaz v. Twinings N.

Am., Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) (the plaintiff's "statement that she would

'consider buying' Twinings products does not satisfy" Article III standard); *Benton v. CVS

Pharmacy, Inc.*, 604 F. Supp. 3d 889, 893 (N.D. Cal. 2022) ("Plaintiffs express no interest in ever

purchasing homeopathic products in the future.").  In contrast, home repair projects arise

unexpectedly.  Ms. Barnes attests "[b]ased on [her] history owning the home, . . .  repair projects

27

arise at least once or twice a year." (Dkt. No. 267-6 ¶ 7.) That Ms. Barnes owns a home where repair projects tend to arise, "would like to obtain financing if available," and "would like to be able to finance [the] projects using a GreekSky loan" is evidence establishing a genuine dispute as to her "real and immediate threat of repeated injury." (*Id.* ¶¶ 6-9.) *See Bates,* 511 F.3d at 985. So, as to Ms. Barnes's claim for injunctive relief, the Court DENIES GreenSky's motion for summary judgment. If Plaintiffs prevail at trial, the Court will resolve factual disputes with respect to Ms. Barnes's standing to pursue injunctive relief during the equitable relief proceedings.

***

In sum, GreenSky is entitled to summary judgment on all performance fee-related claims, Ms. Barnes's UCL claim predicated on section 22305, Mr. Ferguson and Ms. Barnes's UCL claims predicated on section 22400, and Mr. Ferguson's claim for injunctive relief. The Court otherwise DENIES GreenSky's motion for summary judgment.

## III.    CLASS CERTIFICATION

Plaintiffs seek to certify the following class under Rules 23(b)(2) and 23(b)(3)[3]:

> All persons who secured in California, between January 9, 2016, and the present, a GreenSky Consumer Program loan for which the loan principal amount was $500 or higher and the associated transaction fee was at least 1% of the loan principal amount.

(Dkt. No. 235-3 at 19 (footnotes reproduced below).) [4]

"Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal

---

[3] This proposed class definition, from Plaintiffs' motion for class certification, is narrower than the definition in the operative complaint. While GreenSky objects via footnote, GreenSky does not explain how it is prejudiced by this smaller class.

[4] "The 'Greensky Consumer Program' refers to Greensky's lending and financing program aimed at facilitating home-improvement and home-maintenance loans for consumers, as distinct from Greensky's elective healthcare loans and other programs." (Dkt. No. 235-3 at 19 n.7.) "Excluded from the class are GreenSky Consumer Program loans bearing the following plan numbers: 2029, 2039, 2049, 2059, 2064, 2069, 2139, 2149, 2180, 2182, 2183, 2184, 2185, 2186, 2189, 2249, 2500, 2501, 2502, 2503, 2800, 2803, 2806, 2807, 2902, 2903, 7096, 7373, 7375, 7377, 7684, 9144, 9145, 9984, 9996, and 9999. Also excluded are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse; and members of the judge's staff." (*Id.* at 19 n.8.)

1    court." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). "Parties seeking

2    class certification must satisfy each of the four requirements of Rule 23(a) . . . and at least one of

3    the requirements of Rule 23(b)." *Id.* Plaintiffs bear the burden of establishing their proposed class

4    satisfies each requirement of Rule 23 by a preponderance of the evidence. *Lytle v. Nutramax*

5    *Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (en banc) (cleaned up).

6        The Court "must conduct a rigorous analysis to determine if the prerequisites of FRCP 23

7    have been satisfied." *Lytle*, 114 F.4th at 1023. While the class-certification analysis "may entail

8    some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license

9    to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut*

10   *Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (cleaned up). "Merits questions may be

11   considered to the extent—but only to the extent—that they are relevant to determining whether the

12   Rule 23 prerequisites for class certification are satisfied." *Id.*

13       **A.    Rule 23(A)**

14       Under Rule 23(a), a case is appropriate for certification if:

15           (1) the class is so numerous that joinder of all members is
             impracticable;
16           (2) there are questions of law or fact common to the class;
             (3) the claims or defenses of the representative parties are typical of
17           the claims or defenses of the class; and
             (4) the representative parties will fairly and adequately protect the
18           interests of the class.

19   Fed. R. Civ. P. 23(a).

20       **1.    Numerosity**

21       First, Plaintiffs must establish "the class is so numerous that joinder of all members is

22   impracticable." Fed. R. Civ. P. 23. "While there is no fixed number that satisfies the numerosity

23   requirement, as a general matter, a class greater than forty often satisfies the requirement, while

24   one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D.

25   Cal. 2012). Plaintiffs state the GreenSky Consumer Program included thousands of individuals,

26   (Dkt. No. 239-14 at 31), and GreenSky does not dispute this number or contest numerosity. So,

27   Plaintiff have satisfied the numerosity prerequisite.

28

United States District Court
Northern District of California

### 2.    Commonality

"To show commonality, Plaintiffs must demonstrate that there are questions of fact and law that are common to the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(a)(2)). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). To satisfy Rule 23(a)(2)'s commonality requirement, "even a single common question" is sufficient. *Dukes*, 564 U.S. at 359 (cleaned up).

Plaintiffs satisfy the commonality requirement. A central issue in the case is whether GreenSky's business falls within the purview of the Credit Act and Financing Law. GreenSky has argued and continues to assert it does not. (Dkt. No. 206 at 20 (GreenSky arguing it "does not remotely qualify as a 'finance lender'" under California law because it "is not in the business of 'making consumer loans' or 'lending money'"); Dkt. No. 242-6 at 24 n.12 ("GreenSky intends to litigate the applicability of the [Credit Act] . . . on a more developed record.").) If GreenSky is right, it need not comply with the Credit Act and Financing Law, so contrary to Plaintiffs' allegations, GreenSky's operations do not violate those laws. Because Plaintiffs have presented a question, the answer to which "will resolve an issue that is central to the validity of each one of the claims in one stroke," Plaintiffs have met the commonality requirement. *See Dukes*, 564 U.S. at 350.

GreenSky focuses on the merchant's discretion about whether, and in what portion, to pass the transaction to the borrower. Such discretion, GreenSky contends, defeats commonality. But for the commonality inquiry, "even a single common question" is sufficient. *See Dukes*, 564 U.S. at 359 (cleaned up). So, Plaintiffs have met their burden on commonality.

### 3.    Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality serves to ensure that the interest of the named representative aligns with the interests of

the class." *Ruiz Torres*, 835 F.3d at 1141 (quotations and citations omitted). "Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.* (cleaned up). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Plaintiffs have established typicality. Ms. Barnes and Mr. Ferguson allege they financed home-improvement projects through the GreenSky Consumer Program loans in California, GreenSky unlawfully collected some of the money paid, and as a result, they "paid more than [they] otherwise would have." (Dkt. No. 216 ¶¶ 77, 87.) They seek to represent a class of California consumers subject to "the same course of conduct." *See Ruiz Torres*, 835 F.3d at 1141. So, Plaintiffs have met the burden of establishing typicality. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class."). This is true even though Ms. Barnes's loan, which was greater than $5,000, did not violate section 22305.[5] The Ninth Circuit does not require that every named plaintiff be able to litigate every claim.

GreenSky's statute of limitations defense does not defeat typicality. It is true "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class

---

[5] A subclass is likely appropriate for individuals, like Mr. Ferguson, who have a section 22305 claim because their loan is less than $5,000. The "district court's broad power under Fed. R. P. 23(d) to adopt procedural innovations to facilitate management of the class action" includes the power to create subclasses. *Am. Timber & Trading Co. v. First Nat. Bank of Oregon*, 690 F.2d 781, 786 (9th Cir. 1982). In *American Timber*, the Ninth Circuit affirmed creation of a subclass that would facilitate determining damages "by segregating the compensating balance issue which was common to some members of the existing subclass." *Id.* at 786. Because all the members of the subclass were members of other classes, "it [was] unnecessary to evaluate it under Rule 23(c)(4) for commonality, numerosity, typicality, and adequacy of representation." *Id.* n.5; *see also* Newberg and Rubenstein on Class Actions § 7:29 (6th ed.) (explaining "permissive subclasses" created to promote efficiency, not to address a conflict of interest among class members, need not "have different representation and independently comply with all of the requirements of Rule 23(a), (b), and (g)"). So, at the case management conference, the parties should be prepared to address whether a subclass is appropriate for individuals with a section 22305 claim.

members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citations omitted). In *Hanlon*, the named plaintiff was uniquely susceptible to the defense of non-reliance due to his "extensive experience in prior securities litigation, his relationship with his lawyers, his practice of buying a minimal number shares of stock in various companies, and his uneconomical purchase of only ten shares of stock in Dataproducts." *Id.* Here, in contrast, the statute of limitations defense is not unique to Ms. Barnes. Rather, thousands of class members who originated loans between January 9, 2016 (the first day of the proposed class period) and January 9, 2017 will be subject to the same defenses. (255-4 ¶ 25.) Nor is Ms. Barnes's basis for tolling the statute of limitations unique to her. Plaintiffs' argument that GreenSky's loan agreement did not put borrowers on notice of GreenSky's unlawful collection of fees applies equally to Ms. Barnes as it does the class members she seeks to represent. So, Ms. Barnes's claims are typical in spite of and because of the statute of limitations defense. *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 608 (N.D. Cal. 2018) ("To be typical, a class representative need not prove that she is immune from any possible defense . . . . Instead, she must establish that she is not subject to a defense that is not typical of the defenses which may be raised against other members of the proposed class.") (cleaned up). Greensky offers no evidence that suggests the statute of limitations defense for any class member would be different from Ms. Barnes, let alone different enough so that she does not satisfy the typicality requirement.

Likewise, the arbitration agreements do not defeat typicality. This is not a case where the named plaintiff was one of a handful of individuals who opted out of the arbitration agreement. *See, e.g.*, *Tan v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016), *aff'd sub nom. Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021) (concluding the named plaintiff's claims were not typical because he "[was] one of just two individuals in California to opt out of the class action waiver provisions" and thus was "in a position unique from all but one other driver in California"). Rather, Ms. Barnes is typical of the plaintiffs who signed an agreement from May to October 2016 that did not contain an arbitration agreement, and Mr. Ferguson is typical of the class members who signed agreements outside this period.

Moreover, the Ninth Circuit already concluded GreenSky's agreement with Mr. Ferguson was insufficient to form an agreement to arbitrate, *see Ferguson v. GreenSky, Inc.,* No. 22-15780, 2023 WL 4462126, at *2 (9th Cir. July 11, 2023), and the language in Mr. Ferguson's agreement resembles that of other class members.  (Dkt. No. 235-4 ¶ 11.)  So, were GreenSky to again raise an arbitration defense, the defense as applied to Mr. Ferguson would be typical as applied to the class.

### 4.     Adequacy

Like typicality, adequacy of representation ultimately concerns whether the class action device will protect the interests of absent class members.  *Dukes*, 564 U.S. at 349 n.5.  Courts ask, "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the actions vigorously on behalf of the class?"  *Evon v. L. Offs. of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (cleaned up); *see also Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992) (noting adequacy of representation "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." (cleaned up)); Fed. R. Civ. P. 23(g)(1).  Given no conflicts are apparent between the named plaintiffs and other class members, and class counsel is experienced in class action employment litigation, the adequacy requirement is met.  (Dkt. Nos. 235-4 ¶¶ 3-7; 241-3 ¶¶ 3-9, 241-4 ¶¶ 3-7.)

So, Plaintiffs have satisfied the requirements of Rule 23(a).

### B.     Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.     Predominance

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual

issues." *Olean*, 31 F.4th at 664.  "An individual question is one where members of a proposed

class will need to present evidence that varies from member to member, while a common question

is one where the same evidence will suffice for each member to make a prima facie showing [or]

the issue is susceptible to generalized, class-wide proof." *White v. Symetra Assigned Benefits*

*Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577

U.S. 442, 453 (2016)).  "Considering whether questions of law or fact common to the class

predominate begins, of course, with the elements of the underlying cause of action." *Erica P.*

*John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (cleaned up).  "[T]he Court

identifies the substantive issues related to plaintiff's claims . . . ; then considers the proof

necessary to establish each element of the claim or defense; and considers how these issues would

be tried." *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 426 (N.D. Cal. 2013).  Plaintiffs

seek certification of three claims: (1) violation of the Credit Act, (2) violation of the UCL's

unlawful prong via a predicate violation of the Financing Law, and (3) unjust enrichment.

### a.   Credit Act (Count I)

To prevail on their Credit Act claim, Plaintiffs must first establish GreenSky is a "credit

services organization" as defined by the Act.  This element is common to the class, because

whether GreenSky "[p]rovid[es] . . . assistance to a consumer" in "[o]btaining a loan or other

extension of credit" can be established through common evidence.  Cal. Civ. Code § 1789.12(d).

Tellingly, based on the record before it, the Ninth Circuit concluded "[t]here is no genuine factual

dispute that GreenSky is a 'credit services organization' under the Credit Services Act. *Ferguson*,

2023 WL 4462126, at *1.

Likewise, the issue of whether GreenSky violated the Credit Act is susceptible to

classwide proof.  In the operative complaint, Plaintiffs allege GreenSky violated the act by:

collecting fees in violation of section 1789.13(d)(2); failing to provide specific disclosures; failing

to disclose its role as a credit services organization and the nature and amount of fees charged in

connection with the loans, thereby deceiving consumers; advertising services without being

registered; directly or indirectly extending credit to consumers; referring consumers to bank

partners that provide services related to the extension of credit; and evading the prohibitions in the

34

Credit Act.  (Dkt. No. 216 ¶ 109.)  Whether such violations occurred can be established through common evidence.  For example, GreenSky is or is not registered, and it did or did not provide customers the requisite information statement.

GreenSky does not dispute the existence of classwide evidence to establish the above two elements.  In disputing predominance, GreenSky argues individualized evidence will be required to establish (1) detrimental reliance, (2) injury, and (3) damages.  The Court addresses each argument in turn.

### i.    Detrimental Reliance

GreenSky argues Plaintiffs must establish detrimental reliance for their Credit Act claim, and "[i]ssues concerning reliance are generally inappropriate for class certification."  (Dkt. No. 242-6 at 27.)  GreenSky's single citation for the detrimental reliance requirement is an unpublished Ninth Circuit opinion.  *Reyes v. Auburn Nissan*, 168 F.3d 501 (9th Cir. 1999).  And in *Reyes*, the Ninth Circuit did not determine whether detrimental reliance was the standard for Credit Act (and Truth in Lending Act) claims because "notwithstanding the proper standard," the plaintiffs did not seek any individualized determination of the paid amount.  *Id.*  So, the Court declines to deny certification on this basis.

### ii.    Injury

Plaintiffs must establish they were injured by a violation of the Credit Act.  *See* Cal. Civ. Code § 1789.21(a) ("Any consumer injured by a violation of this title or by the credit services organization's breach of a contract subject to this title may bring any action for recovery of damages, or for injunctive relief, or both.").  As explained above, a violation of section 1789 by itself is insufficient to establish injury.  But Plaintiffs have presented common evidence of injury through Dr. Williams's report, which concludes *every* class member paid transaction fees in the form of inflated project costs.  (Dkt. No. 239-14 ¶ 57.)  Because every class member can rely on Dr. Williams's report to establish injury, common questions predominate as to injury.  *See Olean,* 31 F.4th at 667 (quoting *Tyson Foods*, 577 U.S. at 456) (stating the predominance requirement is met "[i]f each class member could have relied on the [report] to establish liability if he or she had brought an individual action, and the evidence could have sustained a reasonable jury finding on

35

1    the merits of a common question") (cleaned up).  Put another way, Dr. Williams's report can

2    resolve the injury issue "in a single stroke."  *See Olean*, 31 F.4th at 682.  If a jury decides Dr.

3    Williams's report is not persuasive, then the class members have not proved injury and the Credit

4    Act claim fails—in a single stroke.  Conversely, if a jury decides Dr. Williams's report is

5    persuasive, then every class member has established injury—again in a single stroke.  *See Tyson*,

6    577 U.S. at 457 (the question whether the expert's "study was unrepresentative or inaccurate" was

7    "itself common to the claims made by all class members").  At oral argument, Plaintiffs

8    acknowledged that if the fact finder does not believe Dr. Williams's report, GreenSky prevails on

9    every class member's claims.  (Dkt. No. 276 at 42.).

10        GreenSky argues Dr. Williams's report does not constitute classwide evidence of injury

11    because his 42.5% figure assesses average, not common, impact.  But the Ninth Circuit recently

12    affirmed use of a similar classwide percentage.  In *Olean*, the plaintiffs brought an antitrust class

13    action against the major U.S. packaged tuna suppliers, alleging the suppliers engaged in unlawful

14    price fixing.  31 F.4th at 662.  The economists, including Dr. Williams, used regression analyses

15    to "test and isolate the extent to which the actual prices paid by plaintiffs [were] higher because of

16    a defendant's collusive behavior." *Id.* at 671.  For the subclass of direct purchasers, the economist

17    produced a regression model showing subclass members "paid 10.28 percent more for tuna during

18    the conspiracy period than they did during the benchmark periods." *Id.*

19        On appeal, the defendants argued the regression model "assume[d] that all [subclass

20    members] were overcharged by the same uniform percentage (10.28 percent)" when in fact there

21    were "individualized differences among class members," such as "different bargaining power

22    among the purchasers." *Id.* at 677.  The Ninth Circuit concluded even if a class member's

23    overcharge was above or below the 10.28 percentage, the figure was still capable of showing

24    class-wide impact:

25            For purposes of determining whether each member of the . . . class
              can rely on the model to prove antitrust impact, it is irrelevant whether
26            actual sales data shows a specific class member was overcharged by
              more or less than 10.28 percent.  Rather, the question is whether each
27            member of the class can rely on [the economist's] model to show
              antitrust impact of any amount. The district court did not abuse its
28            discretion in finding that each member could.

*Id.* at 679.  The dissent emphasized the expert merely "concluded that tuna producers overcharged the direct purchases by an *average* of 10.28%."  *Id.* at 686 (Lee, J., dissenting) (emphasis added).  But as the *Olean* majority determined the 10.28% figure demonstrated common impact despite evidence of "overcharges both above and below" this figure, *id.* at 679, so the Court here holds the 42.5% figure is capable of representing common impact.

GreenSky argues *Olean* is inapposite because it was an antitrust case involving market-wide price-fixing whereas this case involves thousands of individual merchants.  *See Wright v. Greensky Mgmt. Co., LLC*, No. 20-CV-62441, 2022 WL 17250331, at *8 (S.D. Fla. Nov. 28, 2022) ("It is . . . simpler to demonstrate impact and damages using a regressive analysis in an antitrust case because an entire market is affected by the complained of scheme.").  But even in the antitrust context, the *Olean* dissent raised concerns about individualized differences among class members, which the majority rejected.  For example, the dissent asserted the expert's assumption of class-wide impact "flies against common sense and empirical evidence" because "[p]owerful retailers (like Walmart) . . . will fiercely negotiate the list price down, or more likely, demand promotional credits or rebates that offset any price increase," so Walmart may not have suffered any injury, let alone injury at the 10.28% figure.  *Olean*, 31 F.4th at 689-90 (Lee, J., dissenting).  While the non-antitrust nature of this case may make Dr. Williams's analysis less persuasive to a jury, it does not render the report incapable of demonstrating classwide impact.

*Walmart v. Dukes*, the primary case GreenSky relies on, is distinguishable.  In *Dukes*, the plaintiffs alleged Wal-Mart "discriminated against them on the basis of their sex by denying them equal pay or promotions."  564 U.S. at 343.  The Supreme Court concluded class certification was improper because the plaintiffs failed to establish "a common answer to the crucial question *why was I disfavored*."  *Id.* at 352.  The Court rejected the plaintiffs' attempt to prove commonality through regression analyses indicating there were "statistically significant disparities between men and women at Wal-Mart . . . [and] these disparities . . . can be explained only by gender discrimination."  *Id.* at 356.  The Court reasoned such disparities could not raise the inference of a company-wide policy or "establish the uniform, store-by-store disparity upon which the plaintiffs'

theory of commonality depends." *Id.* at 357.  Here, Dr. Williams's expert report purports to do what the Wal-mart plaintiffs' expert report did not: establish a uniform practice of passing on transaction fees.  (Dkt. No. 239-14 ("the analysis indicates that 100% of Class Members were injured.").)  So, Plaintiffs have refuted GreenSky's emphasis on merchant discretion with an expert report "demonstratin[ing] that at least a portion of the GreenSky transaction fees was passed through to all Class Members."  (Dkt. No. 239-14 ¶ 57.)  Whether the expert report is persuasive is a question for the jury.  *Olean*, 31 F.4th at 667-78 ("[I]t is for the jury, not the court, to decide the persuasiveness of [the expert's] evidence in light of common sense and empirical evidence."); *see also Lytle*, 114 F.4th at 1025 ("Requiring that class action plaintiffs actually prove classwide injury at this stage would improperly conflate the class certification inquiry with the merits.").

### iii.      Damages

In its *Daubert* motion, GreenSky argues that even if Plaintiffs establish classwide injury by establishing that at least some portion of the transaction fee was borne by each class member, due process requires Plaintiffs to prove at the damages phase precisely how much of the fee was passed along to each class member by each merchant.  (Dkt. Nos. 247-5 at 31; 262-3 at 8.)  So, the Court understands GreenSky to argue that individualized questions regarding damages predominate.  In *Comcast Corp. v. Behrend*, the Supreme Court held when plaintiffs cannot establish "that damages are capable of measurement on a classwide basis," plaintiffs "cannot show Rule 23(b)(3) predominance" because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  569 U.S. 27, 34 (2013).  This circuit has "interpreted *Comcast* to mean that plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (quotation marks omitted).  Meanwhile, the Ninth Circuit "reaffirmed that damage calculations alone cannot defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015).  So, "[t]he rule is clear: the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *Olean*, 31 F.4th at 681–82

38

1   ("[T]here is no per se rule that a district court is precluded from certifying a class if plaintiffs may

2   have to prove individualized damages at trial.").

3        At oral argument, Plaintiffs stated Dr. Williams's 42.5% common-impact finding may be

4   used to calculate damages.  This is consistent with Dr. Williams's deposition.  While noting he

5   had not been asked to determine a method to calculate individual damages, Dr. Williams stated he

6   could "take [each class member's] transaction fee . . . [and] multiply it by that 42.5 percent."

7   (Dkt. No. 246-4 at 16.)  This proposed methodology mirrors *Olean*, where the "proposal for

8   calculating damages" was "a straightforward process of applying the class-wide overcharge to the

9   Tuna Purchasers' net sales records."  *Olean*, 31 F.4th at 682 n.31.  The Ninth Circuit affirmed this

10  approach while acknowledging "actual sales data show[ing] a specific class member was

11  overcharged by more or less than 10.28 percent."  *Id.* at 679.  And it did so over strenuous

12  objections from the dissent and the defendants about individualized differences requiring mini-

13  trials to determine the damages for each class member.  *Id.* at 691.  The Ninth Circuit's holding in

14  *Olean* reflects the reality that that "[d]amages calculations have long been understood to involve a

15  degree of approximation."  *Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL

16  1947512, at *22 (N.D. Cal. May 14, 2021).  "[A]s long as a valid method has been proposed for

17  calculating those damages"—as there is here—"uncertainty regarding class members' damages

18  does not prevent certification of a class."  *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th

19  Cir. 2019); *see also Vaquero*, 824 F.3d at 1155 (affirming class certification "even if the measure

20  of damages proposed here [was] imperfect").  And outside the antitrust context, courts have

21  granted class certification when damages would be calculated using a single overpayment

22  percentage.  *See, e.g.*, *In re University of Southern California Tuition and Fees COVID-19 Refund

23  Litigation*, 695 F. Supp. 3d 1128, 1137 (C.D. Cal. 2023); *Behar v. Northrop Grumman Corp.*, No.

24  2:21-CV-03946-HDV-SKX, 2024 WL 4004052, at *1 (C.D. Cal. July 1, 2024).

25       In the single (and out-of-circuit) case GreenSky cites to support its insistence Plaintiffs'

26  proposed damages calculation violates due process, the court denied class certification because the

27  six proposed subclasses "mask[ed] a staggering contractual variety."  *Sacred Heart Health Sys.,

28  Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010) (quotation

marks omitted).  In *Sacred Heart*, when a "'potpourri' subclass . . . [was] broken down into its disparate component parts, the illusion of uniformity [gave] way to nearly thirty subclasses," creating "a distinct possibility that there was a breach of contract with some class members, but not with other class members." *Id.* at 1176 (quotation marks omitted).  The proposed amalgamation of claims stemming from distinct contracts triggered the Eleventh Circuit's due process concern, not damages calculations.  So, *Sacred Heart* is inapposite.

Likewise, GreenSky's citation to *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459 (9th Cir. 2023) is unavailing.  In *Bowerman*, the plaintiffs argued the defendant, by misclassifying them as independent contractors, failed to pay overtime compensation and indemnify them for business expenses.  *Id.* at 464-65.  The Ninth Circuit reversed the district court's order granting class certification, concluding "any common question as to misclassification [was] outweighed by the individual questions going to injury and damages."  *Id.* at 469.  The *Bowerman* class members had to "rely[] on individual testimony to establish the existence of an injury and the amount of damages," which was no "simple matter."  *Id.* at 469-70.  In the bellwether trial, it took eight days to determine the damages for 11 of the 156 class members, as individual class members "relied on their unaided memories as the primary or sole evidence of their work schedules."  *Id.* at 470.  The *Bowerman* court observed "[t]he 'individualized mini-trials' required to establish liability and damages plainly distinguish this case from *Olean*, where the proposal for calculating damages for each class member—though individualized—was 'straightforward.'"  *Id.*  Here, under Plaintiffs' proposed methodology for calculating damages, individualized testimony will not be required.  Because this case more closely resembles *Olean* than *Bowerman*, individualized issues as to damages do not preclude class certification.

The outcome on this issue might be different if each class member's recovery would be in the thousands of dollars.  In *Bowerman*, for example, the jury verdict forms for the 11 bellwether trial plaintiffs reveal the plaintiffs were awarded sums ranging from $27,000 to $126,000.  (Case No. 13-cv-57, Dkt. No. 358.)  With damages figures so large and varied, to award class members a fixed percentage of the total sum recovered might raise due process concerns.  Here, in contrast, inaccuracies stemming from Plaintiffs' proposed method to calculate damages will be in the tens-

United States District Court
Northern District of California

1    of-dollars range.  Take Mr. Ferguson.  If Plaintiffs prevail and the Court applies the 42.5% figure

2    to the $107.79 transaction fee his contractor paid, (Dkt. No. 239-15 at 2-3), Mr. Ferguson is

3    entitled to approximately $46.  If the pass-through rate was actually 20% or 80%, then Mr.

4    Ferguson's recovery would be $22 or $86, respectively.  The difference between these figures

5    does not create a due process concern.  Nor does the difference between the figures elevate

6    individualized issues as to damages over issues common to the class—particularly when all three

7    figures are too small to warrant separate lawsuits.  In light of the relatively small sum each class

8    member will recover if Plaintiffs prevail, this case is ideally suited for classwise resolution.

9         In sum, the Court concludes common issues predominate as to Plaintiffs' Credit Act

10   claims.

11                          **b.     UCL (Count II)**

12        To prevail on their claim GreenSky violates the unlawful prong of the UCL by violating

13   the Financing Law, Plaintiffs must first prove GreenSky acts as a loan "broker" under the

14   Financing Law.  Whether GreenSky "engaged in the business of negotiating or performing any act

15   as broker in connection with loans made by a finance lender" will be established by common

16   evidence, including GreenSky's agreements and communications with its banking partners and

17   consumers.  *See* Cal. Fin. Code § 22004.  So, this element is common to the class.

18        Next, Plaintiffs must establish GreenSky violated one or more provisions of the Financing

19   Law.  In the operative complaint, Plaintiffs allege GreenSky violated the Financing Law by

20   "operat[ing] throughout California without complying with the licensing and application

21   procedures"; failing to disclose its role as a lender and broker and the amount of fees charged;

22   charging excessive administrative fees; receiving amounts exceeding the limits provided; and not

23   obtaining a surety bond.  (Dkt. No. 216 ¶ 116.)  Common evidence will establish whether

24   GreenSky is or is not licensed, whether it does or does not have a surety bond, and whether it

25   charges transaction fees exceeding the caps provided by the Financing law, so this element is

26   common to the class.

27        Finally, as discussed above, individual issues as to injury and damages do not defeat

28   predominance.  This is especially so in the context of the UCL, as "[c]lass wide damages

                                         41

1   calculations under the UCL . . . are particularly forgiving." *Lambert v. Nutraceutical Corp.*, 870

2   F.3d 1170, 1183 (9th Cir. 2017), *rev'd on other grounds*, 586 U.S. 188 (2019). "[A] court need

3   not make individual determinations regarding entitlement to restitution"; instead, it "is available

4   on a classwide basis once the class representative makes the threshold showing of liability under

5   the UCL." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015); *see*

6   *also In re Tobacco II Cases*, 46 Cal. 4th 298, 326, 207 P.3d 20, 39 (2009) (quoting *Massachusetts*

7   *Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282 (2002)) ("California courts have

8   repeatedly held that relief under the UCL is available without individualized proof of . . . injury.").

9        In sum, the Court concludes common issues predominate as to Plaintiffs' UCL claims.

10               **c.**     **Unjust Enrichment**

11        To prevail on their unjust enrichment claim, Plaintiffs must establish "receipt of a benefit

12   and unjust retention of the benefit at the expense of another." *Lectrodryer v. SeoulBank*, 77 Cal.

13   App. 4th 723, 726, 91 Cal. Rptr. 2d 881 (2000). Plaintiffs can rely on class-wide proof in arguing

14   GreenSky received a benefit through transaction fees it was not authorized to collect. Likewise,

15   common evidence—specifically Dr. Williams's report—can establish whether Plaintiffs conferred

16   a benefit on GreenSky in the form of inflated project costs, in which case GreenSky's retention of

17   the transaction fees was at Plaintiffs' expense.

18        In so holding, the Court rejects Plaintiffs' argument that class members need not show they

19   made payments to GreenSky to allege a claim for unjust enrichment. As described above,

20   Plaintiffs' citations to data privacy cases on this point are inapposite and unpersuasive. To permit

21   plaintiffs who have not been injured to pursue their claims under the label "unjust enrichment"

22   "would allow them to circumvent the law and public policy reflected in (1) section 17204's

23   mandate that only an injured plaintiff may assert a private action under the UCL, and (2) the

24   Legislature's decision *not* to create a private right of action for violations of the [Finance Law]

25   sections relevant to this case." *Peterson*, 164 Cal. App. 4th at 1595.

26        So, the Court concludes common issues predominate as to Plaintiffs' unjust enrichment

27   claim. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942,

28   997 (N.D. Cal. 2022) ("generally, unjust enrichment claims are appropriate for class certification

1  as they require common proof of the defendant's conduct and raise the same legal issues for all

2  class members") (cleaned up).

3          **2.     Superiority**

4          To certify, a class action must be "superior to other available methods for fairly and

5  efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Courts consider the following

6  factors:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy
> already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of
> the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

11  *Id.*  "[T]hese factors require[] the court to focus on the efficiency and economy elements of the

12  class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most

13  profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190

14  (9th Cir. 2001) (cleaned up).

15          Because "recovery on an individual basis would be dwarfed by the cost of litigating on an

16  individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N.*

17  *Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  This is true even though a few plaintiffs,

18  including Ms. Belyea and Ms. Lodge, pursued individual claims in arbitration. *See Moore v. Ulta*

19  *Salon, Cosms. & Fragrance, Inc.*, 311 F.R.D. 590, 624 (C.D. Cal. 2015) ("the presence of a few

20  other suits does not undercut the court's superiority conclusion") (cleaned up.)

21          The Court is not persuaded by GreenSky's citation to *Soares v. Flowers Foods, Inc.*, 320

22  F.R.D. 464 (N.D. Cal. 2017).  In *Soares*, the fact that "26 Distributors ha[d] brought individual

23  claims . . . suggest[ed] that requiring individual actions in lieu of this class action would not

24  overburden the courts." *Id.* at 475.  Whereas the *Soares* class contained approximately 150

25  individuals, *id.* at 474, the proposed class here numbers in the hundreds of thousands.  Further, the

26  *Soares* class members had a strong interest in making individual litigation decisions as their

27  potential damages were in the six figures, not around $50 like Mr. Ferguson here. *Id.* at 485.  So,

28  a handful of individual actions in this case does not similarly suggest individual lawsuits are

1   superior.

2   * * *

3   In sum, because Plaintiffs satisfy Rule 23(a) and 23(b)(3), their motion to certify the (b)(3)

4   class is GRANTED.

5   **C.    Rule 23(b)(2)**

6   To satisfy Rule 23(b)(2), Plaintiffs must show GreenSky "has acted or refused to act on

7   grounds that apply generally to the class, so that final injunctive relief or corresponding

8   declaratory relief is appropriate respecting the class as a whole[.]"  Fed. R. Civ. P. 23(b)(2).  "In a

9   class action, standing is satisfied if at least one named plaintiff meets the requirements."  *See Bates*

10  *v. United Parcel Service, Inc.,* 511 F.3d 974, 985 (9th Cir. 2007).  GreenSky argues neither named

11  Plaintiff has standing to seek injunctive relief so certification of the (b)(2) class is inappropriate.

12  Because the Court denied GreenSky's motion for summary judgment as to Ms. Barnes's claim for

13  injunctive relief, Ms. Barnes has standing to pursue injunctive relief.

14  In sum, because Plaintiffs satisfy Rule 23(a) and 23(b)(2), their motion to certify the (b)(2)

15  class is GRANTED.

16  **CONCLUSION**

17  For the reasons stated above, the Court DENIES GreenSky's motion to exclude the report

18  of Dr. Williams.

19  The Court GRANTS GreenSky's motion for summary judgment on all performance fee-

20  related claims, Ms. Barnes's UCL claim predicated on section 22305, Mr. Ferguson and Ms.

21  Barnes's UCL claims predicated on section 22400, and Mr. Ferguson's claim for injunctive relief.

22  The Court otherwise DENIES GreenSky's motion for summary judgment.

23  The Court GRANTS Plaintiffs' motion for class certification.  Accordingly, Plaintiffs'

24  Credit Act, UCL, and Unjust Enrichment claims are certified as to the following class:

25      All persons who secured in California, between January 9, 2016, and
        the present, a GreenSky Consumer Program loan for which the loan
26      principal amount was $500 or higher and the associated transaction
        fee was at least 1% of the loan principal amount.
27

28  The class definition has certain exclusions.  (Dkt. No. 235-3 at 19 n.2.)  The Court appoints Gibbs

*United States District Court*
*Northern District of California*

44

1    Law Group LLP, Cohen Milstein Sellers & Toll PLLC, and Bell Law, LLC, as Class Counsel.  A

2    further case management conference is set for February 13, 2025 at 1:30 p.m. by Zoom video.  An

3    updated joint case management conference statement, which shall include a proposed case

4    schedule through trial, is due February 6, 2025.  In the meantime, the parties should meet and

5    confer on the form of class notice and include it with the case management conference statement.

6    Plaintiffs shall also attach to the statement a proposed form of verdict.

7        This Order disposes of Docket Nos. 241, 248, and 254.

8        **IT IS SO ORDERED.**

9    Dated: January 2, 2025

JACQUELINE SCOTT CORLEY
United States District Judge